**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

IN RE GENERAL CABLE CORPORATION SECURITIES LITIGATION

Civil Action No. 2:17-cv-00025-WOB-CJS

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

CLASS ACTION

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

**Page**


I. NATURE OF THE ACTION AND OVERVIEW ........ 2

II. JURISDICTION AND VENUE ........ 8

III. PARTIES AND RELEVANT NON-PARTIES ........ 9

A. Lead Plaintiff ........ 9

B. Defendants ........ 9

C. Relevant Non-Parties ........ 11

1. General Cable Subsidiaries ........ 11

2. Former General Cable Employees ........ 14

IV. FACTUAL BACKGROUND ........ 17

A. Factual Background ........ 17

1. Before and During the Class Period, General Cable Greatly Expanded Its Overseas Operations ........ 17

2. The FCPA ........ 19

B. Defendants Lied to Investors Regarding General Cable's Efforts to Ensure Compliance with and the Effectiveness of Internal Controls Concerning the FCPA During the Class Period ........ 23

1. Defendants Had No Basis to Assure Investors that General Cable Had Effective FCPA Policies, Procedures, and Controls in Place During the Class Period ........ 24

a. General Cable Did Not Have Effective Policies, Procedures, or Internal Controls to Ensure FCPA Compliance ........ 25

b. Defendants' Lack of Commitment to and Ineffective Communication of FCPA Compliance ........ 28

i. Defendants Failed to Set the "Proper Tone" with Respect to FCPA Compliance ........ 29

ii. Defendants Failed to Ensure General Cable's FCPA Compliance Function Received Proper Oversight, Independence, and Resources ........ 31

iii. Defendants Failed to Effectively Communicate FCPA Compliance Objectives to General Cable Employees and Third Party Agents ........ 34

c. Lack of Risk Assessment and Periodic Testing and Auditing ........ 35

i. Defendants Failed to Conduct a Comprehensive Assessment of the FCPA Compliance Risks Generated by General Cable's Overseas Operations ........ 35

ii. Defendants Failed to Conduct FCPA Periodic Compliance Testing or Auditing ..... 37

2. As a Result of General Cable's Deficient Internal Controls and Virtually Non-Existent Compliance Program, the Company Committed Widespread FCPA Violations ..... 38

a. Angola ..... 39

b. Thailand ..... 41

c. Bangladesh ..... 43

d. Indonesia ..... 44

e. China ..... 45

f. Egypt ..... 46

C. General Cable's Bribery Scheme Eventually Runs Its Course ..... 46

1. Defendants Become Aware of Red Flags Regarding General Cable's Lack of FCPA Compliance ..... 46

2. Internal Audit Alerts Defendants to Evidence of Corrupt Payments in Angola in 3Q 2012 ..... 49

3. Defendants Belatedly Commence an Internal Investigation, but Allow Additional FCPA Violations to Occur ..... 51

4. News of General Cable's FCPA Violations Begins to Emerge ..... 52

D. The Company's Disclosures of Its FCPA Violations Prompt Criminal and Civil Investigations, Resulting in Severe Penalties ..... 54

1. Criminal Investigation by the Department of Justice ..... 54

2. The SEC's Investigation ..... 56

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ..... 56

A. FY 2011 Form 10-K, 1Q 2012 Form 10-Q, and 2Q 2012 Form 10-Q ..... 57

B. FY 2011 Form 10-K/A, FY 2012 Form 10-K, 3Q 2012 Form 10-Q, and 1Q 2013 Form 10-Q ..... 64

C. FY 2011 2nd Form 10-K/A, FY 2012 Form 10-K/A, Forms 10-Q/A for 1Q-3Q 2012 and 1Q 2013, and Forms 10-Q for 2Q-3Q 2013 ..... 68

D. FY 2013 Form 10-K and 1Q 2014 Form 10-Q ..... 72

VI. LOSS CAUSATION AND EMERGENCE OF THE RELEVANT TRUTH ..... 72

A. September 22, 2014 Partial Corrective Disclosure ..... 74

B. October 29, 2014 Partial Corrective Disclosure ..... 75

C. February 10, 2016 Partial Corrective Disclosure ..... 77

VII. ADDITIONAL SCIENTER ALLEGATIONS ..... 79

A. General Cable Has Admitted to Knowingly Paying Bribes in Violation of the FCPA and to Knowingly and Willfully Failing to Implement Effective Policies, Procedures, and Internal Controls to Ensure FCPA Compliance........... 80

1. General Cable Knowingly Made Corrupt Payments in Violation of the FCPA........ 80

2. General Cable Failed to Implement Effective Policies, Procedures, and Internal Controls to Ensure FCPA Compliance........ 82

B. Internal Reports of Corrupt Payments and Inadequate Policies, Procedures, and Controls Concerning FCPA Compliance Diverged from Defendants' Public Statements to Investors........ 84

1. Internal Reports of Corrupt Payments........ 84

2. Internal Reports of Inadequate Policies, Procedures, and Controls Concerning FCPA Compliance........ 85

C. Kenny and Robinson Knowingly or Recklessly Disregarded General Cable's Obligations Under the FCPA........ 86

D. The Knowledge of Senior Executives and Other High Managerial Agents is Imputed to General Cable........ 89

VIII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE........ 92

IX. CONTROLLING PERSON ALLEGATIONS........ 93

X. CLASS ACTION ALLEGATIONS........ 95

XI. LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE........ 97

XII. JURY TRIAL DEMANDED........ 104

Lead Plaintiff William Edward Long, as Trustee of the UA 09-21-2001 William Edward Long & Bonnie Diane Long Living Trust ("Lead Plaintiff"), makes the following allegations against Defendants General Cable Corporation ("General Cable" or the "Company"), Gregory B. Kenny ("Kenny"), and Brian J. Robinson ("Robinson") (collectively, "Defendants") for violations of Sections 10(b) and/or 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5, individually and on behalf of all individuals or entities that purchased or otherwise acquired the General Cable's common stock (the "Class") between February 23, 2012 and February 10, 2016, inclusive (the "Class Period"). Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.

Except as to allegations specifically pertaining to Lead Plaintiff's own acts, the allegations herein reflect Lead Plaintiff's information and belief based upon a continuing investigation by Lead Plaintiff's counsel, which includes, but is not limited to, the review and analysis of: (i) General Cable's public filings with the SEC; (ii) Defendants' press releases and other public statements; (iii) securities analysts' reports about General Cable; (iv) transcripts of General Cable's conference calls with securities analysts and investors; (v) media reports concerning General Cable; (vi) data and other publicly available information concerning General Cable securities; (vii) the December 22, 2016 Non-Prosecution Agreement entered into by General Cable and the United States Department of Justice ("DOJ") regarding the General Cable Corporation Criminal Investigation ("Non-Prosecution Agreement" or "NPA"); (viii) the December 29, 2016 Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order entered in *In*

*the Matter of General Cable Corp.*, File No. 3-17755, SEC Release No. 79703 (Dec. 29, 2016) (the "Cease-and-Desist Order"); and (ix) interviews of numerous former employees of General Cable. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This securities fraud class action arises out of General Cable's admitted, decade-long bribery scheme involving operations in at least five different countries on two continents, and the generation of tens of millions of dollars in profits through corrupt payments in violation of the Foreign Corrupt Practices Act of 1977 ("FCPA").

2. General Cable manufactures and sells copper, aluminum, and fiber optic wire, and cable products for use in the energy, industrial, construction, specialty, and communications markets. Prior to and during the Class Period, General Cable vastly expanded the scope of its overseas operations, acquiring operations in Africa and the Asian-Pacific region beginning in 2010 and continuing through December 2012.

3. General Cable's overseas operations were critical to the Company as they accounted for nearly two-thirds of its annual revenues. Despite their importance to the business, however, several of the countries in which General Cable operated during the Class Period were well-known as breeding grounds for high levels of public sector corruption. In particular, Angola, a country in which the Company had operated since 1999, consistently placed in the top 10% of countries with the highest public sector corruption world-wide.

4. As a U.S. company, General Cable and all of its subsidiaries, both foreign and domestic, and all officers, directors, employees, and agents of such entities, were subject to the FCPA. The FCPA prohibits the payment of bribes by U.S. companies to secure business in foreign countries, and includes provisions to ensure that such companies maintain accurate books

and records and sufficient internal controls to help prevent the payment of bribes in violation of the FCPA. Failure to comply with any FCPA provisions can lead to the disgorgement of profits tied to the FCPA violations, civil and criminal fines, and material operational impacts, including the inability to maintain operations in counties where violations occurred.

5. Given the importance of both its overseas operations and its adherence to the requirements of the FCPA, Defendants reassured Class Period investors that General Cable had (i) policies and procedures in place to ensure compliance with the FCPA, and (ii) internal controls in place to safeguard, *inter alia,* that the Company's books and records were accurate, and the Company complied with the FCPA. Defendants also cautioned investors of certain risks posed by the Company's overseas operations, but notably omitted any discussion of the risks that would arise if the Company was found to have bribed foreign officials to secure work in violation of the FCPA. These representations were repeated in more than 15 annual and quarterly reports filed with the SEC during the Class Period, and signed by or on behalf of Defendants.

6. Unbeknownst to investors, however, Defendants did not implement any FCPA-specific policies, procedures, or internal controls to prevent FCPA violations. Defendants' wholesale disregard of General Cable's FCPA obligations—and disregard of their promises to investors—led to rampant bribery involving the Company's operations in Angola, Indonesia, Thailand, Bangladesh, China, and Egypt. When all was said and done, General Cable paid more than $13 million in bribes to secure more than $50 million in illegal profits.

7. The DOJ and SEC both commenced investigations into General Cable's overseas operations in January 2014. The DOJ and General Cable entered into a Non-Prosecution Agreement on December 22, 2016, which included detailed admissions on the part of the Company. The SEC issued a Cease-and-Desist Order against General Cable on December 29,

2016. The contents of the NPA and the Cease-and-Desist Order, along with the contemporaneous accounts of ***12 former General Cable employees*** identified through Plaintiff's investigation and designated herein as confidential witnesses ("CWs"), demonstrate that Defendants' Class Period statements concerning FCPA compliance were materially false or misleading at the time they were issued.

8. For example, contemporaneous accounts from the CWs both before and during the Class Period demonstrate that General Cable did not have in place even the basic elements of a suitable FCPA compliance program, let alone sufficient internal controls or "policies and procedures designed to ensure compliance" with the FCPA as represented by Defendants.

9. Specifically, the CWs, including the former Vice President of Internal Audit, confirm that General Cable lacked: (i) due diligence policies or procedures to guard against the Company's payment of bribes to third parties and agents in foreign countries; (ii) a central database or repository for information on its various agents and third parties; (iii) a commitment to compliance from senior management as they took a "head in the sand" approach to FCPA compliance and refused to dedicate the necessary resources to ensure compliance; (iv) a FCPA training program to enable its employees to detect FCPA violations; and (v) any sort of risk assessment, testing, or auditing of the Company's compliance with the FCPA.

10. The SEC likewise found – contrary to the Defendants' public statements – that General Cable violated the FCPA by failing to (i) "adequately train[]" its employees "on anticorruption risks;" (ii) "require third-parties;" with whom General Cable contracted to facilitate sales to state-owned enterprises ("SOEs"), "to comply with the FCPA;" and (iii) "perform any anticorruption due diligence on third parties."

11. Furthermore, as part of the NPA, General Cable was required to (i) "develop and

promulgate compliance policies and procedures designed to reduce the prospect of" FCPA violations, and (ii) "ensure that it ha[d] a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure" compliance with the FCPA's accounting provisions. These newly imposed requirements—i.e., to establish policies, procedures, and internal controls to ensure FCPA compliance—further demonstrates that those policies, procedures, and internal controls did not exist during the Class Period despite Defendants' representations to the contrary.

12. The admissions of the Company contained in the NPA, the SEC's findings, and the CWs' accounts likewise demonstrate that Defendants issued the alleged misstatements knowingly or with reckless disregard for their truth. For example, as part of the Non-Prosecution Agreement, General Cable admitted that it "***knowingly and willfully*** failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents." Similarly, General Cable ***conceded*** that it knew it had material internal control deficiencies and that these deficiencies allowed the corrupt payments to occur and continue.

13. As for the corrupt payments, General Cable also ***admitted*** to knowingly making corrupt payments in Angola, Indonesia, Thailand, Bangladesh, and China and, in certain instances, falsely recording these payments on its books and records in violation of the FCPA. For example, General Cable has admitted that by no later than December 2011, prior to the start of the Class Period, it was aware of bribes paid in Thailand, but nevertheless "closed [its] eyes" to the fact that the payments were "used for bribery." Likewise, General Cable admitted that it was aware of corrupt payments made in Angola to secure business with state owned entities by no later than December 2012. In all, the Company has admitted that it "made more than $13

million in payments to third-party agents and distributors which were used to make unlawful payments" to SOEs.

14. Furthermore, certain CWs recall specifically advising Defendant Robinson that General Cable did not have a sufficient FCPA compliance program in place and, in the case of an Angola audit conducted in 3Q 2012, the Company likely was making corrupt payments in violation of the FCPA. Robinson likewise knew that General Cable's audit plan did not include any FCPA specific testing or cover subsidiaries located in countries with high levels of public corruption. Robinson also was aware that General Cable had not devoted sufficiently numerous, or in the case of employees, competent, resources to ensure the Company complied with the FCPA.

15. The CWs' concerns, however, were not addressed by Robinson or Kenny. In fact, General Cable did nothing to address its failure to institute an effective FCPA compliance program until well into 2014, after the Company had made corrupt payments in six different countries over more than ten years.

16. Defendants' knowing and/or reckless disregard of the Company's FCPA obligations finally caught up to them and the risks associated with their misstatements and omissions began to materialize in late 2014.

17. Despite receiving a December 2012 audit report evidencing General Cable's payment of bribes to an Angolan agent for nearly a year and a second audit identifying additional red flags in August 2013, Defendants continued to allow General Cable's Angolan operation to work with the agent it was bribing to avoid losing millions in business. Indeed, General Cable paid nearly $1.5 million in additional bribes in 4Q 2013.

18. In January 2014, however, General Cable disclosed that the Audit Committee of its Board of Directors was overseeing an internal review of certain Angolan payments that was overseen by the Audit Committee of the Company's board of directors. Seven months later, on August 1, 2014, General Cable revealed that this review was looking into potential FCPA violations in Angola, which the Company had reported to the SEC and DOJ.

19. Six weeks later, on September 22, 2014, the relevant truth regarding Defendants' material misrepresentations began to emerge, when General Cable partially disclosed for the first time the scope and magnitude of certain bribes. General Cable revealed that its employees in Portugal and Angola had made payments to an agent between 2002 and 2013 in connection with General Cable's operations in Angola. The Company further disclosed that its FCPA investigation had expanded to include the Company's operations in Thailand and India. On this news, General Cable stock declined more than 10%.

20. Thereafter, on October 30, 2014, General Cable announced that (i) it was going to divest its Asia Pacific and African operations—some of which it had owned for less than five years—due to purported "operational complexity" and (ii) it had taken additional remedial measures to address its woefully deficient FCPA compliance.

21. One of the primary and concealed risks facing the Company's operations was that General Cable's overseas operations were facilitated by corruption, and the termination of these practices would have a material adverse impact on the Company's continued operations. This is precisely the risk that materialized on October 30, 2014 as General Cable was forced to divest much of its overseas operations once its corrupt scheme was exposed. Analysts subsequently confirmed that one aspect of this "complexity" were the bribes paid in at least two of the countries covered by the divestiture. The stock price declined 6% on the news.

22. Finally, on February 10, 2016, the last day of the Class Period, General Cable disclosed that it was adding $4 million to its accrual for profits it would have to disgorge due to FCPA violations and had identified additional transactions, the profits of which might also need to be disgorged under the FCPA.

23. Commenting on the news, Defendant Robinson stated in a conference call the next day, that in addition to increasing General Cable's FCPA accrual to $28 million, General Cable had "identified certain other transactions that may raise concerns under the FCPA" which may require an "additional possible profit disgorgement" in the "range of . . . $0 to $33 million." In response to the news, General Cable's stock price declined 32%, on extremely heavy volume.

24. When the dust finally settled and after the harm was done to investors, General Cable was forced to pay over ***$75 million*** in criminal fines and disgorgement of profits to resolve the DOJ's and SEC's investigations of the Company's FCPA violations. In addition, General Cable was required to undertake extensive remedial measures and establish an effective FCPA compliance program – the very program that Defendants misrepresented was in place throughout the Class Period.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

27. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 28 U.S.C. § 1391(b) because the Company has its headquarters in this District, it conducts a substantial amount of business throughout this District, and a substantial part of the events giving rise to these claims took place in this District.

28. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. General Cable common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "BGC."

## III. PARTIES AND RELEVANT NON-PARTIES

### A. Lead Plaintiff

29. Lead Plaintiff William Edward Long ("Long") is a Trustee of the UA 09-21-2001 William Edward Long & Bonnie Diane Long Living Trust. Long purchased General Cable common stock during the Class Period at artificially inflated prices and suffered damages when the relevant truth about General Cable's deficient internal controls, lack of an effective FCPA compliance program, and widespread FCPA violations were revealed, and the price of General Cable's common stock declined. Long's transactions in General Cable common stock are reflected in Exhibit A attached hereto.

### B. Defendants

30. Defendant General Cable is a Delaware corporation headquartered in Highland Heights, Kentucky. General Cable is one of the world's largest manufacturers of cable and wire for commercial and industrial uses. The Company's operations focus on the production of aluminum, copper and fiber optic wire, and cable for use in the energy, construction, and communications sectors. General Cable also engages in the design, integration, and installation

of so called "turn-key" high and extra-high voltage terrestrial and submarine systems. On December 4, 2017, the Company announced that it had entered into a definitive merger agreement with Prysmian Group, which is expected to close by the third quarter of 2018.

31. Defendant Kenny served as President and Chief Executive Officer ("CEO") of General Cable from August 2001 until July 1, 2015. Prior to that, he held the positions of President and Chief Operating Officer ("COO") from May 1999 through August 2001. Kenny held a number of senior management positions at General Cable and its immediate predecessor company beginning in 1994. Kenny was a member of the Board of Directors from 1997 until his departure from Company in July 2015. Prior to joining General Cable, Kenny had a diplomatic career with the U.S. Department of State as Foreign Service Officer, where he focused on international economics and trade. Kenny announced his retirement in the wake of the disclosure of the Company's FCPA violations and other internal control deficiencies described herein. During the Class Period, Kenny signed General Cable's SEC reports, as well as the accompanying Sarbanes-Oxley Act of 2002 ("SOX") certifications.

32. Defendant Robinson served as General Cable's Chief Financial Officer ("CFO") and Treasurer from January 2007 until August 12, 2016. Robinson was the Assistant Controller and then Controller for General Cable from 1999 through 2006. Robinson came to General Cable from Deloitte & Touche LLP ("Deloitte"), where he had roles of increasing responsibility in Deloitte's Cincinnati, Ohio office, and ended his tenure in London, England as Audit Manager providing accounting services to global companies. During the Class Period, Robinson signed General Cable's SEC reports as well as the accompanying SOX certifications.

33. Because of their positions in the Company, Kenny and Robinson possessed the power and authority to control the contents of General Cable's reports to the SEC, press releases,

and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Kenny and Robinson were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, Kenny and Robinson knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the affirmative representations which were being made were materially false and misleading. Kenny and Robinson are liable for the false or misleading statements pleaded herein because they made, or caused to be made, all of these false or misleading statements.

### C. Relevant Non-Parties

#### 1. General Cable Subsidiaries

34. General Cable Celcat, Energia e Telecomunicações, S.A. ("Celcat") was an indirect General Cable subsidiary located in Portugal and acquired by General Cable in June 1999. Celcat manufactured and sold General Cable's wire and cable products in Portugal and Angola. Celcat's operations were under the responsibility of General Cable's Europe and Mediterranean division ("E&M"). Before and during the Class Period, Celcat's financial statements were consolidated into the financial statements of General Cable.

35. General Cable Condel, Cabos de Energia e Telecomunicações, S.A. ("Condel") was an indirect General Cable subsidiary headquartered in Angola and acquired by General Cable in June 1999. Condel manufactured and sold General Cable products primarily to entities owned by the Angolan government. Condel's operations were under the responsibility of General Cable's E&M division. Before and during the Class Period, Condel's financial statements were

consolidated into Celcat's financial statements, which were in turn consolidated into the financial statements of General Cable.

36. Phelps Dodge International (Thailand) Limited ("PDTL") was an indirect subsidiary General Cable headquartered in Thailand and acquired in October 2007 as part General Cable's acquisition of Phelps Dodge International Corp. ("PDIC"). PDIC operated factories and distribution centers in 19 countries throughout Latin America, Asia, and Africa and sold cable and wire in Bangladesh, Indonesia, the Philippines, and Thailand through PDTL. PDTL was under the responsibility of General Cable's Asia Pacific division. Before and during the Class Period, PDTL's financial statements were consolidated into the financial statements of General Cable. General Cable sold PDTL in August 2015.

37. General Cable (Tianjin) Alloy Products Company Limited ("GC China") was an indirect General Cable subsidiary headquartered in China and acquired by General Cable in December 2012 as part of the Company's acquisition of Alcan Cable. GC China manufactured and sold cable and wire in China. GC China was under the responsibility of General Cable's Asia Pacific division. After its acquisition in December 2012, GC Cable's financial statements were consolidated into the financial statements of General Cable.

38. General Cable Egypt S.A.E. ("GC Egypt") was an indirect subsidiary of General Cable acquired by General Cable in September 2010. GC Egypt manufactured a wide variety of wire and cable products for the electrical markets including low voltage insulated power and control cables, building wire, instrumentation cable, halogen free power and control cables, and overhead power cables, which were and sold throughout the E&M segment (defined herein). General Cable sold GC Egypt in May 2016.

39. On December 22, 2016, General Cable entered into a Non-Prosecution Agreement with the DOJ concerning violations FCPA by General Cable between 2003 and 2015 involving its Celcat, Condel, GC China, and PDTL subsidiaries.

40. As part of the Non-Prosecution Agreement, General Cable "agree[d] and stipulate[d]" that the facts set forth in the Statement of Facts incorporated by reference into the NPA were "true and accurate." These facts included the following admissions: (i) General Cable ***knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to prevent corruption or otherwise illegal payments by its agents***; (ii) General Cable had deficient internal accounting controls that did not require and/or ensure, among other things (a) due diligence for the retention of third party agents and distributors, (b) proof that services had been rendered by third parties before payment could be made to them, and (c) oversight of the payment process to ensure that payments were made pursuant to contractual terms or that payments were reasonable and legitimate; and (iii) General Cable ***knowingly and willfully failing to address these known weaknesses which allowed the conduct to continue***.

41. Additionally, the Company agreed that it "admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents" and "expressly agree[d] that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company" as set forth in the Statement of Facts.

42. On December 29, 2016, the SEC filed the Cease-and-Desist Order concerning violations of the FCPA by General Cable between 2003 and 2015, involving its Celcat, Condel,

GC China, PDTL, and GC Egypt subsidiaries. As explained in the Cease-and-Desist Order, on the basis General Cable's offer of settlement and the Order itself, the SEC found that:

a. General Cable violated Section 30A of the Exchange Act (15 U.S.C. § 78dd-1), which prohibits the making of corrupt payments "by corruptly paying or offering to pay bribes or give other things of value to employees or officials of SOEs in Angola to obtain or retain business";

b. General Cable violated Section 13(b)(2)(A) of the Exchange Act (15 U.S.C. § 78m(b)(2)(A)), which requires the Company to maintain accurate books and records, because certain payments by Celcat, Condel, PDTL, GC China, and GC Egypt "were recorded as legitimate business expenses on" on the financial statements of each of these subsidiaries "when knowing or believing they were in fact used as bribes or improper payments to foreign government officials, or otherwise lacked reasonably detailed documentation to accurately and fairly reflect the payments on the subsidiaries' books and records, which were included in [General Cable's] books and records and consolidated financial statements"; and

c. General Cable violated Section 13(b)(2)(B), which requires the Company to maintain an adequate system of internal controls, because (i) "the payments or offers by" Celcat, Condel, PDTL, GC China , and GC Egypt, violated General Cable's policies "against bribery and excessive payments to third-parties on transactions with SOEs, or otherwise were not supported by proper documentation or authorization," and (ii) employees of Celcat, Condel, PDTL, GC China , and GC Egypt "were not adequately trained on anticorruption risks, did not require third-parties on [State-Owned Entity] sales to comply with the FCPA, and did not perform any anticorruption due diligence on third parties."

**2. Former General Cable Employees**

43. CW 1 was the Vice President of Internal Audit at General Cable during the Class Period, based at the Company's headquarters in Highland Heights, Kentucky. CW 1 reported to the Audit Committee of the Board of Directors and to Robinson. CW 1's responsibilities included creating the Audit Plan for the Board and executive review, executing the approved audit plan, updating the Board on a quarterly basis, and updating the CFO on approximately a bi-weekly basis on the specific audits that were being conducted.

44. CW 2 was a Manager in Internal Audit at General Cable during the Class Period, reporting directly to the Vice President of Internal Audit. CW 2's duties included conducting onsite audits at General Cable's foreign subsidiaries. During CW 2's tenure, CW 2 conducted onsite audits at Celcat in Portugal and Condel in Angola, among other locations.

45. CW 3 was a Senior Auditor with General Cable from 2007 through 2010, based at the Company's headquarters in Highland Heights, Kentucky. CW 3 reported to John Rayburn, head of General Cable's Compliance section and then to Marc Moehlman, head of General Cable's Internal Audit department.

46. CW 4 was a Senior Internal Auditor with General Cable based at the Company's headquarters in Highland Heights, Kentucky from 2008 to 2010. During this time, CW 4 worked under Vice President of Internal Audit Moehlman. During the Class Period, CW 4 worked in Barcelona as an Internal Controls Manager for Europe and North Africa.

47. CW 5 was a Senior Internal Auditor with General Cable during the Class Period, based at the Company's headquarters in Highland Heights, Kentucky. CW 5 ultimately reported to the Vice President of Internal Audit. CW 5's duties included internal controls testing for foreign subsidiaries and internal audits at international locations including the Philippines, South Africa, and Brazil. CW 5 explained that when CW 5 conducted an on-sight audit, CW 5 would visit the site for approximately one and one half weeks, conducting disbursement testing, and analysis of recurring payments, "unusual items" and other balances or transactions.

48. CW 6 worked in the Internal Audit Department at General Cable during the Class Period. CW 6 started out as an Internal Audit staff member and ultimately achieved the role of Audit and Compliance Manager. CW 6's department conducted internal audits of most of the

global operations of General Cable. CW 6's department would report its audit results to upper management, including executive level management.

49. CW 7 is a former General Cable Finance and Financial Planning and Analysis manager who worked in South Africa during the Class Period. During CW 7's tenure, CW 7 reported to CFO Ped Peters (ph.) and later to CFO Errol Campbell, who in turn reported to the Vice President of General Cable Africa. CW 7's responsibilities included financial reporting, forecasting and budgeting, and cash flow analysis.

50. CW 8 was a Production Planner and then Production Superintendent with General Cable from approximately 2010 and, during the Class Period, worked at a manufacturing facility in Zambia. CW 8 was responsible for facilitating the material and production planning on a daily, weekly and monthly basis. In doing so, CW 8 interacted with marketing and the factory team.

51. CW 9 was a General Manager for General Cable subsidiary located in Asia from 2008 to 2010, and thereafter served as Deputy General Manager for PDTL until the end of 2011. CW 9 was ultimately responsible for the sales representatives employed at GC China. While in Thailand, CW 9 was primarily involved on the production side of the business.

52. CW 10 was a Director of Finance in the Asia division General Cable, based in India during the Class Period. CW 10 was the "de facto CFO" for General Cable India. CW 10's responsibilities included consolidation work, analysis of accounts, budgets and projections, other financial planning functions, tax compliance, and completing annual Sarbanes-Oxley questionnaires, which CW 10 received from General Cable counterparts in the U.S. or Thailand. CW 10 was also occasionally assigned ad hoc projects related to General Cable's Thailand operations.

53. CW 11 worked as a Senior Auditor with General Cable based at the Company's headquarters in Highland Heights, Kentucky prior to the Class Period and then as a Senior Accountant, Financial Reporting during the Class Period. During CW 11's time in Internal Audit, CW 11 reported to the Vice President of Internal Audit.

54. CW 12 was the Global Integrated Audit Manager at General Cable from during the Class Period, based at the Company's headquarters in Highland Heights, Kentucky. CW 12's responsibilities included managing General Cable's IT audits globally and integrating the IT audits with the financial reporting audits.

## IV. FACTUAL BACKGROUND

### A. Factual Background

#### 1. Before and During the Class Period, General Cable Greatly Expanded Its Overseas Operations

55. General Cable is a global leader in the development, design, manufacture, marketing, and distribution of copper, aluminum, and fiber optic wire and cable products for use in the energy, industrial, construction, specialty, and communications markets. The Company also engages in the design, integration, and installation on a turn-key basis for products such as high and extra-high voltage terrestrial and submarine systems.

56. During the Class Period, General Cable's operations were divided into three geographic divisions: (i) North America; (ii) Europe and Mediterranean or E&M, which included the Company's Celcat, Condel, and GC Egypt subsidiaries; and (iii) Rest of World ("ROW"), which included the Company's PDTL and GC China subsidiaries.

57. Beginning in October 2007, General Cable significantly expanded its international operations by acquiring PDIC (and its subsidiary, PDTL) for $710 million. At the time of acquisition, over half of PDIC's revenues were generated from manufacturing assets located in

South and Central America, with the remainder spread across sub-Saharan Africa, Southeast Asia, India, China, and the Philippines. According to Kenny, the PDIC acquisition was "a unique opportunity" which "greatly accelerat[ed]" General Cable's expansion "into many of the faster growing emerging economies of the world."

58. In September, 2010 General Cable acquired GC Egypt. According to the Company this acquisition "further[ed] [its] geographic expansion by establishing a production and commercial base in one of the largest and fastest growing markets in the Mediterranean and North African region" and allowed it to claim it was "now a leading manufacturer of power cables in the Mediterranean and North African region as well as the Sub-Saharan region."

59. Thereafter, in December 2012, General Cable acquired Alcan Cable, the wire and cable business of Rio Tinto plc for $185 million. At the time of the acquisition, Alcan Cable employed over 1,000 people in its aluminum cable manufacturing and distribution facilities servicing the energy and construction markets in the United States, Canada, Mexico, and China. Alcan's China operations were of particular importance to General Cable. As Kenny stated at the time of acquisition, Alcan "built a state of the art facility in China that is successfully penetrating the domestic construction cable market," which he described as "highly complementary to our two long standing partnerships in China representing a new route to market for our full range of products."

60. General Cable derived the majority of its revenues from the Company's overseas operations. For example, the E&M division contributed approximately 30%, 28%, and 25% of the Company's consolidated revenues for 2011, 2012, and 2013, respectively, while the ROW division contributed approximately 34%, 33%, and 32% of the Company's consolidated revenues in 2011, 2012 and 2013, respectively. By October 2014, General Cable's Asia Pacific and Africa

operations, in particular, were worth approximately $1 billion or 16% of the Company's total sales.

61. During the Class Period, Defendants touted the Company's far-reaching overseas operations. For example, during a February 25, 2013 conference call with analysts, Kenny described the Company's African operations, noting that "the primary footprints" were in Zambia and South Africa but involved "trading throughout the region" and specifically highlighted Condel, explaining that it was supported by Celcat and "has strong links to Portuguese contractors." During the same conference call, Kenny also described General Cable's focus on its Asia Pacific operations, noting its "strong profile" in this "important growth area," due in part to the addition of GC China, and highlighting "a start-up in India," "a very strong business in the Philippines," and the fact that the Company's business in Thailand had taken a nice "turn."

62. However, General Cable's rapid expansion into developing markets and the related increase of the Company's interactions with state actors, particularly in emerging economies in Sub-Saharan Africa and the Asia-Pacific region with high levels of public sector corruption, brought with it vastly increased exposure to foreign bribery and corruption and risks related to compliance with the FCPA.

**2. The FCPA**

63. Congress enacted the FCPA, 15 U.S.C. § 78dd-1, *et seq.*, in 1977, in response to revelations of widespread bribery of foreign officials by U.S. companies. Congress passed the FCPA to halt those corrupt practices, create a level playing field for honest businesses, and restore public confidence in the integrity of the marketplace.

64. In general, the FCPA prohibits offering to pay, paying, promising to pay, or authorizing the payment of money or anything of value to a foreign official in order to influence any act or decision of the foreign official in his or her official capacity or to secure any other

improper advantage in order to obtain or retain business. The DOJ and SEC jointly enforce compliance with the FCPA through two sets of provisions, the anti-bribery provisions (*e.g.*, Section 30A of the Exchange Act) and the accounting provisions (*e.g.*, Section 13(b)(2) of the Exchange Act).

65. The FCPA's anti-bribery provisions foreclose all corrupt payments to foreign officials, including those payments made through third parties or intermediaries where the person making the payment knows "that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly," to a foreign official. Corrupt payments can consist of "anything of value," or the provision of a job to a family member or business associate of a foreign official, gifts, entertainment, or political contributions, among other things. The FCPA defines a foreign official as anyone acting in an official capacity on behalf of a foreign government, or any department, agency, or instrumentality thereof, and includes, *inter alia,* elected or appointed officials, and officers and employees of state-owned or partially state-owned entities ("SOEs").

66. The FCPA accounting provisions require companies to (i) make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflect an issuer's transactions and dispositions of an issuer's assets ("books and records") and (ii) devise and maintain a system of internal accounting controls sufficient to assure management's control, authority, and responsibility over the firm's assets ("internal controls").

67. The FCPA's internal control provisions address the fact that the payment of bribes often occurs in companies that have weak internal control environments. The FCPA's books and records provisions address the concern that bribes are often mischaracterized in companies' books and records, with companies utilizing things like commissions, consulting fees, sales and marketing fees, and rebates or discounts to conceal corrupt payments. Additionally, given that

bribes may be paid in small amounts or installments over a number of years or across a number of recipients, there are no materiality thresholds for enforcing the FCPA's accounting provisions.

68. For companies that maintain significant overseas operations, failure to comply with any of the FCPA's provisions can result in civil or criminal penalties, including substantial fines and the prohibition of operations in an industry or particular country. In turn, these penalties often lead to material damage to a company's brand, business, and operating results, not to mention costly investigation and remediation efforts.

69. Given the severe consequences of non-compliance, there are a number of resources available to companies with significant exposure to foreign corruption and bribery to assist them with complying with the FCPA. For example, several independent bodies conduct evaluations of the risks posed by operating in and conducting business with the public sectors in countries around the world.

70. In particular, Transparency International issues an annual Corruptions Perceptions Index, which measures the perceived levels of public sector corruption in 176 countries and territories around the world and ranks each country, from best to worst in terms of the existence of corruption perceived by analysts, businesspeople, and experts. According to this annual analysis, General Cable maintained operations in some of the world's most corrupt nations. For example, Angola was consistently ranked among the top 10% most corrupt nations in the World between 2009 and 2016, while Bangladesh, Indonesia, Egypt, and Thailand were consistently ranked among the top 30-50% of the most corrupt nations in the World.

71. U.S. companies operating abroad also have access to more than 40 years-worth of materials generated by past SEC and DOJ enforcement proceedings, including detailed SEC releases, which identify not only the kinds of conduct prohibited by the FCPA, but also the risks

that are posed by operating in particular countries and with particular government officials and SOEs and ways to address those risks through a robust compliance and audit program.

72. The wealth of information generated through these enforcement proceedings, among other things, led the agencies to jointly promulgate *A Resource Guide to the U.S. Foreign Corrupt Practices Act* (*"FCPA Resource Guide"*). First published in 2012, the *FCPA Resource Guide* sets forth the agencies' guidelines for enforcement and their expectations for minimum internal controls and compliance programs for U.S. companies operating abroad.

73. As explained in the *FCPA Resource Guide*, "[a]n effective compliance program is a critical component of a company's internal controls and is essential to detecting and preventing FCPA violations." Specifically, "[a] well-constructed, thoughtfully implemented, and consistently enforced" compliance program "protects a company's reputation, ensures investor value and confidence, reduces uncertainty in business transactions and secures a company's assets" and "helps prevent, detect, remediate, and report . . . FCPA violations."

74. To be effective, a compliance program must be well-designed and applied in "good faith." It must be "tailored to" "the operational realities and risks attendant to the company's business" including, among other things, "the degree to which it has operations in countries with a high risk of corruption" and "the extent of its government interaction." It must be applied "from the board room to the supply room," ensuring that no one is beyond its reach.

75. According the *FCPA Resources Guide*, an effective FCPA compliance program should include at least the following: (i) policies and procedures to address FCPA compliance; (ii) well-designed and effective internal controls to prevent FCPA violations; (iii) high-level commitment from senior executives to FCPA compliance and enforcement of compliance program; (iv) sufficient compliance resources with proper oversight and independence from

business operations; (v) initial and ongoing periodic assessments of FCPA risk; (vi) ongoing monitoring, testing, and auditing of effectiveness of compliance program; (vii) training and guidance for employees concerning the FCPA and enforcement of a FCPA compliance program; and (viii) due diligence concerning FCPA compliance issues, especially of third parties and merger/acquisition candidates.

### B. Defendants Lied to Investors Regarding General Cable's Efforts to Ensure Compliance with and the Effectiveness of Internal Controls Concerning the FCPA During the Class Period

76. Throughout the Class Period, in every Form 10-K and Form 10-K/A filed with the SEC, Defendants stated that General Cable had "***implemented policies and procedures designed to ensure compliance with [the FCPA]***." This statement was incorporated by reference into every Form 10-Q and Form 10-Q/A filed during the same period. *See, infra* Section V. Defendants also certified in General Cable's FY11 and FY14 Forms 10-K that the Company's financial controls were effective pursuant to SOX, and in each Form 10-K, Form 10-K/A, Form 10-Q, and Form 10-Q/A, certified that General Cable had designed internal controls to ensure that all material information was disclosed and the Company's books and records were accurate. *See, infra* Section V. As explained herein, these controls would have included accounting controls specifically targeted to address compliance with FCPA books and records provisions.

77. The undisclosed reality, however, was very different. Unbeknownst to investors, General Cable did not have a meaningful or effective program in place to ensure that General Cable was complying with the FCPA and, more specifically, did not have internal controls in place to prevent violations of the FCPA. In fact, as the Company admitted in the Non-Prosecution Agreement, General Cable "knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents."

78. Former employees likewise confirmed that General Cable lacked the components of an effective FCPA compliance program or internal controls specifically covering FCPA's accounting provisions during the Class Period. The accounts of confidential witnesses reveal that General Cable did not possess a FCPA compliance program that met even the minimum guidelines of the *Resource Guide* and was effectively nonexistent with respect to each of the areas identified by the DOJ and SEC as being necessary for an entity like General Cable to ensure FCPA compliance given the scope of its overseas operations.

79. The lack of an effective FCPA compliance program led General Cable to violate both the books and records and internal controls provisions of the FCPA, as well as to make corrupt payments in at least six countries through no fewer than seven subsidiaries over a 12-year period, as explained herein in Section IV.B.2. Ultimately, General Cable's lack of an effective compliance program and internal controls, coupled with the payment of bribes, led to the entry of the Non-Prosecution Agreement with the DOJ, the entry of the Cease-and-Desist Order, and the payment of over $75 million in fines and disgorged profits.

### 1. Defendants Had No Basis to Assure Investors that General Cable Had Effective FCPA Policies, Procedures, and Controls in Place During the Class Period

80. Prior to and during the Class Period, General Cable did not have effective policies, procedures, and internal controls in place to ensure compliance with the FCPA. General Cable likewise failed to implement the minimum requirements of an effective FCPA compliance program, including (i) a commitment to compliance among senior management; (ii) sufficient resources with authority and independence to ensure FCPA compliance; (iii) initial and periodic risk assessments, and periodic testing and auditing of the effectiveness of FCPA policies, procedures, and internal controls; and (iv) training General Cable employees regarding the FCPA, its application, and the Company's specific policies and procedures for ensuring compliance

therewith. Without a functioning FCPA compliance program, including, specifically, initial and periodic risk assessments, and testing/monitoring and auditing programs, Defendants had no basis to reassure investors during the Class Period that General Cable had sufficient policies, procedures, and internal controls in place to ensure compliance with the FCPA.

**a. General Cable Did Not Have Effective Policies, Procedures, or Internal Controls to Ensure FCPA Compliance**

81. General Cable's admissions and the accounts of several former employees confirm that, contrary to Defendants' repeated assertion that General Cable had "policies and procedures" in place "designed to ensure compliance with [the FCPA]," the Company had virtually no policies or procedures to specifically address General Cable's FCPA obligations, and what policies or procedures did exist were ineffective. Likewise, despite Defendants' SOX certifications confirming the existence of internal controls, General Cable did not have sufficient internal controls in place to ensure that (i) General Cable disclosed all material information and (ii) its books and records were reasonably accurate.

82. Properly designed, implemented, and enforced policies, procedures, and controls are critical to any company's ability to ensure FCPA compliance by preventing, detecting, and remediating FCPA violations. Policies (i.e., a guiding principle used within an organization) and procedures (i.e., a series of steps to be followed to accomplish a consistent result) provide the company with a framework to ensure that FCPA compliance flows through every aspect of its operations. Internal controls prevent deviations from a company's policies and procedures and alert senior management to any FCPA violations or compliance issues.

83. As explained by in the *FCPA Resource Guide*, effective policies and procedures (and by extension internal controls) require an in-depth understanding of the risks posed by the company's business model in interacting with government officials or SOEs in foreign countries.

Such policies, procedures, and/or internal controls should be designed to reduce the prospect of FCPA violations and address topics like: (i) hiring; (ii) gifts; (iii) hospitality, entertainment, and expenses; (iv) customer travel; (v) political contributions; (vi) charitable donations and sponsorships; (vii) facilitation payments; and (viii) solicitation and extortion. In particular, companies should implement policies, procedures, and/or internal controls to address due diligence of all agents and business partners, including conducting and properly documenting due diligence of the hiring and oversight of all agents and business partners, and ensuring that all agents and business partners are aware of, and have agreed to abide by the company's FCPA-related policies, procedures, and internal controls.

84. In the context of entering into the NPA with the DOJ, General Cable admitted that as of a December 2012 audit report regarding FCPA issues in Angola, the Company did not have a global policy regarding the use of agents and sales representatives and, thereafter, "failed to establish adequate internal accounting controls," allowing General Cable to continue "to make corrupt payments to [an] agent in excess of the contractually required amounts."

85. Furthermore, General Cable admitted, that the Company "knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments to agents." Specifically, the Company conceded that it "had deficient internal accounting controls" including controls "that did not require and/or ensure" at least the following: "(a) due diligence for the retention of third party agents and distributors;" "(b) proof that services had been rendered by third parties before payment could be made to them;" and "(c) oversight of the payment process to ensure that payments were made pursuant to contractual terms or that payments were reasonable and legitimate." General Cable has further admitted that its "knowing[] and willful[] fail[ure] to

address these known weaknesses, in relevant part, . . . allow[ed] the [violative] conduct to continue."

86. Based in part on these admissions, the SEC determined that General Cable violated the internal controls requirements of the FCPA accounting provisions. The SEC found that: (i) the illicit payments made by General Cable's subsidiaries violated the Company's internal policies and were not supported by proper documentation or authorization; (ii) the Company's employees were not adequately trained on anticorruption risks; and (iii) the Company did not require third-parties on SOE sales to comply with the FCPA, and did not perform any anticorruption due diligence on third parties.

87. The SEC's findings were consistent with what the CWs recalled with respect to the complete lack of policies, procedures, and controls concerning FCPA compliance during the Class Period. For example, CW 1 recounted the lack of any due diligence policies or procedure regarding the Company's use of third parties and agents, and lack of a central database or repository for information on its various agents and third parties. CW 2 also stated that General Cable did not have a formal system of conducting due diligence on third parties (e.g. agents, sales representatives, or distributors), or of collecting or maintaining records of what third parties the Company was using, prior to 2015. As explained in the *FCPA Resources Guide*, policies and procedures governing due diligence of and payments to third party distributors and agents is critical to ensuring FCPA compliance.

88. These CW accounts and the SEC's findings are corroborated by the fact that, as part of the NPA, General Cable was required to "develop and promulgate compliance policies and procedures designed to reduce the prospect of" FCPA violations—policies and procedures that necessarily did not exist during the Class Period despite representations to the contrary.

These policies and procedures were required to apply to all General Cable employees and any third parties acting on the Company's behalf in foreign countries, and address, among other topics: "a) hiring; b) gifts; c) hospitality, entertainment, and expenses; d) customer travel; e) political contributions; charitable donations and sponsorships; facilitation payments; and h) solicitation and extortion."

89. The NPA also required General Cable to "ensure that it ha[d] a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure" compliance with the FCPA's accounting provisions, including that (i) management authorizes the relevant transactions and access to the Company's assets and (ii) the transactions and assets are recorded in such a way that General Cable can comply with GAAP. Because the NPA only sought to address nonexistent or deficient policies and procedures, this provision confirms that General Cable did not have sufficient procedures or controls in place to comply with FCPA accounting procedures during the during the Class Period.

#### b. Defendants' Lack of Commitment to and Ineffective Communication of FCPA Compliance

90. As detailed below, senior management exhibited a lack of commitment to FCPA compliance, including the failure to assign sufficient oversight and compliance resources, and ineffective communication regarding FCPA compliance to General Cable's employees. These deficiencies made it such that Defendants had no basis to represent that (i) General Cable had implemented policies, procedures designed to ensure FCPA compliance or (ii) its internal controls over the Company's financial reporting were designed to disclose all material information or to ensure accurate financial results.

### i. Defendants Failed to Set the "Proper Tone" with Respect to FCPA Compliance

91. According to the *Resource Guide*, "compliance with the FCPA . . . must start at the top" of the company. Because "[m]anagers and employees take their cues" from a company's board of directors and senior executives, senior management must "set[] the proper tone for the rest of the company." When evaluating a company's "tone-at-the-top" with respect to an FCPA compliance program, the DOJ and SEC look for "the commitment of corporate leaders to a 'culture of compliance,'" and "whether senior management has clearly articulated company standards, communicated them in unambiguous terms, adhered to them scrupulously, and disseminated them throughout the organization."

92. Here, General Cable's senior leadership, including Defendants Kenny and Robinson, disregarded the Company's non-compliance with the FCPA and the risk that non-compliance posed to its business, taking an approach described by the former VP of Internal Audit CW 1 as a "head in the sand" attitude to compliance with FCPA requirements.

93. CW 1 explained that CW 1 was hired in the third quarter of 2012 as Vice President of Internal Audit, in part to address the Company's recognition that its Internal Audit department was grossly inadequate given the size and scope of the Company's operations. Upon taking on the lead internal audit role, it was immediately apparent to CW 1 that the Company lacked an effective FCPA compliance program. In fact, to CW 1's knowledge, General Cable had never conducted an assessment of the sufficiency of its FCPA compliance program prior to CW 1 being hired. Accordingly, CW 1 routinely communicated CW 1's concerns with respect to the Company's FCPA compliance to Robinson.

94. CW 1 explained that the prevailing attitude among senior management at the Company was that since there had been no FCPA violation uncovered to date, the Company's

FCPA compliance must be sufficient. CW 1 explained that this "head in the sand" attitude was totally inconsistent with the level of exposure General Cable faced given the scope of its international operations, a fact which CW 1 explained to Robinson.

95. For example, CW 1 described Robinson's reaction to CW 1's concerns regarding the Company's deficient FCPA compliance program as a "nonresponse." CW 1 explained that as CFO, a former company controller, and someone with vast experience in company financial roles, Robinson of all people should have appreciated the level of FCPA risk facing General Cable.

96. CW 1 further offered that because CW 1 was specifically hired in order to enhance the Company's "broken" Internal Audit department, CW 1 believed, should have led to a greater willingness on the part of Robinson to sponsor efforts to enhance FCPA compliance. However, when CW 1 raised the need for additional resources and a formalized FCPA compliance program with Robinson, Robinson was not receptive and did not express his willingness to devote additional resources to the issue. Based on his experience at General Cable, CW 1 believed that Kenny simply relied on Robinson when it came to issues such as compliance. As such, while CW 1 was attempting to raise awareness about FCPA compliance, CW 1 lacked the necessary support of senior management to get these efforts off the ground.

97. CW 1 also described efforts led by General Cable's Assistant General Counsel, Diana Toman ("Toman") to raise awareness about FCPA compliance during the Class Period. In particular, Toman, like CW 1, explained to Robinson that General Cable lacked an effective FCPA compliance program; Robinson was nonresponsive to Toman's efforts. As a result, and similar to CW 1's experience, Toman lacked the necessary support of senior management. In

fact, according to CW 1, at that point in time, there was no corporate "appetite" at General Cable to expand FCPA compliance and training.

98. Ultimately, the efforts of CW 1 and Toman to highlight General Cable's FCPA risks and its lack of an effective compliance were rejected as General Cable's senior management refused to "sponsor" efforts within the Company to increase FCPA compliance and training. Indeed, it was not until 2013, more than nine months after senior management received evidence of FCPA violations occurring in the Company's Angolan subsidiary, that any effort was made to even investigate these risks, let alone implement the policies, procedures, and controls to address them that Defendants publically represented were in place during the Class Period. Indeed, CW 2 confirmed that General Cable's senior management did not establish a formal FCPA compliance program until 2015.

**ii. Defendants Failed to Ensure General Cable's FCPA Compliance Function Received Proper Oversight, Independence, and Resources**

99. The effectiveness of an FCPA compliance program is contingent on sufficient high-level oversight of its design, implementation, and enforcement, *and* independence from the business operations.

100. To that end, it is important for a company to assign responsibility for the compliance program to a senior executive who has "appropriate authority within the organization, adequate autonomy from management," (e.g., direct access to the board of directors) and "sufficient resources to ensure that the company's compliance program is implemented effectively." This role is typically filed by a chief compliance executive, who reports to both the CEO and the independent audit committee of the board of directors. Significantly, despite the Company's explosive overseas growth between 2010 and 2012, General Cable did not even hire a Chief Compliance Officer ***until 2015***.

101. The relative effectiveness of any FCPA compliance program also is dependent on the resources the company devotes to its compliance program. In assessing the sufficiency of the resources a company has allocated for FCPA compliance, the DOJ and SEC look to whether "the company [has] devoted adequate staffing and resources to the compliance program given the size, structure, and risk profile of the business." The amount of resources necessary to ensure the effective design, implementation, and enforcement of an FCPA compliance program "will depend on the company's size, complexity, industry, geographical reach, and risks associated with the business." Moreover, as explained in the *FCPA Resource Guide* "[a]s a company's risk for FCPA violations increases, that business should consider increasing its compliance procedures, including due diligence and periodic internal audits."

102. Despite acquiring at least three subsidiaries that did business in countries with significant levels of FCPA risk between 2010 and 2012, General Cable allocated insufficient staffing and resources to ensure that it was complying with the FCPA in its foreign operations. As noted above, CW 1 was hired in order to bolster the Company's deficient internal audit department, which consisted of just four auditors based in Kentucky and one auditor based in Europe for a Company that had 14,000 employees and $3.6 billion in sales in overseas markets the year CW 1 was hired, including in several countries where there was a high level of public sector corruption. To make matters worse, CW 1 noted that only two of the five auditors competently fulfilled their job responsibilities.

103. CW 1 further confirmed that Internal Audit did not conduct or engage in any FCPA-specific audit work, *see infra* Section IV.B.1.c.ii. In fact, even when one of the high-risk countries was audited, CW 1 explained that these audits never included any FCPA-specific work or analysis. The reasons for the lack of FCPA-specific audits were two-fold.

104. *First*, CW 1 stated that no one in the Internal Audit department, including CW 1, possessed the expertise necessary to conduct a formal FCPA audit. In particular, none of the auditors on CW 1's staff ever received any specific training regarding how to conduct an FCPA audit. CW 1, CW 2, CW 3, CW 4, CW 5, CW 11, and CW 12 all confirmed that General Cable did not provide Internal Audit employees with any specific FCPA training. As a member of the Internal Audit department, CW 4 also did not recall receiving any FCPA training or even a formal FCPA policy. As CW 1 explained, part of CW 1's challenge after CW 1 became the VP of Internal Audit was increasing the FCPA competency of the General Cable audit staff.

105. *Second*, due to the "woefully inadequate" level of staffing and resources in Internal Audit overall, CW 1 stated that even if properly trained, CW 1's staff would not have been able to devote sufficient time to conduct any meaningful FCPA testing at any of the sites that were audited. Several CWs within the Company's internal audit and compliance departments confirmed the fact that General Cable failed to devote sufficient resources to FCPA compliance. For example, CW 3 confirmed that the Company's Compliance section was not focused on making sure General Cable complied with the FCPA. CW 6 explained that General Cable's Internal Audit department did not have an FCPA testing protocol.

106. CW 4 likewise recalled that while compliance audits were conducted during the 2008 to 2010 timeframe, these audits did not include any work addressing FCPA compliance. As evidence of this, CW 2 described an audit of Celcat that General Cable conducted in Portugal in 2009, which focused on getting "a basic understanding" of the Company's operation in Angola and did not involve any FCPA-specific testing. In fact, the Company did not audit its Angolan subsidiary directly until August 2012, despite the fact that Angola was consistently rated in the top 10% of countries with the highest levels of public sector corruption by Transparency

International and, as confirmed by CW 1, Internal Audit considered Transparency International's rankings, among other things, in determining which countries to audit.

107. Moreover, as confirmed by CW 5, the Internal Audit department lacked an understanding of the FCPA and did not have sufficient oversight of General Cable's foreign subsidiaries. These deficiencies stemmed from the Company's failure to devote sufficient resources to FCPA compliance. According to CW 6, General Cable did not have anyone at the Company who was specifically responsible for FCPA compliance until it hired a CCO in January 2015. CW 5 confirmed that operations in General Cable subsidiaries with high-FCPA risk like Angola were not reviewed by Internal Audit with any regularity. In fact, according to CW 5, no one from General Cable's Internal Audit department visited or audited Angola, China, Thailand or India during CW 5's entire 2009 to 2012 tenure. As a result, General Cable lacked any insight into whether the Company's Angolan operations were compliant with the FCPA.

108. As a result of the Company's failure to devote sufficient resources to its FCPA compliance, CW 1 recounted, General Cable was unprepared or slow to respond when these FCPA compliance issues arose.

#### iii. Defendants Failed to Effectively Communicate FCPA Compliance Objectives to General Cable Employees and Third Party Agents

109. A FCPA compliance program, including, specifically, policies, procedures, and internal controls, cannot prevent FCPA violations "unless it is effectively communicated throughout a company." To that end, the DOJ and SEC "evaluate whether a company has taken steps to ensure that relevant policies and procedures have been communicated throughout the organization, including through periodic training and certification of all directors, officers, relevant employees, and, where appropriate, agents and business partners." Virtually all of the CWs with responsibilities related to General Cable's international operations reported that there

was very little, if any, training specifically concerning the FCPA and General Cable's policies, procedures, and controls intended to ensure the Company's compliance therewith prior to 3Q 2014. For example, CW 8 stated that there was no FCPA training prior to 2014. CW 9 recalled that FCPA training or guidance "was not pushed" by General Cable. Similarly, CW 9, CW 5, and CW 10 did not recall General Cable providing any formal training in the areas of FCPA or compliance issues.

110. The confidential witnesses' recollections are corroborated by the SEC's finding that General Cable "did not provide adequate . . . training on policies and procedures to ensure compliance with the FCPA" and, more specifically, that employees of General Cable's "subsidiaries were not adequately trained on anticorruption risks."

**c. Lack of Risk Assessment and Periodic Testing and Auditing**

111. As detailed herein, General Cable did not conduct an overall risk assessment or engage in periodic testing or auditing of the Company's compliance with the FCPA. As a result, even if the Company had policies, procedures, or internal controls in place concerning FCPA compliance, which it did not, Defendants had no basis to assert that General Cable's (i) policies and procedures ***were designed to ensure*** FCPA compliance, or (ii) internal controls over financial reporting ***were effective*** with respect to FCPA compliance.

**i. Defendants Failed to Conduct a Comprehensive Assessment of the FCPA Compliance Risks Generated by General Cable's Overseas Operations**

112. According to the *FCPA Resource Guide*, the "[a]ssessment of risk is fundamental to developing a strong [FCPA] compliance program." A formal risk assessment includes identifying (i) the relevant business units under review; (ii) the activities or conduct the company would like to prevent (e.g., the payment of bribes); (iii) the presence of relevant risk factors (e.g., reliance on SOEs); and (iv) any mitigating controls the company already has in place. The

resulting risks are then weighed on a numerical scale so that the company can identify the risks it faces and the relevant importance of the risk to its operations.

113. Companies use the results of a risk assessment to design and implement policies, procedures, and controls to address and mitigate specific risks identified in the assessment. Companies also use the risk assessment to develop and implement ongoing monitoring, testing, and audits of the design, implementation, and effectiveness of these policies, procedures, and controls. Essentially, a formal risk assessment is the first step in developing an effective compliance program.

114. In the context of FCPA compliance, the risk assessment should identify the individual circumstances of the company that may led to increased FCPA compliance risk, including, among other things: (i) the company's geographic organization; (ii) interactions with various types and levels of government officials, industrial sectors of operation; (iii) involvement in joint venture agreements (if any); (iv) importance of licenses and permits in a company's operations; (v) the degree of governmental oversight and inspection; and (vi) volume and importance of goods and personnel clearing through customs and immigration."

115. General Cable, however, did not even initiate a process to conduct a formal assessment of the FCPA risks posed by its international operations until 2015. CW 3, CW 4, and CW 5, all confirmed that during their tenure General Cable did not conduct any FCPA risk assessments. In fact, while CW 1 described the process of planning General Cable's annual audit as "risk-based," CW 1 conceded that the Company did not conduct a formalized global risk assessment, let alone a risk assessment specifically tailored to the Company's FCPA risk. Similarly, CW 6, who according to CW 2 was jointly responsible with the VP of Internal Audit

for the Company-wide risk assessment, confirmed that FCPA risk assessments were not conducted during CW 6's tenure.

### ii. Defendants Failed to Conduct FCPA Periodic Compliance Testing or Auditing

116. FCPA compliance weaknesses and violations typically are uncovered through periodic testing, monitoring, or audits. As a result, having a testing, monitoring, and/or audit plan is a critical component of any FCPA compliance program.

117. According to the *FCPA Resource Guide*, "[a]n organization should take the time to review and test its controls, and it should think critically about its potential weaknesses and risk areas." These tests should, among other things: (i) "measure" a company's "compliance culture," and "the strength of its internal controls;" (ii) "identify best practices;" (iii)"detect new risk areas;" and (iv) "make certain that controls on paper are working in practice." There are three types of compliance testing: (i) testing or monitoring by the business unit implementing the policies and procedures; (ii) testing or monitoring the business unit's compliance with the relevant policies and procedures conducted by a separate compliance unit, and (iii) testing conducted by an independent internal audit function or outside auditors. To be fully functional, a compliance program should include all three types of testing.

118. Here, as confirmed by the CWs, General Cable did not test the Company's compliance with the FCPA at any level. For example, CW 7 reported that during CW 7's tenure there was no FCPA compliance testing. A member of General Cable's compliance section, CW 3 also confirmed that no FCPA testing was done by the compliance group while CW 3 was at the Company. CW 2, CW 4, CW 5, and CW 11 each confirmed that General Cable's Internal Audit department did not specifically test the Company's FCPA compliance during the Class Period.

119. CW 1 further confirmed that the Company did not conduct any due diligence whatsoever of third parties and agents, and did not maintain any centralized database or repository for information on its various agents and third parties, including those utilized by General Cable's overseas subsidiaries. As such, even if a concern was raised regarding a particular disbursement, this would not translate into any institutional knowledge that could then inform future disbursement decisions with respect to that agent or that subsidiary. CW 4 also confirmed that in conducting audits of various foreign subsidiaries, CW 4 was not tasked with any FCPA compliance testing, including any due diligence testing, or required to review any payments made to third party distributors, sales representatives, or agents.

120. With respect to the final category of testing, the former VP of Internal Audit, CW 1 explained that the Company's audit work was not specifically focused on FCPA compliance and General Cable did not audit the countries with the highest FCPA risk, such as Angola, Thailand, or China, every year or even on a regular basis. CW 1 described the process whereby the annual audit plan was formulated as follows: CW 1 had an initial high level discussion with the Controller John Winstel and Robinson regarding the necessary areas to be covered within the audit. CW 1 then spoke to the other relevant parties, including legal, finance, and business unit heads, who provided input. At the end of the process, CW 1 circled back to Robinson to refine the audit approach. Accordingly, Robinson was acutely aware that General Cable's annual audit plan did not include any testing specifically focused on FCPA compliance.

### 2. As a Result of General Cable's Deficient Internal Controls and Virtually Non-Existent Compliance Program, the Company Committed Widespread FCPA Violations

121. As admitted by the Company and extensively documented by the SEC and DOJ, General Cable engaged in widespread violations of the FCPA in at least six separate countries and over a 12-year span, generating illicit profits to the Company exceeding $50 million.

122. Specifically, General Cable has admitted that between 2003 and 2015 it used certain third-party agents and distributors to make corrupt payments to foreign officials in order to obtain and retain business in Angola, Thailand, Bangladesh, Indonesia, and China. General Cable further admitted that its illegal activity was done "***knowingly and willfull***y." Despite this knowledge, as the Company admitted, General Cable "***knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents***." Moreover, based on corrupt payments in Angola, Thailand, Bangladesh, Indonesia, China, and Egypt, the SEC has found that General Cable violated both the anti-bribery and the accounting provisions of the FCPA.

123. The following is a summary of General Cable's violations of the FCPA as admitted to by the Company in the Non-Prosecution Agreement and as set forth in the Cease-and-Desist Order.

**a. Angola**

124. Between 2003 and 2013, General Cable conducted business in Angola through Celcat and Condel. The majority of the Company's sales in Angola were made to state-owned customers, including Angolan SOE 1, Angolan SOE 2, and Angolan SOE 3. General Cable admitted that, acting through its subsidiaries, it paid bribes to employees of these three state-owned Angolan companies to obtain and retain business in Angola. General Cable also admitted that it falsely recorded the payments made directly to the foreign officials as payments for third-party consulting services, and falsely recorded the payments to the sales agent as offsets against sales.

125. From the outset of the Company's scheme, General Cable was explicit about the illegal nature of its operations in Angola. For example, an October 22, 2002 email from a Condel senior executive to a Celcat employee stated: "I agreed with [Angolan SOE 1 employee] on a

commission of 2% on orders placed, which at this stage will be through General Cable Condel; I propose to work through objectives, on an identical basis with [Angolan SOE 2]." Similarly, a September 12, 2005 communication from a Condel employee to a Celcat employee stated: "Everyone knew that [an Angolan SOE2 official] was being paid (if not there would be no need for the bills that come from there); when the contract was signed, that was what was agreed had to be paid."

126. Over the course of the scheme, General Cable admitted that it paid bribes directly to employees of the Angolan SOEs, in addition to making payments to a sales agent with knowledge that the sales agent would, and did, pass a portion of those payments to officials at the Angolan SOEs. The SEC found that as a result of General Cable's relationship with the agent, General Cable's annual sales to the SOEs in Angola increased substantially, from approximately $6.7 million in 2009 to $23.6 million in 2012.

127. Specifically, between 2003 and 2009, General Cable admitted to paying more than $450,000 directly to officials at Angolan SOEs 1, 2, and 3. The SEC found that between 2003 and 2009, General Cable made a total of 38 improper payments of $459,369 directly to at least five employees of Angolan SOEs on sales of approximately $6.1 million. The payments ranged from 1.7% to 2% of the related sales value. The SEC also found that General Cable made three commission payments of $150,156 to an agent of a SOE in Angola in 2008, with knowledge that the payments would be passed on, in part, to officials of the SOE. The commission was 15% of the related sales value of $967,644 and the agent shared the commission with two officials of the SOE.

128. Beginning in or around May 2009, in order to conceal the payments to the Angolan officials, General Cable admitted that it began making payments through the use of a third-party

sales agent. The Company purportedly retained the sales agent to provide commercial assistance services in Angola, but in reality the sales agent was used "as an intermediary to funnel corrupt payments to Angolan officials." General Cable also admitted that it paid more than $8.7 million to the sales agent in Angola between 2009 and 2013 with knowledge that the sales agent would pass a portion of those payments to officials at Angolan SOEs 1, 2, and 3.

129. The SEC determined that these payments consisted of illegal "commissions" General Cable paid to the agent ranging from 5 to 24% of the sales value, with an average commission rate of 16%. The SEC found that the records of these commissions did not describe any services performed by the agent; the commissions were calculated separately from sales invoices to the SOEs; and were directed the commission payments to the agent's personal bank account.

**b. Thailand**

130. With respect to its operations in Thailand, General Cable admitted that from 2012 to 2013, PDTL provided more than $1.5 million in "rebates" to a distributor in Thailand with the understanding that the distributor would use the money, in part, for corrupt purposes in association with PDTL's sales to state-owned customers in Thailand, including sales to the Provincial Electricity Authority, the Metropolitan Electricity Authority, and TOT Public Company Limited. Additionally, the SEC found that that from January 2008 until January 2013, General Cable's subsidiary, PDTL, paid more than $5.4 million in improper payments to a Thai Company, resulting in profits of $13 million on PDTL's sales to SOEs of the Thai government.

131. Specifically, the SEC determined that between "January 2008 to December 2011, in connection with at least 26 sales contracts between PDTL and Thai SOEs, PDTL paid $3.9 million in 'success fees' to the Thai Company that were improperly booked by PDTL as prepaid commissions or discounts." The SEC found that these "payments were internally referred to as

'success fees,'" to reflect the fact that these illicit payments were PDTL's reward to the Thai Company for securing business with SOEs.

132. The SEC further determined that between "April 2012 to January 2013, in connection with 12 sales contracts between PDTL and a Thai SOE, PDTL made $1.5 million in payments to the Thai Company, with the understanding that the Thai Company would use the money, in part, to pass on to Thai SOE officials." According to the SEC's findings, "[t]hese payments were internally referred to as "rebates" and improperly booked by PDTL as 'Cash Discounts' and 'Discount-Customer Rebates.'"

133. With respect to these corrupt payments, the Company has admitted that in or about 2011, a high-ranking PDTL executive met with a high-level executive at General Cable with responsibility for overseeing international operations and expressed concern that payments made by the Company to a distributor in Thailand were being used for corrupt purposes. ***However, despite this conversation, the payments did not stop and there was no investigation of PDTL's relationship with the distributor.***

134. Indeed, as General Cable admitted, the same high-level executive at General Cable who spoke with the high-ranking PDTL executive about the latter's concerns in Thailand received emails on December 13, 2011 that included the following statement regarding the findings of a tax review in Thailand: "***potential applicability of the US Foreign Corrupt Practices Act ('FCPA') for commissions paid to Thai governmental authorities***." Another email from a General Cable employee in the corporate tax department stated: "***Since this is a legal matter rather than tax, no need to do anything further for me. I will leave it up to you as to whether you want to look into any further***."

135. However, despite these direct communications to a member of General Cable's senior management explicitly discussing ongoing FCPA violations occurring at the Company's Thai operations***, General Cable admitted that it "took no further corrective action based on this information***." Instead, "***the corrupt payments made through the Thai Company in Thailand and elsewhere continued and GCC failed to enhance its deficient internal accounting controls***."

136. Moreover, the Company admitted that while it "***came to the understanding that money being paid to the distributor was being used for illegal purposes, and closed their eyes to it being used for bribery***." The SEC likewise found that PDTL's payments to the Thai Company were approved by PDTL's senior management and primarily managed by a Domestic Sales Director, who was aware that the Thai Company was paying bribes to Thai SOE officials from the success fees paid by PDTL.

**c. Bangladesh**

137. General Cable sold cable and wire in Bangladesh via PDTL. General Cable admitted that between 2010 and 2014, General Cable paid bribes to obtain business in Bangladesh. For example, the Company admitted that on May 5, 2013, a General Cable executive approved a $43,700 payment to an agent in Bangladesh with the understanding that the agent would use the money for corrupt purposes. General Cable also admitted that it "***was aware of red flags in connection with these payments and ultimately became aware of, or at the very least were willfully blind to, certain of the corrupt payments***."

138. The SEC also determined that PDTL made an improper commission payment of $43,700 to a third-party agent on a sale of products to a Bangladeshi SOE that resulted in profits of $85,759. In an e-mail to senior PDTL executives, the agent explicitly requested a commission of 10% (or $147,761) of the sale to be "shared by decision makers [at the SOE and] concerned

higher ups" in the Bangladeshi government. "Although PDTL rejected the agent's request for a 10% commission on the sale as excessive," the SEC found that "PDTL nonetheless approved a 5% commission to the agent without addressing whether the agent would send any portion of the commission to a Bangladeshi government official."

139. As with the Company's other bribery schemes, details of General Cable's illicit payments were openly discussed among General Cable employees. For example, a June 18, 2012 email from a Bangladeshi sales agent to multiple General Cable employees stating that a portion of the money that General Cable was paying the sales agent would "be shared by decision makers in customer, concerned higher ups in Ministry and some top executives at bidder."

**d. Indonesia**

140. General Cable admitted that between 2010 and 2014, it paid bribes in Indonesia, including $2 million to two freight forwarders in Indonesia with the understanding that they would use the money for corrupt purposes. The SEC likewise found that from May 2011 to January 2014, General Cable made "improper payments of $2.2 million to two purported freight forwarders on sales to an Indonesian SOE that resulted in $2 million in profits." According to the SEC, "PDTL's records lacked evidence of services provided by the freight forwarders, which had ties to Indonesian government officials." Moreover, the fees to the freight forwarders ranged from 8.9 to 70.5% of the related sales to the Indonesian SOE in violation of PDTL's policies relating to third-party payments.

141. The Company also has admitted that it "***was aware of red flags in connection with these payments and ultimately became aware of, or at the very least were willfully blind to, certain of the corrupt payments***." Indeed, General Cable employees openly communicated about the illicit activity in Indonesia. A March 11, 2010 email describing the services of a principal of the two freight forwarders in Indonesia stated: "Like I [sic] mention it before, my agent doesn't

ask for any money upfront. He can afford to pay his way in and out of PLN [Perusahaan Listrik Negara, the Indonesia-state-owned electricity company]." Despite these many red flags, the SEC found that it was not until February 2014 that General Cable terminated the PDTL manager involved in the illicit payments.

**e. China**

142. The Company admitted that between December 2012 and 2015, GC China made corrupt payments to obtain and retain business in China, including $500,000 to China-based agents and distributors, typically in the form of rebates, special discounts, and technical service fees. As explained in the General Cable Cease-and-Desist Order, the SEC found that General Cable's corrupt payments in China were made "in connection with sales to SOE customers on nineteen projects, resulting in profits of $1.8 million. Portions of these payments, among other things of value, such as merchandise, were given or intended to be given by the distributors or agents to SOE employees."

143. General Cable has admitted that it "***knew that the third-party agents and distributors would use the money, in part, for corrupt purposes***." In fact, as with the Company's other corrupt operations, General Cable employees openly communicated about the scheme via e-mail, among other means of communication. For example, in an August 14, 2013 email, a GC China employee sought approval from a GC China supervisor to provide additional money to a distributor in the form of a discount in association with a sale to a China SOE customer. The GCC China employee emailed the supervisor and justified the corrupt payment, stating that "a few key players at [the SOE customer] are our internal contacts and charge a certain amount of fees. If we are looking to have long term cooperation with them, charges for this is rather inevitable."

144. Similarly, an internal General Cable document dated February 26, 2014 outlined the reasons GCC China provided special discounts to a distributor in association with sales to a state-owned end-customer, stating: "[O]n July 17, 2013, processed the consulting fee of 20,000 [yuan] for [a SOE customer employee] with 10,900 [yuan] remaining."

#### f. Egypt

145. With respect to corrupt payments in Egypt, the SEC found that from September 2010 to May 2015, GC Egypt employees gave or offered to give more than $80,000 in improper payments, including cash, gifts, or tips to employees of certain customers or suppliers, some of which were Egyptian SOEs, resulting in approximately $114,000 in profits. Some of these payments were improperly recorded as "consultant fees" for SOE customer employees to add GC Egypt to, or not to remove it from, supplier lists of the SOE customers. Also, GC Egypt gave small amounts of cash or merchandise, such as laptop computers and televisions, to employees of SOE customers or suppliers as tips, "new year gifts," to buy goodwill, or to recognize them in winning or successfully completing contracts.

## C. General Cable's Bribery Scheme Eventually Runs Its Course

### 1. Defendants Become Aware of Red Flags Regarding General Cable's Lack of FCPA Compliance

146. General Cable's admissions establish that by no later than 2011, prior to the start of the Class Period, the Company knew that its foreign subsidiaries were actively violating the FCPA. As General Cable admitted in the Non-Prosecution Agreement, by December 2011, the Company "knew that certain of [the Company's] foreign subsidiaries used certain third-party agents and distributors to make corrupt payments to foreign officials in order to obtain and retain business." For example, the NPA describes a 2011 meeting between a General Cable executive and a high level PDTL executive during which the PDTL executive "expressed concerns that

payments to the distributor in Thailand were being used for corrupt purposes." The Company admitted that "[d]espite this conversation, the corrupt payments did not stop, nor was an investigation conducted."

147. Moreover, General Cable admitted that after the aforementioned meeting, the same high-level executive at General Cable received multiple emails in December 2011 regarding the findings of a tax review in Thailand that expressly raised the "potential applicability of the US Foreign Corrupt Practices Act ('FCPA') for commissions paid to Thai governmental authorities." General Cable admitted that even after receiving these communications, the Company "took no further action and did not take any steps to implement adequate internal accounting controls." Instead, the Company admitted that the "corrupt payments made through intermediary companies in Thailand and elsewhere continued and General Cable failed to enhance its deficient internal controls."

148. Adding to this corporate knowledge, CW 2 stated that General Cable's executive management, including Robinson, received an Internal Audit report prior to the third quarter of 2012, which recommended that management "create, implement and enhance," FCPA policies and procedures. However, CW 2 does not recall management having acted in response to this audit finding.

149. In addition, CW 2 described several incidents which raised "red flags" regarding the sufficiency of General Cable's internal controls and compliance program at the Company's overseas subsidiaries. CW 2 explained that many of General Cable's ROW subsidiaries were difficult to work with and very defensive when it came to dealing with Internal Audit because they wanted to continue effectuating General Cable's illegal conduct in violation of the FCPA.

150. To that end, CW 2 recounted several incidents involving problems encountered in attempting to audit ROW subsidiaries, which CW 2 deemed suspicious, and communicated to the VP of Internal Audit at the time, Marc Moehlman. CW 2 also alerted CW 1 to these incidents when CW 1 started as the VP of Internal Audit in August 2012.

151. For example, CW 2 learned that there was a memorandum circulating on the ROW intranet, authored by a ROW Compliance Manager, titled "How to deal with auditors," which cautioned that auditors are "not your friends" and "only give the auditors what they ask for." CW 2 brought the memorandum to the attention of Moehlman. CW 2 stated that the normal course of business would have been for Moehlman to forward the memorandum to Robinson.

152. In another incident, during an audit of General Cable's South African operations, CW 2 uncovered an email which stated, in effect: "If [CW 2] or anyone from Internal Audit asks why Raphael Mena, a Costa Rican Internal Controls accountant, was in South Africa, tell [CW 2] that Mena is working on an internal project." The email was erroneously sent by ROW Controller Douglas Guerra to Assistant General Counsel Toman, who forward the email to CW 2. CW 2 informed Robinson of the issue and forwarded Robinson the email from Guerra. Robinson told CW 2 to "calm down" and just do CW 2's work and assured CW 2 that Robinson would get to the bottom of it. However, CW 2 never heard from Robinson again on the issue.

153. CW 2's experiences were confirmed by CW 1. CW 1 stated that General Cable's senior management, including Robinson, hired CW 1 in order to fix the Company's "broken" internal audit department. However, despite Defendants' awareness of gaps in the Company's ability to even audit its foreign operations, let alone ensure compliance with, among other things, the FCPA, CW 1 confirmed that Defendants refused to devote additional resources to directly address these risks until well after the Company began investigating the payments in Angola.

### 2. Internal Audit Alerts Defendants to Evidence of Corrupt Payments in Angola in 3Q 2012

154. According to CW 2, General Cable conducted an audit of Condel in Angola in 3Q 2012. The audit consisted of a "Balance Sheet Review," during which CW 2 examined Condel's financial statements, including a sample of Condel transactions, and assessed its basic internal controls. CW 2 stated that in planning this audit, CW 2 was aware that Angola was "ranked very high" for corruption and so CW 2 was looking for any red flags that might suggest violations of the FCPA were occurring. However, CW 2 does not recall the inclusion of specific FCPA testing in the scope of this audit. CW 2 likewise confirmed that a prior audit of Celcat in 2009, which had responsibility for Condel's operations, was "basic" and did not include any review of FCPA compliance.

155. Despite the lack of specific FCPA focus, during CW 2's review, CW 2 flagged certain commission payments that seemed high. Upon further examination, CW 2 determined that all of the high commissions were paid to one distributor; in fact, it was Condel's only distributor. CW 2 viewed the combination of one distributor and high commissions as a "red flag" regarding the propriety of these payments. After requesting and receiving all records of payments to and invoices for Condel's only distributor, CW 2 discovered that the commission payments were suspiciously high (e.g., between 10%-20% of the underlying contract).

156. CW 2 recalled briefing the Vice President of Internal Audit about the red flag results of the Condel audit over the phone and then in face-to-face meetings when CW 2 returned to the U.S. CW 2 stated that the audit report was circulated in draft form among the various relevant departments, including Finance, Accounting, and Legal and a copy of the official audit report was distributed to Robinson, who was required to sign off on all audit reports. Shortly

after the Condel audit report was issued, CW 2 was transferred out of Internal Audit in December 2012.

157. CW 2's account is corroborated by General Cable's admissions and the SEC's findings. For example, General Cable admitted that General Cable executives received the December 2012 internal audit report identifying that: (i) payments made to the third-party sales agent far exceeded the amounts required under the contract with the agent and (ii) the contract with the third-party sales agent did not include anti-corruption language. In addition, General Cable has admitted that the December 2012 audit report recommended that General Cable establish a global policy regarding the use of agents and sales representatives. The SEC likewise confirmed that the Condel audit occurred in 3Q 2012, internal audit issued the related report in December 2012, and the report identified red flags regarding corrupt payments in Angola.

158. Despite red flags that General Cable's relationship with the Angolan sales agent likely violated the FCPA, the SEC found that General Cable failed to further investigate these payments or, indeed, implement any additional internal accounting controls in response to the internal audit report until at least eight months after General Cable issued the audit report, in August 2013. As a result, from December 2012 to August 2013, General Cable continued to make commission payments to the agent of over $1.5 million in violation of the FCPA. Moreover, the Company has admitted that despite its knowledge that the Angolan sales agent was being used as a conduit for the payment of bribes, ***on September 5, 2013, General Cable paid the sales agent in Angola $223,433, knowing that at least part of this payment would be passed on to Angolan government officials***.

159. At the very same time, Defendants falsely reassured investors in Forms 10-K and 10-Q filed in March and May 2013, that the Company (i) had policies and procedures in place to

ensure FCPA compliance and (ii) had designed internal controls to ensure disclosure of material information and reliable financial statements.

### 3. Defendants Belatedly Commence an Internal Investigation, but Allow Additional FCPA Violations to Occur

160. The SEC found that in August 2013, General Cable had an E&M Compliance Manager conduct an onsite review of Condel to address internal controls matters and follow up on the December 2012 report. The Compliance Manager identified additional red flags about Condel's relationship with the agent, including: (a) the average commissions paid in 2012 was 18% when the agreement with the agent specified 1%; (b) Condel's Country Manager, who exclusively managed the relationship with the Agent, directed payments to the Agent's personal bank account; (c) no proof of services performed were provided by the Agent; and (d) the customers related to the agent were Angolan SOEs. The Compliance Manager submitted a memorandum detailing the red flags to E&M's management, including a General Cable executive officer. The Compliance Manager also informed E&M's management that Condel's management may be paying bribes to the agent or to government officials on sales to SOEs.

161. According to the SEC's findings, General Cable's executive management inquired into Condel's relationship with the agent for potential bribery of SOE officials in response to this second report—nearly one year after they received the first Internal Audit report providing evidence of corrupt payments in Angola. Then, in October 2013, General Cable's executive management instructed Celcat and Condel's management to cease payment of past due commissions to the Agent pending further investigation and not to make any additional payments without authorization by General Cable executive management.

162. However, as explained by the SEC, to avoid the loss of approximately $10 million in sales to the Angolan SOEs and approximately $5 million in termination costs, General Cable's

executive management instructed Condel that it could continue to work with the existing Agent on a case-by-case basis for new business with the SOEs, in order to allow time to transition to the new agent. As a result, as late as November 2013, the SEC found that General Cable approved sales contracts with the Angolan SOEs that called for commissions to the agent from 7.5% to 18.5%. Additionally, according to the SEC, in December 2013, General Cable approved the payment of past due commissions totaling $342,613 to the agent from 6% to 18% of the related sales contracts.

163. In January 2014, years after the Company learned that it did not implement policies, procedures, and internal controls to guard against FCPA violations, General Cable first reported certain illegal Angolan payments to the SEC and DOJ as "potential" FCPA violations. At around the same time, Defendants selectively revealed to investors that the Company was reviewing certain payments in Angola, but did not explain that these payments were corrupt and in violation of the FCPA, had been reported to the SEC and DOJ as such, and, ultimately, were the result of a grossly ineffective and nonexistent FCPA compliance program. Moreover, in no less than eight SEC filings on January 21, 2014, including two Forms 10-K/A, four Forms 10-Q/A, and two Forms 10-Q, and in additional Forms 10-K and 10-Q filed in March and May 2014, Defendants once again reassured investors that General Cable had designed and implemented policies, procedures, and internal controls to ensure FCPA compliance.

### 4. News of General Cable's FCPA Violations Begins to Emerge

164. On August 1, 2014, Defendants disclosed that a Company "review" related to potential FCPA violations in Angola had been reported to the SEC and DOJ. The Company further disclosed that the Angolan "review" was "focused upon payment practices with respect to employees of public utility companies, use of agents in connection with such payment practices, and the manner in which the payments were reflected on our books and records."

165. Six weeks later, on September 22, 2014, General Cable filed a Form 8-K with an updated FCPA risk disclosure wherein the Company announced that the magnitude of its FCPA liability was greater than it had previously disclosed. The filing also stated that General Cable was "reviewing, with the assistance of external counsel, our use and payment of agents in connection with our Thailand and India operations, which may have implications under the FCPA."

166. General Cable's announcement confirmed, among other things, that the Company had discovered additional FCPA problems in its Thailand and India operations and was beginning to address its woefully deficient FCPA compliance program. In particular, according to CW 10, the FCPA problem in India related to a $100,000 payment to an Indian lawyer to obtain government licensing for General Cable's Baddi, India plant. CW 10 confirmed that it was well-known within General Cable India that the lawyer had bribed government officials in order to secure the necessary licensing. CW 10 also confirmed that General Cable engaged Kroll-Singapore to conduct a two day audit related to the Baddi, India plant, and in particular, wrong-doing with respect to the licensing of the plant, in the first half of 2014.

167. Then, on October 29, 2014, General Cable announced that it would exit its operations in Asia Pacific and Africa. In a press release on this date, the Company stated that its planned divestiture was "to simplify [the Company's] global portfolio and reduce operational complexity by focusing on core strategic operations in North America, Latin America and Europe."

168. During a related conference call with analysts the following day, General Cable confirmed its decision to divest its Asia Pacific and Africa operations and Defendant Robison provided an update with respect to the FCPA investigation. In particular, Robinson reported that

the scope of the investigation included a review of 450,000 documents and interviews of at least 20 General Cable employees, and explained that General Cable was "tak[ing] steps to strengthen the Company's compliance program," including anti-corruption training and the hiring of a Chief Compliance Officer.

169. Thereafter, on February 10, 2016, Defendants announced that General Cable had identified other confirmed FCPA violations and, as a result, increased its accrual for the disgorgement of profits. Specifically, Defendants revealed that General Cable had increased its accrual for profits the Company likely would be required to disgorge due to FCPA violations to $28 million. Defendants also identified additional profits tied to "certain other transactions that may raise concerns," which required accrual since disgorgement was reasonably possible. In a conference call on February 11, 2016, Robinson reported that the Company had "substantially completed [its] internal investigations related to [its] previously disclosed FCPA matters." With respect to the announcement of additional profits the Company may be required to disgorge for FCPA violations, Robinson stated:

> In the course of our investigation, we also identified certain other transactions that may raise concerns under the FCPA, for which it is at least reasonably possible we may be required to disgorge certain profits. ***The range of additional possible profit disgorgement is from zero to $33 million. These amounts do not include any possible fines, civil or criminal penalties***.

### D. The Company's Disclosures of Its FCPA Violations Prompt Criminal and Civil Investigations, Resulting in Severe Penalties

#### 1. Criminal Investigation by the Department of Justice

170. In response to the Company's disclosure of potential FCPA violations to the DOJ in January 2014, the DOJ instituted a criminal investigation. After a three-year investigation, on December 22, 2016, General Cable entered into a three-year Non-Prosecution Agreement with the DOJ, pursuant to which the Company admitted that it made corrupt payments in Angola,

Indonesia, Thailand, Bangladesh, and China, and that it did not have sufficient internal controls to ensure FCPA compliance.

171. In addition to requiring General Cable to pay a $20.5 million criminal penalty for violating the FCPA, the NPA mandated that the Company "adopt new or [] modify existing internal controls, compliance codes, policies, and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that General Cable makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anticorruption compliance program that includes policies and procedures designed to detect and deter violations of the FCPA and other applicable anticorruption laws."

172. In particular, the DOJ required General Cable to:

a. "ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policies against violations of the FCPA . . . ";

b. "develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the [FCPA]" and do so "on the basis of a periodic risk assessment addressing the individual circumstances of General Cable," including "the foreign bribery risks facing" the Company;

c. "ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts";

d. "institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners," and potential merger and acquisition candidates, with respect to FCPA compliance;

e. "review its [FCPA] compliance policies and procedures no less than annually and update them as appropriate to ensure its continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards";

f. "conduct periodic reviews and testing of" FCPA policies and procedures "designed to evaluate and improve their effectiveness in preventing and detecting violations of [FCPA] . . . ";

g. "implement mechanisms designed to ensure that" FCPA policies and procedures "are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners," including "periodic training" of General Cable employees and "agents and business partners" and "an effective system for providing guidance and advice to" employees and agents regarding FCPA compliance;

h. "implement mechanisms designed to effectively enforce its compliance codes, policies, and procedures, including appropriately incentivizing compliance and disciplining violations"; and

i. "implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance codes, policies, and procedures and making modifications necessary to ensure that the overall anticorruption compliance program is effective."

### 2. The SEC's Investigation

173. Like the DOJ, the SEC launched an investigation in January 2014. On December 29, 2016, the SEC entered the Cease-and-Desist Order, which required the Company to pay disgorgement of $51,174,237 in profits connected the payment of bribes in violation of the FCPA, and prejudgment interest of $4,107,660. In addition to the disgorgement, the SEC imposed additional reporting and compliance requirements regarding General Cable's remediation of its deficient FCPA compliance program and admitted FCPA violations, including submitting a report one year after the date of the Order "setting forth a complete description of its FCPA and anticorruption related remediation efforts to date, its plans or proposals reasonably designed to improve its policies and procedures for ensuring compliance with the FCPA[.]"

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

174. Prior to and during the Class Period, Defendants issued three categories of materially false and misleading statements. *First*, Defendants falsely assured investors that General Cable had implemented policies and procedures designed to ensure compliance with the

FCPA. *Second*, Defendants misleadingly discussed the risks posed to the Company's operations in overseas markets where, unbeknownst to investors, widespread FCPA violations were occurring. *Third*, Defendants falsely represented that the Company's internal controls over financial reporting were effective. Each of these sets of statements regarding the Company's policies and procedures, internal controls over financial reporting, and business operations were either untrue or rendered materially misleading by virtue of the undisclosed (i) lack of any effective compliance program, including policies, procedures, and controls designed and implemented to ensure FCPA compliance and (ii) corrupt scheme ultimately admitted to by the Company in connection with its settlements with the DOJ and SEC.

### A. FY 2011 Form 10-K, 1Q 2012 Form 10-Q, and 2Q 2012 Form 10-Q

175. On February 23, 2012, the first day of the Class Period, Defendants filed General Cable's financial results for the year ending December 31, 2011 ("FY 2011") with the SEC on Form 10-K (the "FY 2011 Form 10-K"). Defendants Kenny and Robinson signed the 2011 Form 10-K in their capacities as General Cable's CEO and CFO, respectively.

176. With respect to the FCPA, the FY 2011 Form 10-K stated: "***we have implemented policies and procedures designed to ensure compliance with [the FCPA]***." Without alteration, this statement concerning General Cable's FCPA policies and procedures had been made in each of its prior Forms 10-K, beginning with the Company's Form 10-K reporting its financial results for the fiscal year ending December 31, 2007.

177. The FY 2011 Form 10-K also contained a risk disclosure regarding "***the economic, political and other risks of maintaining facilities and selling products in foreign countries***." In particular, the FY 2011 Form 10-K stated:

> During the year ended December 31, 2011, approximately 64% of our sales and approximately 77% of our assets were in markets outside of North America. Our operations outside of North America generated approximately 55% of our cash

> flows from operations during this period. Some of our facilities, in particular, certain locations such as Algeria, ***Angola, Egypt, India***, Pakistan, the Philippines, ***Thailand***, and Venezuela, among others, are at higher risk of being targets of economic and political destabilization, international conflicts, restrictive actions by foreign governments, nationalizations or expropriations, changes in regulatory requirements, ***the difficulty of effectively managing diverse global operations***, terrorist activities, adverse foreign tax laws and the threat posed by potential pandemics in countries that do not have the resources necessary to deal with such outbreaks. . . . Economic and political developments in the countries in which we have operations, including future economic changes or crises (such as inflation, currency devaluation or recession), government deadlock, political instability, political activism, terrorist activities, civil strife, international conflicts, changes in laws and regulations and expropriation or nationalization of property or other resources, could impact our operations or the market value of our common stock and have an adverse effect on our business, financial condition and results of operations.

178. The above statements concerning General Cable's FCPA policies and procedures and the specific risks posed to the Company's overseas operations, including those in Angola, Egypt, India, and Thailand, were incorporated by reference into each of General Cable's quarterly reports filed with the SEC on Form 10-Q filed during FY 2012, including (i) General Cable's Form 10-Q for the three months ending March 30, 2012 ("1Q 2012"), filed with the SEC on May 4, 2012 ("1Q 2012 Form 10-Q") and (ii) General Cable's Form 10-Q for the three months ending June 29, 2012 ("2Q 2012") filed on August 3, 2012 ("2Q 2012 Form 10-Q"). Defendants Kenny and Robinson signed each of the Company's FY 2012 quarterly reports.

179. The FY 2011 Form 10-K also contained the following certification with respect to the purported effectiveness of the Company's internal controls over financial reporting. Under the heading "Management's Annual Report on Internal Control over Financial Reporting," Defendants stated:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such item is defined in the Exchange Act Rules 13a-15(f) and 15d-15(f). In connection with the preparation of this Annual Report on Form 10-K, as of December 31, 2011, the Company conducted an evaluation of the effectiveness of internal control over financial reporting based on the

> framework in "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***As a result of this process, management concluded that internal control over financial reporting was effective as of December 31, 2011***.

180. The 1Q 2012 Form 10-Q and the 2Q 2012 Form 10-Q also included the same certification regarding the effectiveness of General Cable's internal controls over financial reporting as of March 30, 2012 and June 29, 2012, respectively.

181. The FY 2011 Form 10-K further appended as Exhibits 31.1 and 31.2, respectively, the Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002 (the "CEO 302 Certification"), signed by Kenny, and the Certification of the Chief Financial Officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002 (the "CFO 302 Certification"), signed by Robinson, for FY 2011.

182. The FY 2011 CEO 302 Certification and the CFO 302 Certification both stated: "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

183. The FY 2011 CEO 302 Certification and CFO 302 Certification also represented that both the CEO and CFO:

> are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:
>
> a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide

> reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

184. The 302 CEO Certification and 302 CFO Certification for 1Q 2012 and 2Q 2012, appended to the 1Q 2012 and 2Q 2012 Forms 10-Q as Exhibits 31.1 and 31.2, respectively, also contained the same or substantially similar certifications as set forth above in ¶¶182-183.

185. The statements identified above in ¶¶176-180, 182-184 were materially false and/or misleading because at the time Defendants assured investors that General Cable had "implemented policies and procedures designed to ensure compliance with [the FCPA]," and "designed" sufficient internal controls "to ensure" the disclosure of material information and "provide reasonable assurance regarding the reliability of [its] financial reporting," and that the Company's "internal control over financial reporting was effective," Defendants knew or were severely reckless in not knowing that: (i) General Cable lacked the components of an effective corporate compliance program for FCPA, including sufficient policies, procedures, and internal controls designed to ensure compliance with the FCPA's anti-bribery and accounting provisions, and (ii) as a direct consequence of Defendants' failure to design and implement an effective corporate FCPA compliance program, had failed to prevent widespread FCPA violations in Angola, Thailand, Indonesia, Bangladesh, and Egypt as of the date of these statements, which led

to the entry of the Cease-and-Desist Order and the Non-Prosecution Agreement and $75 million in fines and penalties once those violations were publicly disclosed.

186. The Company's widespread violations of the FCPA, in turn, rendered the statements set forth above in ¶177 regarding the risks posed to the Company's overseas operations, including those in "Angola, Egypt, India . . . [and] Thailand," materially false and misleading because (i) these disclosures omitted the fact that one of the primary risks facing the Company's operations in these countries as of the date of these statements was the fact that General Cable was dependent upon corruption in order to facilitate it overseas operations, and (ii) an inability to sustain these practices, either due to political reform abroad or enforcement at home, would have a material adverse impact on the Company's continued operations in those countries.

187. Furthermore, these statements were materially false and/or misleading when made because, as the Company has now admitted in the Non-Prosecution Agreement:

a. General Cable "knew that certain of its foreign subsidiaries used certain third-party agents and distributors to make corrupt payments to foreign officials in order to obtain and retain business in certain countries."

b. General Cable had "deficiencies in its internal controls, compliance codes, policies and procedures regarding compliance with the" FCPA.

c. "General Cable ***knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents***."

d. "General Cable had deficient internal accounting controls," including controls "that did not require and/or ensure, among other things (a) due diligence for the retention of third party agents and distributors; (b) proof that services had been rendered by third parties before payment could be made to them; (c) oversight of the payment process to ensure that payments were made pursuant to contractual terms or that payments were reasonable and legitimate."

e. General Cable's "knowing[] and willful[] fail[ure] to address these known weaknesses . . . allow[ed] the conduct to continue" and "[a]s a result, General Cable and its subsidiaries made more than $13 million in payments to third-party agents and distributors which were used to make unlawful payments to secure approximately $51 million in profits to General Cable."

f. The more than $13 million in corrupt payments knowingly made by General Cable included, *inter alia*, the payment of: (i) more than $8.7 million to a sales agent in Angola between 2009 and 2013 "with the knowledge that the sales agent would, and did, pass a portion of those payments to officials" at three Angolan SOEs; (ii) "more than $2 million to two freight forwarders in Indonesia with the understanding that the freight forwarders would use the money, in part, for corrupt purposes" between 2010 and 2014; and (iii) "more than $1.5 million in rebates to a distributor in Thailand with the understanding that the distributor would use the money, in part, for corrupt purposes in association with PDTL's sales to state-owned customers in Thailand."

g. With respect to payment of corrupt payments in Thailand, in 2011 "a high-level" General Cable executive "with responsibility for overseeing international operations . . . expressed concerns" that these payments "were being used for corrupt purpose," received a report finding that the FCPA was potentially applicable to these payments, and, despite these concerns, the Company did not stop making corrupt payments, conduct an investigation, or "take any steps to implement adequate internal accounting controls" or "enhance its deficient internal controls."

188. The falsity of the foregoing statements and the foregoing admissions were further corroborated by the findings of the SEC set forth the Cease-and-Desist Order, including, among other things:

a. General Cable "violated Section 30A [of the Exchange Act, 15 U.S.C. § 78dd-1] by corruptly paying or offering to pay bribes or give other things of value to employees or officials of SOEs in Angola to obtain or retain business."

b. General Cable "violated Section 13(b)(2)(A) [of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A)] as the payments described above by Celcat, Condel, PDTL, GC China, and GC Egypt were recorded as legitimate business expenses on their respective books and records, when knowing or believing they were in fact used as bribes or improper payments to foreign government officials, or otherwise lacked reasonably detailed documentation to accurately and fairly reflect the payments on the

subsidiaries' books and records, which were included in [General Cable]'s books and records and consolidated financial statements."

c. General Cable "violated Section 13(b)(2)(B) [of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B)]" because "the payments or offers by [the Company]'s subsidiaries identified above violated [its] policies against bribery and excessive payments to third-parties on transactions with SOEs, or otherwise were not supported by proper documentation or authorization" and "[e]mployees of [General Cable]'s subsidiaries were not adequately trained on anticorruption risks, did not require third-parties on SOE sales to comply with the FCPA, and did not perform any anticorruption due diligence on third parties."

d. General Cable "***did not provide adequate guidance or training on policies and procedures to ensure compliance with the FCPA***" and "[a]s a result, a number of [the Company's] foreign subsidiaries lacked internal accounting controls for doing business with third-party entities on sales to government customers."

e. General Cable "employees were not aware that the FCPA, as a U.S. law, applied to their operations, and failed to perform anti-corruption due diligence on third-party entities, obtain written contracts with third-party entities requiring their compliance with the FCPA, and report to management transactions that raised corruption issues"

f. The more than $9 million in corrupt payments made to Angolan SOEs between 2003 and 2013 resulted "in more than $34 million in profits on Celcat and Condel's sales to SOEs in Angola."

g. The more than $5.4 million in corrupt payments made to a Thailand corporation, including $3.9 million in purported "success fee" payments from January 2008 to December 2011, resulted "in more than $13 million in profits on PDTL's sales to SOEs of the Thai government."

189. Furthermore, the falsity of the Defendants' misstatements and the foregoing admissions to the DOJ and the SEC's findings also are corroborated by the accounts of 12 CWs, set forth above, including that, prior to and during the Class Period, General Cable:

a. did not have effectively designed and implemented policies and procedures concerning FCPA compliance, *see* Section IV.B.1.a;

b. did not have effectively designed or implemented internal controls concerning FCPA compliance, *see id*;

c. did not have sufficient oversight of and resources assigned to FCPA compliance, *see* Section IV.B.1.b;

d. did not provide sufficient or effective training on FCPA compliance for its employees, *see id.*; and

e. did not conduct sufficient or effective, testing or auditing of the Company's FCPA compliance, or its policies, procedures, or internal controls purportedly designed to ensure FCPA compliance, *see* Section IV.B.1.c.

190. For example, CW 2 confirmed that General Cable did not have a formal FCPA compliance program at the time the foregoing statements were made. CW 2 also stated that General Cable did not have any policies or procedures concerning the Company's use of third parties and agents in its foreign operations, including a formal system of (i) conducting due diligence on third parties (e.g. agents, sales representatives, or distributors), or (ii) collecting or maintaining records of what third parties the Company engaged or relied upon during the relevant period. CW 2 also confirmed that Defendants were aware of, but did not heed, red flags demonstrating that the Company's foreign subsidiaries refused to cooperate with Internal Audit.

191. Moreover, the material falsity and/or misleading nature of these statements was confirmed by the fact that, in the fall of 2014, General Cable belatedly ***began implementing*** the very policies, procedures, and internal controls necessary to ensure FCPA compliance that Defendants promised were in place during the Class Period including, among other things: (i) "a screening process," "risk-based assessment," and "due diligence" "relating to sales agents" used in General Cable's foreign operations; (ii) FCPA compliance training for all General Cable employees; and (iii) hiring a Chief Compliance Officer.

**B. FY 2011 Form 10-K/A, FY 2012 Form 10-K, 3Q 2012 Form 10-Q, and 1Q 2013 Form 10-Q**

192. On March 1, 2013, Defendants filed with the SEC the following: (i) amended and restated financial results for FY 2011 on Form 10-K/A ("FY 2011 Form 10-K/A"); (ii) financial

results for the year ending December 31, 2012 ("FY 2012") on Form 10-K ("FY 2012 Form 10-K"); and (iii) financial results for the three months ending September 28, 2012 ("3Q 2012") on Form 10-Q ("3Q 2012 Form 10-Q"). The FY 2011 Form 10-K/A, FY 2012 Form 10-K, and 3Q 2012 Form 10-Q were signed by Defendants Kenny and Robinson.

193. With respect to General Cable's FCPA compliance, and the risks surrounding the Company's operations in Angola, Egypt, India, and Thailand, the FY 2011 Form 10-K/A and the FY 2012 Form 10-K contained the same statement that appeared in the FY 2011 Form 10-K, as set forth above in ¶¶176-177.

194. The statements set forth in the FY 2011 Form 10-K/A also was incorporated by reference in to the 3Q 2012 Form 10-Q. Additionally, the statements set forth in FY 2012 Form 10-K was incorporated by in to General Cable's Form 10-Q for the three months ended March 29, 2013 ("1Q 2013") filed with the SEC on May 7, 2013 ("1Q 2013 Form 10-Q"). The 3Q 2012 and 1Q 2013 Forms 10-Q were signed by Defendants Kenny and Robinson.

195. The FY 2011 Form 10-K/A, FY 2012 Form 10-K, 3Q 2012 Form 10-Q, and 1Q 2013 Form 10-Q also contained the same or substantially the same 302 CEO and CFO Certifications for FY 2011, FY 2012, 3Q 2012, and 1Q 2013, respectively, as set forth above in ¶¶182-183.

196. The statements identified above in ¶¶193-195 were materially false and/or misleading because at the time Defendants assured investors that General Cable had "implemented policies and procedures designed to ensure compliance with [the FCPA]," and "designed" sufficient internal controls "to ensure" the disclosure of material information and "provide reasonable assurance of the reliability of its financial reporting," Defendants knew or were severely reckless in not knowing that: (i) General Cable lacked the components of an

effective corporate compliance program for FCPA, including sufficient policies, procedures, and internal controls designed to ensure compliance with the FCPA's anti-bribery and accounting provisions, and (ii) as a direct consequence of Defendants' failure to design and implement an effective corporate FCPA compliance program, had failed to prevent widespread FCPA violations in Angola, Thailand, Indonesia, Bangladesh, Egypt, and China as of the date of these statements, which led to the entry of the Cease-and-Desist Order and the Non-Prosecution Agreement and $75 million in fines and penalties once those violations were publicly disclosed.

197. The Company's widespread violations of the FCPA, in turn, rendered the statements identified above in ¶193 regarding the risks posed to the Company's overseas operations, including those in "Angola, Egypt, India . . . [and] Thailand," materially false and misleading because (i) these disclosures omitted the fact that one of the primary risks facing the Company's operations as of the date of these statements was the fact that the Company was dependent upon corruption in order to facilitate it overseas operations, and (ii) an inability to sustain these practices, either due to political reform abroad or enforcement at home, would have a material adverse impact on the Company's continued operations—precisely the risk that materialized when the Company's FCPA violations were disclosed.

198. Specifically, these statements were materially false and/or misleading when made because, in addition to General Cable's admissions regarding ongoing corrupt payments in Angola, Indonesia, Thailand, and Bangladesh and deficient policies, procedures, and internal controls governing FCPA compliance alleged in ¶187, the Company admitted in the Non-Prosecution Agreement:

a. With respect to the corrupt payments made in Angola, "on or about December 19, 2012, General Cable executives received an internal audit report from General Cable's internal audit department" which: (i) detailed "payments made to the third-party [Angolan] sales agent [that] far exceeded

the amounts required under the contract with the agent; (ii) found that "the contract with the third-party [Angolan] sales agent did not include anti-corruption language;" and (iii) "recommended that General Cable establish a global policy regarding the use of agents and sales representatives."

b. After receiving the December 2012 audit report regarding Angola, General Cable "failed to establish adequate internal accounting controls" and Condel "continued to make corrupt payments to the [Angolan] agent in excess of the contractually required amounts."

c. With respect to corrupt payments in China, beginning at the end of FY 2012 and continuing until 2015, GC China "made corrupt payments to obtain and retain business in China," including payments of more than $500,000 to China-based agents and distributors, typically in the form of rebates, special discounts, and technical service fees" which GC China "knew . . . would [be] used . . . in part, for corrupt purposes."

199. These admissions were corroborated by the findings of the SEC set forth the Cease-and-Desist Order, including those findings set forth above in ¶188, as well as the following:

a. With respect to corrupt payments in Angola, Celcat and Condel's annual sales to the Angolan SOEs "increased substantially, from approximately $6.7 million in 2009 to $23.6 million in 2012 as a result of the Company's relationship with the third-party Angolan sales agent."

b. A September 2012 "on-site audit of financial and operational processes and controls at Condel" led to the issuance of the December 2012 report "identify[ing] several red flags concerning Condel's relationship with" the Angolan sales agent, including that actual commissions paid to the agent were 8.5 to 18.5% of sales, far in excess of the 1% commission rate set forth in the agreement and the E&M policy prohibiting commissions of more than 10%.

c. Despite receipt of the December 2012 internal audit report identifying FCPA compliance issues, General Cable's "executive management failed to implement additional internal accounting controls in response to the report" for 8 months, or until August 2013, allowing the Company to pay the Angolan sales agent over $1.5 million.

d. With respect to corrupt payments in Thailand, between April 2012 and January 2013, PDLT made $1.5 million in payments to a Thai company "in connection with 12 sales contracts between PDTL and a Thai SOE" "with the understanding" that the Thai company would pass some of the money on to Thai SOE officials.

200. Furthermore, the falsity of the Defendants' misstatements and the foregoing admissions to the DOJ and the SEC's findings also are corroborated by the accounts of 12 CWs, set forth above in ¶¶189-190. For example, CW 1 recounted that when CW 1 started as General Cable's Vice President of Internal Audit, it was clear to CW 1 that the Company lacked an effective FCPA compliance program. CW raised these concerns with General Cable's senior management, including Robinson, who failed to take corrective action or devote additional resources to FCPA compliance. CW 1 stated that as a result of management's attitude, the Company only had basic FCPA compliance policies, and no FCPA testing or employee training, including for members of CW 1's Internal Audit staff who were responsible for auditing the Company's overseas operations. In particular, CW 1 noted the lack of any due diligence policies or procedure regarding the Company's use of third parties and agents, and lack of a central database or repository for information on its various agents and third parties.

201. Moreover, the material falsity and/or misleading nature of these statements was confirmed by the fact that, in the fall of 2014, General Cable belatedly ***began implementing*** the very policies, procedures, and internal controls necessary to ensure FCPA compliance that Defendants promised were in place during the Class Period including, among other things: (i) "a screening process," "risk-based assessment," and "due diligence" "relating to sales agents" used in General Cable's foreign operations; (ii) FCPA compliance training for all General Cable employees; and (iii) hiring a Chief Compliance Officer.

### C. FY 2011 2nd Form 10-K/A, FY 2012 Form 10-K/A, Forms 10-Q/A for 1Q-3Q 2012 and 1Q 2013, and Forms 10-Q for 2Q-3Q 2013

202. On January 21, 2014, General Cable filed the following with the SEC: (i) second amended and restated financial results for FY 2011 on Form 10-K/A ("FY 2011 2nd Form 10-K/A"); (ii) amended and restated financial results for FY 2012 on Form 10-K/A ("FY 2012 Form

10-K/A"); (iii) amended and restated financial results for 1Q 2012 on Form 10-Q/A ("1Q 2012 Form 10-Q/A"); (iv) amended and restated financial results for 2Q 2012 on Form 10-Q/A ("2Q 2012 Form 10-Q/A"); (v) amended and restated financial results for 3Q 2012 on Form 10-Q/A ("3Q 2012 Form 10-Q/A"); (vi) amended and restated financial results for 1Q 2013 Form 10-Q/A ("1Q 2013 Form 10-Q/A"); (vii) financial results for the three months ending June 28, 2013 ("2Q 2013") on Form 10-Q ("2Q 2013 Form 10-Q"); and (viii) financial results for the three months ending September 27, 2013 ("3Q 2013") on Form 10-Q ("3Q 2013 Form 10-Q"). Each of these SEC filings was signed by Defendants Kenny and Robinson.

203. With respect to General Cable's FCPA compliance and the specific risks to General Cable's operations in Angola, Egypt, India, and Thailand, the FY 2011 2nd Form 10-K/A and FY 2012 Form 10-K/A contained the same statements that appeared in the FY 2011 Form 10-K, as set forth above in ¶¶176-177.

204. Additionally, the same statements set forth in the FY 2011 2nd Form 10-K/A were incorporated by reference in to the Forms 10-Q/A for 1Q-3Q 2012. Likewise, the same statements set forth in the FY 2012 Form 10-K/A were incorporation by reference in to the 1Q 2013 Form 10-Q/A and Forms 10-Q for 2Q-3Q 2013. The FY 2011 2nd Form 10-K/A, FY 2012 Form 10-K/A, forms 10-Q/A for 1Q-3Q 2012 and 1Q 2013, and Forms 10-Q for 2Q-3Q 2013 also contained the same or substantially the same 302 CEO and CFO Certifications for the relevant periods, respectively, as set forth above in ¶¶182-183. Each of these SEC filings was signed by Defendants Kenny and Robinson.

205. The statements identified above in ¶¶203-204 were materially false and/or misleading because at the time Defendants assured investors that General Cable had "implemented policies and procedures designed to ensure compliance with [the FCPA]," and

"designed" sufficient internal controls "to ensure" the disclosure of material information and "provide reasonable assurance of the reliability of its financial reporting," Defendants knew or were severely reckless in not knowing that: (i) General Cable lacked the components of an effective corporate compliance program for FCPA, including sufficient policies, procedures, and internal controls designed to ensure compliance with the FCPA's anti-bribery and accounting provisions, and (ii) as a direct consequence of Defendants' failure to design and implement an effective corporate FCPA compliance program, had failed to prevent widespread FCPA violations in Angola, Thailand, Indonesia, Bangladesh, Egypt, and China, which led to the entry of the Cease-and-Desist Order and the Non-Prosecution Agreement and $75 million in fines and penalties once those violations were publicly disclosed.

206. The Company's widespread violations of the FCPA, in turn, rendered the statements identified above in ¶203 regarding the risks posed to the Company's overseas operations, including those in "Angola, Egypt, India . . . [and] Thailand," materially false and misleading because (i) these disclosures omitted the fact that one of the primary risks facing the Company's operations as of the date of these statements was the fact that the Company was dependent upon corruption in order to facilitate it overseas operations, and (ii) an inability to sustain these practices, either due to political reform abroad or enforcement at home, would have a material adverse impact on the Company's continued operations—precisely the risk that materialized when the Company's FCPA violations were disclosed.

207. Specifically, these statements were materially false and/or misleading because of General Cable's admissions in the Non-Prosecution Agreement regarding ongoing corrupt payments in Angola, Thailand, Indonesia, Bangladesh, and China, and deficient policies,

procedures, and internal controls governing FCPA compliance alleged in ¶¶187, 198. These admissions also were corroborated by the CW accounts as explained in ¶¶189-190, 200 above.

208. These admissions were further corroborated by the findings of the SEC set forth in the Cease-and-Desist Order set forth above in ¶¶188, 199, as well as the following: With respect to the corrupt payments in Angola, an August 2013 on-site review of Condel by Internal Audit revealed "additional red flags about Condel's relationship with" the Angolan sales agent, including "the average commissions paid in 2012 was 18% when the agreement with the [Angolan] agent specified 1%" and were paid to the agent's personal bank account, the relevant customers with respect to the relationship were Angolan SOEs, and there was "no proof of services performed" by the Angolan sales agent.

209. Significantly, Defendants affirmatively republished without any amendment or alteration that General Cable had (i) policies and procedures designed to ensure FCPA compliance and (ii) internal controls to ensure that all material information was disclosed and that the Company's financial reports accurately reflected its results for FY 2011, FY 2012, and several fiscal quarters, in the SEC filings identified in ¶202. These same filings also failed to identify public sector corruption as a risk factor with respect to the Company's overseas operations after or at the same time had Defendants discovered, was internally investigating, ***and reported*** potential FCPA violations in Angola to the SEC and DOJ.

210. Moreover, the material falsity and/or misleading nature of these statements was confirmed by the fact that, in the fall of 2014, General Cable belatedly ***began implementing*** the very policies, procedures, and internal controls necessary to ensure FCPA compliance that Defendants promised were in place during the Class Period including, among other things: (i) "a screening process," "risk-based assessment," and "due diligence" "relating to sales agents" used

in General Cable's foreign operations; (ii) FCPA compliance training for all General Cable employees; and (iii) hiring a Chief Compliance Officer.

**D. FY 2013 Form 10-K and 1Q 2014 Form 10-Q**

211. General Cable filed its financial results for the year ending December 31, 2013 ("FY 2013") with the SEC on Form 10-K on March 3, 2014 ("FY 2013 Form 10-K"). Defendants Kenny and Robinson signed the FY 2013 Form 10-K.

212. With respect to General Cable's FCPA compliance and the specific risks to the Company's operations in Angola, Egypt, India, and Thailand, the FY 2013 Form 10-K contained the same statements that appeared in the FY 2011 Form 10-K, as set forth above in ¶¶176-177.

213. Additionally, the same statements set forth in the FY 2013 10-K were incorporated by reference into the Forms 10-Q for the three months ending March 28, 2014 ("1Q 2014") filed on May 6, 2014 ("1Q 2014 Form 10-Q").

214. The FY 2013 Form 10-K and Forms 10-Q for 1Q 2014 also contained the same or substantially the same 302 CEO and CFO Certifications for the relevant periods, respectively, as set forth above in ¶¶182-183.

215. The statements identified above in ¶¶212-214 were materially false and/or misleading for the reasons set forth above in ¶¶185-191, 196-201, and 205-210.

## VI. LOSS CAUSATION AND EMERGENCE OF THE RELEVANT TRUTH

216. As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, as alleged herein General Cable's publicly traded common stock traded at artificially inflated prices during the Class Period. Specifically, Defendants' misrepresentations and omissions regarding the Company's purported implementation of "policies and procedures designed to ensure compliance" with the FCPA, the risks posed to the Company's overseas operations in countries where bribery was occurring, and

internal controls over financial reporting, caused and/or maintained the artificial inflation in General Cable's stock price during the Class Period.

217. Relying on the integrity of the market price for General Cable common stock and public information relating to General Cable, Lead Plaintiff and other Class members purchased or otherwise acquired General Cable common stock at prices that incorporated and reflected General Cable's misrepresentations and omissions of material fact alleged herein. As a result of their purchases of General Cable common stock during the Class Period at artificially inflated prices and the removal of that inflation upon the partial disclosures set forth below, Lead Plaintiff and the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

218. Defendants' false and misleading statements, material omissions, and course of conduct had their intended effect, directly and proximately causing General Cable common stock to trade at artificially inflated prices during the Class Period, including as high as $36.71 per share on April 10, 2013. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of General Cable common stock served to maintain the price of General Cable common stock at an artificially inflated level.

219. Had Defendants been truthful about these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their General Cable securities at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of General Cable common stock.

220. The economic losses, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class were a direct, proximate, and foreseeable result of Defendants' materially false and/or misleading statements and omissions of material fact, which artificially inflated the price of the

Company's common stock, and subsequently caused a significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized.

221. Defendants' false and misleading statements and omissions about the Company's purported implementation of "policies and procedures designed to ensure compliance" with the FCPA, the risks posed to the Company's overseas operations in countries where bribery was occurring, and internal controls over financial reporting, caused and/or maintained the artificial inflation in General Cable's stock price throughout the Class Period until the relevant truth concealed and/or obscured by Defendants' misconduct was revealed to the market. These revelations occurred through at least three partial corrective disclosures on: September 22, 2014 October 29, 2014, and February 10, 2016, as detailed herein. The timing and magnitude of the declines in the price of General Cable common stock after these disclosures negate any inference that the loss suffered by Lead Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to the revelation and materialization of Defendants' fraudulent misstatements and omissions.

### A. September 22, 2014 Partial Corrective Disclosure

222. On September 22, 2014, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period began to be revealed and/or partially materialized.

223. On this date, General Cable filed a Form 8-K with the SEC to update certain of its risk disclosures, which had been previously issued in its FY13 Form 10-K on March 3, 2014. With respect to the risk disclosure concerning General Cable's FCPA compliance, the Company disclosed for the first time that it had "determined . . . that certain employees in our Portugal and Angola subsidiaries directly and indirectly made payments at various times from 2002 to 2013"

to Angolan SOEs that "raise concerns under the FCPA." General Cable also disclosed that the Company had materially expanded its review of potential corrupt payments, stating that it was "reviewing . . . our use and payment of agents in connection with our Thailand and India operations, which may have implications under the FCPA."

224. Additionally, the Company announced the first in a series of remedial measures General Cable was taking to address the lack of an effective FCPA compliance program, stating:

> We are implementing a screening process relating to sales agents that we use outside of the United States, including, among other things, a review of the agreements under which they were retained and a risk-based assessment of such agents to determine the scope of due diligence measures to be performed by a third-party investigative firm.

225. As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by the Defendants' fraud, the price of General Cable's common stock declined $2.15 per share, or 10.8% over the course of two days, from a close of $19.89 per share on September 19, 2014, to a close of $17.74 on September 23, 2014, on heavy trading volume, thereby partially removing a portion of the artificial inflation in General Cable common stock.

226. Despite this partial disclosure of adverse news, which removed some of the artificial inflation in General Cable's stock price, its stock price remained artificially inflated because the market remained unaware of the extent to which General Cable's grossly deficient FCPA policies, procedures, and controls had failed to identify known instances of corrupt payments in at least six countries over a twelve-year period.

**B. October 29, 2014 Partial Corrective Disclosure**

227. On October 29, 2014, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or materialized. On this date, General Cable announced that it would

exit its operations in Asia Pacific and Africa. In a press release, the Company stated that its planned divestiture was "to simplify [the Company's] global portfolio and reduce operational complexity."

228. During a related conference call with analysts the following day, General Cable reaffirmed its decision to divest its Asia Pacific and Africa operations. In presentation slides utilized during the call, the Company confirmed that it would divest its Thai, Chinese, Egyptian, and Angolan operations, among others. At least one analyst asked about the connection between the "bribery issues" in at least two of the countries identified as part of the sale (e.g., Angola) and the divestiture of these operations, inquiring as to whether General Cable would be required to retain the liability associated with the FCPA violations if they were able to divest these assets.

229. During the call, Defendant Robison also provided an update with respect to the FCPA investigation. In particular, Robinson confirmed that the Company had (i) expended more than $10 million to conduct its investigation, which included a review of 450,000 documents and interviews of at least 20 General Cable employees, and (ii) expected to substantially complete its review in 1Q 2015. General Cable further disclosed that the Company was "tak[ing] steps to strengthen the [C]ompany's compliance program," including anti-corruption training and the hiring of a Chief Compliance Officer.

230. Following the press release and conference call, an analyst with BB&T Capital Markets issued a report on October 31, 2014 commenting on General Cable's disclosures. In particular, the report noted that "cash costs (<$10M so far) related to investigating bribery cases should subside by ~Q1'15, leaving only the uncertainty tied to the DOJ investigation, in our view." With respect to the newly announced divestiture of the Asia Pacific and Africa operations, the report concluded that while "[m]any of these markets" are "'normally' profitable [they] are

dealing with 'subsidiary-specific' events (i.e., bribery in Angola . . .) which "further complicat[e] the divestiture of these assets."

231. The disclosures of the Company's decision to exit its operations in Asia Pacific and Africa to reduce "operational complexity" and the information revealed concerning the scope of the Company's investigation of its FCPA violations, were a foreseeable consequence of the Defendants' misrepresentations and omissions concerning the Company's: (i) purported implementation of "policies and procedures designed to ensure compliance" with the FCPA; (ii) internal controls over financial reporting; and (iii) overseas operations in countries where FCPA violations was occurring.

232. As a direct and proximate result of these further corrective disclosures and/or materializations of foreseeable risks concealed by the Defendants' fraud, General Cable's stock price declined $.88, or 6% from a close of $14.09 per share on October 29, 2014, to a close of $13.21 on October 30, 2014 on heavy trading volume. These disclosures further removed artificial inflation in General Cable's common stock.

233. Despite this partial disclosure of adverse news, which removed some of the artificial inflation in General Cable's stock price, its stock price remained artificially inflated because the market remained unaware of the extent to which General Cable's grossly deficient FCPA compliance program had failed to prevent the widespread corruption that plagued the Company's overseas operations.

**C. February 10, 2016 Partial Corrective Disclosure**

234. On February 10, 2016, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or materialized. On this date, after the market closed, General Cable announced that it had substantially completed its internal investigation of certain suspect

payments by employees in Angola, Thailand, India, China, and Egypt and, based on the findings of the investigation, had increased the Company's accrual for profits likely to be disgorged to resolve FCPA violations to $28 million.

235. In addition to confirming that this accrual only addressed "the estimated profit derived from these subject transactions that we believe is probable to be disgorged," and did not include any amounts addressing the potential civil or criminal fines or penalties that could be levied by the SEC and DOJ, respectively, General Cable announced that it had identified "certain other transactions that may raise concerns under the FCPA for which it is at least reasonably possible we may be required to disgorge estimated profits derived thereform."

236. Commenting on these "certain other transactions," during a conference call the following day, Robinson stated:

> In the course of our investigation, we also identified certain other transactions that may raise concerns under the FCPA, for which it is at least reasonably possible we may be required to disgorge certain profits. ***The range of additional possible profit disgorgement is from zero to $33 million. These amounts do not include any possible fines, civil or criminal penalties***.

237. The disclosures on February 10, 2016 of additional violations of the FCPA, and the Company's consequent need to accrue disgorgement reserves was a foreseeable consequence of the Defendants' misrepresentations and omissions concerning the Company's: (i) purported implementation of "policies and procedures designed to ensure compliance" with the FCPA; (ii) internal controls over financial reporting; and (iii) overseas operations in countries where FCPA violations was occurring.

238. As a direct and proximate result of these further corrective disclosures and/or materializations of foreseeable risks concealed by the Defendants' fraud, General Cable's stock price declined $3.05, or 31.61% from a close of $9.65 per share on February 10, 2016, to a close

of $6.60 on February 11, 2016 on extremely heavy trading volume. These disclosures further removed artificial inflation in General Cable's common stock.

239. Following the press release and conference call, a D.A. Davidson analyst issued a report on February 12, 2016, noting that General Cable's "[s]hare [p]rice [c]ollapse[d]" in part due to disclosures concerning the FCPA "[i]nvestigations." Likewise, a February 10, 2016 news article posted to Cincinnati.com noted that shares of General Cable "plummeted" partly in response to the news that the Company "now expects to surrender at least $28 million in profits it may have earned by bribing foreign utility company officials."

## VII. ADDITIONAL SCIENTER ALLEGATIONS

240. As more fully alleged above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or were reckless in not knowing that the statements identified above concerning: (i) the Company's purported implementation of "policies and procedures designed to ensure compliance" with the FCPA; (ii) the risks posed to the Company's overseas operations in countries where bribery was occurring; and (iii) internal controls over financial reporting, were materially false and misleading when made and/or omitted material facts necessary to make those statements not misleading. In particular, Defendants: (i) knew and/or recklessly disregarded that the public documents and statements issued and disseminated in the name of the Company were false and/or misleading; (ii) knew that these statements or documents were issued and disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.

241. As set forth herein, Defendants participated in the fraudulent scheme by means of their control over and receipt or dissemination of the Company's materially false and misleading

statements, and their associations with the Company that made them privy to material nonpublic information about General Cable.

### A. General Cable Has Admitted to Knowingly Paying Bribes in Violation of the FCPA and to Knowingly and Willfully Failing to Implement Effective Policies, Procedures, and Internal Controls to Ensure FCPA Compliance

242. The Company's admissions readily establish Defendants' knowledge with respect to the Company's FCPA violations and deficient policies, procedures, and internal controls concerning FCPA compliance, which rendered each of the misrepresentations alleged in Section V, *supra,* materially false and/or misleading.

#### 1. General Cable Knowingly Made Corrupt Payments in Violation of the FCPA

243. In the Non-Prosecution Agreement, General Cable admitted that it "***knew*** that certain of its foreign subsidiaries used certain third-party agents and distributors to make corrupt payments to foreign officials in order to obtain and retain business in certain countries." General Cable also admitted that even after it "came to the understanding" that bribes were being paid by its subsidiaries, the Company's senior management "***closed their eyes to***" the illegal activity.

244. Specifically, the Company has admitted to knowingly making more than $13 million in corrupt payments including, *inter alia*, the payment of: (i) more than $8.7 million to a sales agent in Angola between 2009 and 2013 "***with knowledge that the sales agent would, and did, pass a portion of those payments to officials***" at three Angolan SOEs; (ii) "more than $2 million to two freight forwarders in Indonesia w***ith the understanding that the freight forwarders would use the money, in part, for corrupt purposes***" between 2010 and 2014; and (iii) "more than $1.5 million in rebates to a distributor in Thailand ***with the understanding that the distributor would use the money, in part, for corrupt purposes in association with PDTL's sales to state-owned customers in Thailand***."

245. Moreover, the Company admitted that it was widely known within the Company that its employees were paying bribes. For example, the Non-Prosecution Agreement cites:

a. A September 12, 2005 communication from a Condel employee to a Celcat employee that stated: "Everyone knew that [an Angolan SOE 2 official] was being paid."

b. A March 11, 2010 email that described the services of a principal of the two freight forwarders in Indonesia and stated: "Like I [sic] mention it before, my agent doesn't ask for any money upfront. He can afford to pay his way in and out of PLN [Perusahaan Listrik Negara, the Indonesia-state-owned electricity company]."

c. A December 13, 2011 email received by a high-level executive at General Cable that discussed the "potential applicability of US Foreign Corrupt Practices Act ('FCPA') for commissions paid to Thai governmental authorities." Another email from a General Cable employee in the corporate tax department that likewise stated: "Since this is a legal matter rather than tax, no need to do anything further for me. I will leave it up to you as to whether you want to look into any further."

d. An August 14, 2013 email, in which a GC China employee stated that "a few key players at [the state-owned customer] are our internal contacts and charge a certain amount of fees. If we are looking to have long-term cooperation with them, charges for this is rather inevitable."

246. Despite these direct communications explicitly discussing ongoing FCPA violations occurring at the Company, ***General Cable admitted that it "took no further corrective action based on this information***." Instead, "***the corrupt payments made through the [Company's subsidiaries] continued and GCC failed to enhance its deficient internal accounting controls***."

247. With respect to actual violations of the FCPA by its subsidiaries and agents, the Non-Prosecution Agreement states that General Cable "admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents." Accordingly, General Cable admitted to corrupt payments by its employees, which were facilitated by its executive management.

248. Additionally, based in large part on these admissions, the SEC determined that General Cable violated the FCPA's anti-bribery and accounting provisions, including Sections 13(b)(2)(A) and 30A, by, among other things: (i) "corruptly paying or offering to pay bribes or give other things of value to employees or officials of SOEs in Angola to obtain or retain business," and (ii) improperly recording as legitimate business expenses on General Cable's books and records payments by Celcat, Condel, PDTL, GC China, and GC Egypt "when knowing or believing they were in fact used as bribes or improper payments to foreign government officials, or otherwise lacked reasonably detailed documentation to accurately and fairly reflect the payments on the subsidiaries books and records," which were consolidated and reported by General Cable in its Forms 10-Q and 10-K.

### 2. General Cable Failed to Implement Effective Policies, Procedures, and Internal Controls to Ensure FCPA Compliance

249. Moreover, in addition to admitting to specific FCPA violations, General Cable admitted that it "***knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents***."

250. Specifically, General Cable admitted in the NPA that it had "deficient internal accounting controls that did not require and/or ensure . . . (a) due diligence for the retention of third party agents and distributors; (b) proof that services had been rendered by third parties before payment could be made to them; and (c) oversight of the payment process to ensure that payments were made pursuant to contractual terms or that payments were reasonable and legitimate."

251. The Company likewise admitted that despite the known corrupt payments in violation of the FCPA, General Cable "***knowingly and willfully failed to implement adequate internal accounting controls over payments to third parties despite knowing that third parties***

***were making illegal payments***." Additionally, the Company admitted that "***General Cable knowingly and willfully failed to address these known weaknesses [in the Company's internal accounting controls], in relevant part, to allow the conduct to continue***."

252. General Cable further admitted that its "***know[ing] and willful[]***" failure "***to address these known weaknesses,***" in its compliance with the FCPA, "***allow[ed] the conduct to continue***." For example, General Cable admitted that its "executive management" received a report in December 2012 identifying several red flags indicating that General Cable's relationship with an Angolan sales agent likely violated anti-bribery laws, yet they failed to implement any additional internal accounting controls. The Company also admitted that it continued to pay new and past-due illicit commissions to the corrupt sales agent until December 2013.

253. As a result of the Company's knowing misconduct, it has admitted that General Cable "made more than $13 million in payments to third-party agents and distributors which were used to make unlawful payments to secure approximately $51 million in profits to General Cable."

254. Furthermore, based in part on these admissions, the SEC has found that General Cable violated the FCPA's accounting provisions, including specifically Section 13(b)(2)(B), by failing to "adequately train[] its employees on anti-corruption risks, . . . require third parties on SOE sales to comply with the FCPA, and . . . [to] perform any anticorruption due diligence on third parties."

### B. Internal Reports of Corrupt Payments and Inadequate Policies, Procedures, and Controls Concerning FCPA Compliance Diverged from Defendants' Public Statements to Investors

#### 1. Internal Reports of Corrupt Payments

255. In addition to General Cable's admissions concerning the payment of bribes in Angola, Thailand, Indonesia, Bangladesh, and China, *see supra* Section VII.A, Defendants' public statements confirmed that Defendants knew of or were reckless in not knowing about the corrupt payments in these countries during the Class Period. For example, during a March 26, 2013 conference call, Robinson disclosed to investors that he, among others, had gone "through all of our balance sheets in our ROW unit," which included the Company's Thailand, Indonesia, Bangladesh, and China operations, and "just made sure that . . . we're aware of what's in there, we were comfortable with everything."

256. Likewise, the SEC's findings in the Cease-and-Desist Order and the confidential witness accounts confirmed the existence of internal reports concerning the corrupt payments which were directly communicated to and received by Defendants during the Class Period. For example, both the SEC and CW 2 confirmed that senior executives at General Cable received the December 2012 audit report. CW 2 also confirmed that CW 2 personally briefed the Vice President of Internal Audit about the results of the 2012 Condel audit prior to the completion of the report. Moreover, CW 2 stated that the official audit report was distributed to Robinson, who was required to sign off on all audit reports.

257. The SEC also determined that a General Cable "executive officer" received a report that detailed the results of an August 2013 follow-up audit, noted that Condel's management may be paying bribes to an agent or to government officials on sales to SOEs, and revealed additional red flags with respect Condel's relationship with the Angolan sales agent, including: (i) the average commissions paid in 2012 was 18% when the agreement with the agent

specified 1%; (ii) Condel's Country Manager, who exclusively managed the relationship with the Agent, directed payments to the Agent's personal bank account; (iii) no proof of services performed were provided by the Agent; and (iv) the customers related to the agent were Angolan SOEs.

### 2. Internal Reports of Inadequate Policies, Procedures, and Controls Concerning FCPA Compliance

258. In addition to General Cable's admissions concerning the inadequacy or ineffectiveness of its FCPA compliance program, confidential witnesses confirmed the existence of internal reports concerning these deficiencies that were directly communicated to and received by Defendants during the Class Period.

259. CW 2 recalled an Internal Audit report that was circulated to General Cable's executive management, including Robinson, prior to the third quarter of 2012, which had recommended that management "create, implement and enhance," FCPA policies and procedures. However, CW 2 could not recall anything that management did in response to this audit finding and confirmed that a formal FCPA compliance program was not established until 2015.

260. Furthermore, CW 2 stated that prior to the third quarter of 2012, there were several incidents that raised "red flags" regarding the lack of internal controls and a compliance program at the Company's overseas subsidiaries. CW 2 advised that many of the subsidiaries in the Company's ROW division were difficult to work with and very defensive when it came to dealing with Internal Audit. CW 2 specifically recalled informing CW 1 in Q2 or Q3 2012 about the suspicious behavior of ROW management. CW 2 highlighted the following ROW incidents, which were communicated to CW 1 in 2012:

a. CW 2 was made aware of a memo circulating in the ROW division authored by a ROW Compliance Manager commenting on "How to deal with auditors." The memo stated that auditors are "not your friends" and to "only

give the auditors what they ask for." CW 2 stated this memo was brought to the attention of the then-current VP of Internal Audit, Marc Moehlman.

b. CW 2 uncovered an email during an audit of General Cable's South Africa operation which stated words to the effect: "If [CW 2] or anyone from Internal Audit asks why Raphael Mena, a Costa Rican Internal Controls accountant, was in South Africa, tell [CW 2] that Mena is working on an internal project." This email was forwarded to Robinson, who told CW 2 to "calm down" and that Robinson would get to the bottom of it. However, CW 2 never heard from Robinson on the issue.

261. CW 1 confirmed that when CW 1 assumed the role of Vice President of Internal Audit, CW 1 discovered that there was: (i) no evidence General Cable had ever assessed the sufficiency of its FCPA compliance program; (ii) no centralized system for tracking interactions between the Company's foreign operations and third party agents; and (iii) no testing or monitoring of the due diligence General Cable should have conducted of any third parties its foreign subsidiaries relied upon. CW 1 also immediately began raising with Robinson the deficiencies in the Company's FCPA compliance program. In response to CW 1's reports, Robinson, and by extension Kenny, were unwilling to devote sufficient resources to assessing and potentially mitigating the Company's FCPA risk. *See supra* Section IV.B.1.b.

### C. Kenny and Robinson Knowingly or Recklessly Disregarded General Cable's Obligations Under the FCPA

262. Defendants were at least reckless with respect to General Cable's FCPA obligations. Kenny and Robinson, as CEO and CFO, respectively, were the two most senior and visible senior executives at General Cable during the Class Period. As such, they were familiar with General Cable's overseas operations, including its operations in countries where violations of the FCPA were allowed to occur. Significantly, prior to joining General Cable, Kenny had a diplomatic career with the U.S. Department of State as Foreign Service Officer, and therefore had a heightened awareness of the problems of corruption in the emerging economies in which General Cable operated. Similarly, Robinson's prior work as a Deloitte auditor with international

experience provided him with extensive exposure to the FCPA. CW 1 confirmed that as CFO, a former company controller, and an experienced finance professional, Robinson should have appreciated the level of FCPA risk facing the Company.

263. By virtue of their high-level executive positions, Kenny and Robinson directly participated and were involved in both the management and day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company's core operations. In fact, in connection with the filing of each of General Cable's 10-Ks and 10-Qs issued during the Class Period, Kenny and Robinson signed sworn SOX certifications representing, *inter alia*, that both Kenny and Robinson had taken steps to ensure that General Cable had sufficient, effective controls that were designed to ensure the disclosure of all material information and the accuracy of the Company's financial statements.

264. Defendant Robinson also publicly commented on his role as General Cable's CFO with respect to internal controls during a March 26, 2013 conference call, explaining that "as a management team, we own this" and "[a]s a finance executive and principal accounting officer, I own this." He further explained that General Cable's senior management "take[s] it seriously" and was "all over it."

265. Particularly with respect to oversight of internal controls, Defendant Robinson confirmed that General Cable had "shrunk . . . the decision-making of the company and the flow of the information" to ensure that executives were fully aware of what was going on in the Company's operations. In that regard, CW 1 confirmed that Robinson was involved in formulating the Company's annual audit plan. CW 2 likewise confirmed that Robinson was debriefed on significant audit findings prior to the issuance of formal audit reports. As these

examples demonstrate, Kenny and Robinson had unfettered access to the Company's operations, including its foreign subsidiaries.

266. As General Cable's most senior executives with direct control and supervision over its business, operations, and public statements, Kenny and Robinson knew or were reckless in not knowing about the Company's core operations, which included selling cable and wire to SOEs in countries with high levels of public corruption, and its exposure to the substantial risk of FCPA violations.

267. The Company's ability to operate in these areas of the world without violating the FCPA was of critical importance to the Company's profitability and its reputation, both with investors and regulators. General Cable's overseas operations comprised over 50% of the Company's sales for each year of the Class Period. Furthermore, as Kenny touted prior to the Class Period, the Company's overseas operations were critical to their overall strategy of expanding into emerging markets to capitalize on the rapid development taking place in these economies. There also were severe financial and reputational risks if General Cable violated the FCPA, including the disgorgement of any profits linked to bribery, and the potential for massive civil and criminal penalties/fines.

268. Thus, given that Kenny and Robinson were two of the most senior General Cable executives with hands-on involvement with Company operations and, in particular, its FCPA compliance, they knew or were reckless in not knowing that (i) General Cable knowingly paid bribes in five countries over a twelve-year period to secure more than $50 million in profits, and (ii) the Company's FCPA policies, procedures, and controls where nonexistent or insufficient to ensure General Cable's compliance.

269. This inference is corroborated by CW 1 who explained that General Cable's virtually non-existent corporate compliance program—including a total lack of FCPA-specific compliance policies, testing, or training—was the product of management's reckless attitude with respect to the Company's FCPA liability. According to CW 1, the FCPA violations that General Cable failed to prevent were perpetuated by this continuous, "not at risk" mentality fostered and maintained by upper management, including Kenny and Robinson, who rejected attempts to enhance General Cable's compliance program. *See supra* Section IV.B.1.b.

270. Moreover, with respect to the specific representations in the SEC filings regarding the FCPA identified herein as materially false and/or misleading, CW 1 confirmed that he could recall nothing that was done by the Defendants to verify the accuracy of these representations prior to their issuance to investors. CW 1's knowledge is based on CW 1's participation in disclosure review committee meetings in which these representations were supposed to be vetted so that they could be certified as true and accurate. CW 1 stated that during his tenure at the Company, Defendants did not engage in any meaningful discussion concerning the representations and whether the Company had a basis to make them. Notably, CW 1 explained that the fact the representation had been included in prior year's filings served as the basis for which Defendants included it in the current year's filings. As a result, Robinson and Kenny were both at least reckless with respect to the accuracy of these representations.

### D. The Knowledge of Senior Executives and Other High Managerial Agents is Imputed to General Cable

271. The knowledge and/or severe recklessness of Kenny and Robinson by virtue of their high-level positions as the two most senior officers of the Company, participation in and awareness of General Cable's day-to-day operations, and control over the issuance of the false and misleading statements alleged above in Section V, is imputed to General Cable. In addition,

the knowledge of other senior executives and high managerial agents concerning the Company's: (i) purported implementation of "policies and procedures designed to ensure compliance" with the FCPA; (ii) the risks posed to the Company's overseas operations in countries where bribery was occurring; and (iii) internal controls over financial reporting also is imputed to General Cable.

272. As General Cable admitted in the Non-Prosecution Agreement, the Company "admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents." Among the individuals for whom the Company has admitted it is responsible, the NPA identifies Executive A as an officer at PDTL from 2010 to 2012, and beginning in December 2012, a high-level executive at General Cable in Thailand. The Company admitted that Executive A "knew that certain of [the Company's] foreign subsidiaries used certain third-party agents and distributors to make corrupt payments to foreign officials in order to obtain and retain business."

273. The NPA also identifies "a high-level executive at General Cable with responsibility for overseeing international operations." General Cable admitted that "in or about 2011," this high-level General Cable executive met with Executive A and that Executive A "expressed concerns that payments to the distributor in Thailand were being used for corrupt purposes" but that "[d]espite this conversation, the corrupt payments did not stop, nor was an investigation conducted."

274. Moreover, General Cable admitted that after the meeting with Executive A, the same high-level executive at General Cable received multiple emails in December 2011 regarding the findings of a tax review in Thailand which expressly raised the "potential applicability of the US Foreign Corrupt Practices Act ('FCPA') for commissions paid to Thai governmental authorities." General Cable admitted that even after receiving these communications, the Company "took no further action and did not take any steps to implement adequate internal accounting

controls." Instead, the Company admitted that the "corrupt payments made through intermediary companies in Thailand and elsewhere continued and General Cable failed to enhance its deficient internal controls."

275. By virtue of their positions at the Company and the Company's acceptance of responsibility, the knowledge of Executive A and the high-level executive at General Cable is imputed to General Cable, establishing that by no later than 2011, prior to the start of the Class Period, General Cable knew that the Company's foreign subsidiaries were actively violating the FCPA.

276. Likewise, the knowledge and experience of General Cable's Vice Presidents of Audit – the highest ranking audit position at General Cable during the Class Period – is imputed to the Company. As alleged above, Moehlman, who served as General Cable's Vice President for Internal Audit from 2005 until CW 1 took over the role, would have known that the Company did not have an effective compliance program in place, including, policies, procedures, and internal controls designed to ensure FCPA compliance. For example, as explained by CW 2, Moehlman was aware of and was forced to intercede in several incidents involving General Cable's foreign subsidiaries seeking to ignore, undermine, or deceive internal audit employees. *See supra,* Section IV.C.3.

277. Likewise, CW 1 knew or and brought to Defendants' attention General Cable's "woefully inadequate" internal audit department, deficient FCPA compliance program, and the results of CW 2's audit of Condel in August 2012. *See, e.g.,* Sections IV.B.1.b and IV.C.2. Indeed, it was immediately apparent to CW 1 when CW 1 assumed the lead internal audit role that the Company lacked an effective FCPA compliance program. Specifically, CW 1 noted the fact that: (i) none of the auditors on CW 1's staff ever received any specific training regarding how to conduct an FCPA audit; (ii) no one in the Internal Audit department, including CW 1, had

the competence or expertise to conduct a formal FCPA audit; and, as a result, (iii) to the extent the Company even audited its overseas subsidiaries, no meaningful FCPA testing at any of these sites was being conducted.

278. In light of these glaring deficiencies, which CW 1 brought to Robinson's attention, CW 1 explained that the Company lacked a basis for its representations in its SEC filings regarding its purported implementation of "policies and procedures designed to ensure compliance" with the FCPA. As set forth above, during CW 1's tenure there was never any discussion of whether the Company had a basis to make such a representation and that this representation was made solely because it had been included in prior year's filings.

279. CW 1 also was provided information concerning the results of CW 2's audit of Condel in August 2012 prior to the official report being circulated internally, including to Robinson for his sign off. As such, in addition to the admission regarding the December 2012 audit report set forth above in Section VII.A, the Company's knowledge of the ongoing violations of the Company's internal policies and likely violation of the FCPA is readily established as of this date on the basis of CW 1's knowledge.

## VIII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

280. The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misrepresentations and omissions alleged in this Complaint.

281. None of Defendants' historic or present-tense statements alleged herein was a forward-looking statement because none was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance

when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

282. To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

283. Defendants are also liable for any false or misleading forward-looking statement alleged herein, or portion thereof, because at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading, or the forward-looking statement was authorized and approved by an executive officer of General Cable who knew that the forward-looking statement was false or misleading.

## IX. CONTROLLING PERSON ALLEGATIONS

284. By virtue of Defendants Kenny's and Robinson's positions of management and control within the Company, they had access to undisclosed adverse information about General Cable's operations and performance, including information regarding General Cable's purported implementation of "***policies and procedures designed to ensure compliance***" with the FCPA, internal controls over financial reporting, and overseas operations in countries where bribery was occurring, as particularized herein. Defendants Kenny and Robinson ascertained such information through General Cable's internal corporate documents, conversations, and connections with corporate officers and employees, attendance at Board of Directors meetings,

including committees thereof, and through reports and other information provided to them in connection with their roles and duties as General Cable officers, directors, and managers.

285. Defendants Kenny and Robinson participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein, and knew or recklessly disregarded that there were material misstatements and omissions contained therein. Because of their Board, executive, or managerial positions with General Cable, Defendants Kenny and Robinson had access to the adverse undisclosed information about General Cable's operations and performance, including information regarding the Company's failure to implement "policies and procedures designed to ensure compliance" with the FCPA, the resultant undisclosed risks posed to the Company's overseas operations in countries where bribery was occurring, and deficient internal controls over financial reporting, as particularized herein, and knew (or were deliberately reckless in not knowing) that these undisclosed facts rendered the positive representations made by or about General Cable and its business materially false and misleading.

286. Defendants Kenny and Robinson, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Defendants Kenny and Robinson were provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, Defendants Kenny and Robinson are responsible for the accuracy of the public reports and releases detailed herein, and are therefore primarily liable for the representations therein.

287. As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, is traded on the NYSE, and governed by the provisions of the federal securities laws, Defendants Kenny and Robinson had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and performance, including information regarding the Company's failure to implement "policies and procedures designed to ensure compliance" with the FCPA, the resultant undisclosed risks posed to the Company's overseas operations in countries where bribery was occurring, and deficient internal controls over financial reporting, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based on truthful and accurate information. General Cable's material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## X. CLASS ACTION ALLEGATIONS

288. Lead Plaintiff brings this action on behalf of itself and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period, purchased or otherwise acquired the publicly traded common stock of General Cable and were damaged thereby. Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

289. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown

to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. At the end of the Class Period, General Cable had more than 48 million shares of common stock issued and outstanding, owned by thousands of persons, and actively traded on the NYSE. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Record owners and other members of the Class may be identified from records maintained by General Cable or its transfer agent, and may be notified of the pendency of this action by a combination of published notice and first-class mail, using the techniques and form of notice similar to that customarily used in class actions arising under the federal securities laws.

290. There is a well-defined commonality of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) whether Defendants' actions as alleged herein violated the federal securities laws;

(b) whether Defendants' statements issued during the Class Period were materially false and/or misleading;

(c) whether Defendants knew or were deliberately reckless in not knowing that their statements were false and/or misleading;

(d) whether and to what extent the market prices of General Cable publicly traded common stock were artificially inflated and/or distorted before and/or during the Class Period due to the misrepresentations and/or omissions of material fact alleged herein; and

(e) whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

291. Lead Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired General Cable publicly traded securities during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct as alleged herein.

292. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class action securities litigation to further ensure such protection, and intends to prosecute this action vigorously. Lead Plaintiff has no interests that are adverse or antagonistic to those of the Class.

293. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XI. LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

294. Lead Plaintiff and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) General Cable common stock traded in efficient markets;

(d) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of General Cable common stock; and

(e) Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and other members of the Class purchased or otherwise acquired General Cable common stock between the time that Defendants made material misrepresentation and omissions and the time the concealed risks materialized or the true facts were disclosed.

295. At all relevant times, the market for General Cable common stock was open and efficient for the following reasons, among others:

(a) as a registered and regulated issuer of securities, General Cable filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

(b) General Cable regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c) General Cable was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d) General Cable common stock met the requirements for listing, and was listed and actively traded on highly efficient markets, including NYSE, where the Company's common stock trades under the ticker symbol "BGC."

296. As a result of the foregoing, the markets for General Cable common stock promptly digested current information regarding General Cable from all publicly available sources, and the prices of General Cable's stock reflected such information.

297. Based upon the materially false and misleading statements and omissions of material fact alleged herein, General Cable common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and the other members of the Class purchased General Cable common stock relying upon the integrity of the market price of General Cable common stock and other market information relating to General Cable.

298. Under these circumstances, all purchasers of General Cable common stock during the Class Period suffered similar injuries through their purchases at artificially inflated prices, and a presumption of reliance applies.

299. Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired General Cable common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## COUNT I

### Asserted Against General Cable, Kenny, and Robinson for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder

300. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class against General Cable, Kenny and Robinson.

301. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding the intrinsic value of General Cable common stock, as alleged herein; (ii) artificially inflate the price of General Cable common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase General Cable common stock at artificially inflated prices that did not reflect their true value. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

302. Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain the artificially inflated price of General Cable common stock in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

303. Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of General Cable's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make their statements, in light of the circumstances under

which they were made, not misleading, as set forth more particularly herein. Defendants did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of General Cable common stock during the Class Period.

304. Defendants are liable for all materially false and/or misleading statements and omissions made during the Class Period, as alleged above, including the false and/or misleading statements and omissions included in press releases, conference calls, SEC filings, news media, blogs, and General Cable's website.

305. Defendants are further liable for the false and/or misleading statements made by General Cable's officers, management, and agents in press releases, conference calls, conferences with investors and analysts, news media, and General Cable's website, as alleged above, as they either made or controlled such statements and had ultimate authority and responsibility for the contents thereof.

306. Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of General Cable common stock. By concealing material facts from investors, Defendants maintained the Company's artificially inflated common stock prices throughout the Class Period.

307. Without knowledge of the fact that the price of General Cable common stock was artificially inflated, and relying directly or indirectly on the false and/or misleading statements and omissions made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by General Cable but not disclosed in public statements by General Cable

during the Class Period, Lead Plaintiff and the other members of the Class purchased or acquired General Cable common stock during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of General Cable common stock.

308. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff, the other members of the Class, and the marketplace known of the truth concerning the Company's conduct and the intrinsic value of General Cable's common stock, Lead Plaintiff and other members of the Class would not have purchased or acquired their General Cable common stock, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

309. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

310. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of General Cable common stock during the Class Period.

## COUNT II

### Asserted Against Defendants Kenny and Robinson for Violations of Section 20(a) of the Securities Exchange Act of 1934

311. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class against the Defendants Kenny and Robinson.

312. At all relevant times during the Class Period, as set forth in, *inter alia*, Section III.B, Kenny was the Company's CEO and a member of the Company's Board of Directors, and

Robinson was the Company's CFO. As such, both Kenny and Robinson had regular access to non-public information about General Cable's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

313. Defendants Kenny and Robinson acted as a controlling persons of General Cable within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of General Cable's day-to-day operations, and/or knowledge of statements filed by the Company with the SEC and/or disseminated to the investing public, Defendants Kenny and Robinson had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Lead Plaintiff contends are false and/or misleading.

314. Defendants Kenny and Robinson were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be false and/or misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

315. In particular, Defendants Kenny and Robinson had direct and supervisory involvement in and control of the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular conduct and transactions giving rise to the securities violations as alleged herein, and exercised the same.

316. As set forth above, General Cable and Defendants Kenny and Robinson each violated Section 10(b) and Rule 10b-5 by their acts, statements, and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants Kenny and Robinson are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and/or acquisition of General Cable common stock during the Class Period.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding damages and equitable relief in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMANDED

317. Lead Plaintiff hereby demands a trial by jury.

Dated: January 19, 2018

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*s/ Andrew L. Zivitz*
ANDREW L. ZIVITZ (Admitted *Pro Hac Vice*)
NATHAN HASIUK (Admitted *Pro Hac Vice*)
280 King of Prussia Road

Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

JENNIFER L. JOOST (Admitted *Pro Hac Vice*)
One Sansome St, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Attorneys for Lead Plaintiff Long Trust and Lead Counsel for the Putative Class*

**MEHR, FAIRBANKS & PETERSON TRIAL LAWYERS, PLLC**

ERIK PETERSON (Bar No. 93003)
201 West Short Street, Suite 800
Lexington, KY 40507
Telephone: (859) 225-3731
Facsimile: (859) 225-3830

*Liaison Counsel for Lead Plaintiff Long Trust and for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2018 I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*s/ Andrew L. Zivitz*
Andrew L. Zivitz