**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

IN RE GENERAL CABLE CORP.
SECURITIES LITIGATION

Civil Action No. 2:17-cv-00025-WOB-CJS

**PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT .................................................................................1

II.  STATEMENT OF FACTS ....................................................................................5

    A.   General Cable's Global Expansion ........................................................5

    B.   The FCPA and the Components of an Effective FCPA Compliance
         Program ......................................................................................6

    C.   Defendants Misrepresent that They had Taken Steps to Mitigate FCPA
         Risk and that Their Internal Controls Were Effective .............................7

    D.   The NPA and CDO Reveal Previously Undisclosed Facts About GC's
         Lack of a Compliance Program and Resulting FCPA Violations...........10

         1.   GC's Admissions Regarding Its Deficient FCPA Compliance
                Program and Internal Controls................................................11

         2.   GC's Admitted Failure to Prevent or Detect Widespread
                Corruption Within Its Overseas Operations...............................12

    E.   Lead Plaintiff's Investigation Reveals GC's Virtually Non-Existent FCPA
         Compliance Program and Deficient Internal Controls...........................16

         1.   GC Lacked a High-Level Commitment from Senior Executives to
                FCPA Compliance and Enforcement of Its Compliance Program ............17

         2.   GC Failed to Devote Sufficient Oversight and Resources to FCPA
                Compliance .........................................................................17

          3.   GC Did Not Conduct Assessments of FCPA Risk or Any Ongoing
                Monitoring, Testing, or Auditing of Its FCPA Compliance ....................19

          4.   GC Failed to Conduct any FCPA Due Diligence of Third Parties ...........19

    F.   Lead Plaintiff's Investigation Revealed Defendants' Knowledge of and/or
         Reckless Disregard for Their Misstatements ......................................20

III. LEGAL STANDARD.........................................................................................22

IV.  ARGUMENT....................................................................................................23

    A.   The Complaint Pleads Actionable Misrepresentations .........................23

         1.   Defendants Misrepresented the *Existence* of the Company's
                Purported FCPA Compliance Program......................................24

          2.   Defendants Misrepresented that GC's Internal Controls over
                Financial Reporting and Disclosure Controls Were Effective..................28

          3.   Defendants Failed to Disclose the Risks Posed by the Company's
                Reliance on Corruption to Facilitate Its Overseas Operations..................32

          4.   Defendants' Remaining Falsity Challenges Fail........................................34

B.    The Complaint Alleges a Strong Inference of Scienter .........................................36

    1.    The NPA Admissions and CDO Findings Establish a Strong Inference of Defendants' Scienter .....................................................37

    2.    The Complaint Alleges Kenny's and Robinson's Scienter.......................40

    3.    The Fact that the Corrupt Scheme Concerned the Company's Core Operations Supports a Strong Inference of Scienter...................................45

    4.    The Complaint Raises a Strong Inference of Scienter under *Helwig* ........46

    5.    The Individual Defendants' Remaining Scienter Challenges Fail............47

C.    Defendants' Statute of Limitations Affirmative Defense Fails ............................52

    1.    The Discovery Rule and Exchange Act Claims.........................................52

    2.    Plaintiff's Exchange Act Claims Are Timely ............................................53

        a.    Disclosures Prior to January 5, 2015 Did Not Reveal that Defendants Possessed the Intent to Deceive Investors ................ 54

        b.    Defendants' Contentions that Scienter Facts Were Discoverable before January 5, 2015 Fail.................................................... 57

        c.    Disclosures Prior to January 5, 2015 Did Not Reveal Facts Sufficient to Plead Material Omissions with Particularity ........... 60

        d.    Defendants' Arguments that the Alleged Material Omissions Were Discoverable before January 5, 2015 Fail........................... 64

D.    The Complaint Sufficiently Alleges Loss Causation...............................................68

E.    The Complaint Sufficiently Alleges that the Individual Defendants Were Controlling Persons under § 20(a) .........................................................................70

V.    CONCLUSION.............................................................................................................71

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akbar v. Bangash*,
    No. 15-cv-12688, 2017 WL 4334912 (E.D. Mich. July 11, 2017).........................................53

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    No. 03-1519, 2012 WL 1680097 (D.N.J. May 11, 2012)..................................................58, 61

*Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*,
    435 F.3d 396 (3d Cir. 2006)......................................................................................................63

*In re Am. Apparel S'holder Litig.*,
    No. 10-06352 MMM, 2013 WL 174119 (C.D. Cal. Jan. 16, 2013) ..................................44, 45

*In re American Serv. Grp., Inc.*,
    No. 3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009).....................................37, 45

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................................23

*Ashland, Inc. v. Oppenheimer & Co., Inc.*,
    648 F.3d 461 (6th Cir. 2011) ...................................................................................................24

*Beaver Cty. Ret. Bd. v. LCA-Vision Inc.*,
    No. 1:07-cv-750, 2009 WL 806714 (S.D. Ohio 2009) .............................................................37

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................................22-23

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)........................................................................................28

*In re BofI Holding, Inc. Sec. Litig.*,
    No. 3:15-cv-02324-GPC-KSC, 2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) .......... 25-26, 27

*Bondali v. Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015) ............................................................................................35

*In re BP p.l.c. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) .................................................................................43-44

*In re Bradley Pharms., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) ......................................................................................66-67

*In re Cardinal Health, Inc. Sec. Litigs.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ......................................................................... *passim*

*Cataldo v. U.S. Steel Corp.*,
    676 F.3d 542 (6th Cir. 2012) ....................................................................................52

*Catogas v. Cyberonics, Inc.*,
    292 F. App'x 311 (5th Cir. 2008) .............................................................................70

*Chamberlain v. Reddy Ice Holdings, Inc.*,
    757 F. Supp. 2d 683 (E.D. Mich. 2010).....................................................................44

*In re Cirrus Logic, Inc.*,
    No. A-07-CA-212-SS, 2008 WL 4065925 (W.D. Tex. Aug. 28, 2008).................................49

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
    No. 11 Civ. 4665(PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ..............................50

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) ................................................................................ *passim*

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011).....................................................................53, 54, 62, 64

*D.E.&J. Ltd. P'ship v. Conaway*,
    133 F. App'x 994 (6th Cir. 2005) .............................................................................70

*Doshi v. Gen. Cable Corp.*,
    823 F.3d 1032 (6th Cir. 2016) .................................................................47, 50, 58, 59

*Doshi v. Gen. Cable Corp.*,
    No. 2:14-cv-22, 2015 WL 2229233 (E.D. Ky. May 12, 2015)..........................................59

*Doshi v. Gen. Cable Corp.*
    No. 2:14-cv-00022 (WOB-CJS), 2015 WL 366644 (E.D. Ky. Jan. 27, 2015).......................47

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)...........................................................................................68, 69

*In re FARO Techs., Inc. Sec. Litig.*,
    534 F. Supp. 2d 1248 (M.D. Fla. 2007).....................................................................34

*Frank v. Dana Corp.*,
    547 F.3d 564 (6th Cir. 2008) .............................................................................24, 35, 36

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) ............................................................................... *passim*

iv

*Gabelli v. SEC*,
   568 U.S. 442 (2013)................................................................................60

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (9th Cir. 2000) ..............................................................34

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
   No. 3:09-00882, 2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011)...................................43, 46

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ..............................................................40

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
   No. 1:13CV1165, 2014 WL 4064256 (N.D. Ohio Aug. 18, 2014) ................................ *passim*

*Halford v. AtriCure, Inc.*,
   No. 1:08cv867, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) ......................................43, 48

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) ..............................................................28

*Haw. Ironworkers Annuity Tr. Fund v. Cole*,
   No. 3:10cv371, 2011 WL 1257756 (N.D. Ohio Mar. 31, 2011) .........................52, 54, 56, 57

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ......................................................... *passim*

*In re Huffy Corp. Sec. Litig.*,
   577 F. Supp. 2d 968 (S.D. Ohio 2008) ..............................................................45

*Hull v. Global Dig. Sols., Inc.*,
   No. 16-5153 (FLW), 2017 WL 6493148 (D.N.J. Dec. 19, 2017)....................................53, 57

*In re Immucor, Inc., Sec. Litig.*,
   No. 1:05-cv-2276-WSD, 2006 WL 3000133 (N.D. Ga. Oct. 4, 2006)........................... *passim*

*Ind. State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund*
   *v. Omnicare, Inc.*,
   583 F.3d 935 (6th Cir. 2009) ..............................................................70

*In re Invision Techs., Inc. Sec. Litig.*,
   No. C04-03181 MJJ, 2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ......................................31

*In re Key Energy Servs., Inc. Sec. Litig.*,
   166 F. Supp. 3d 822 (S.D. Tex. 2016) ..........................................................31, 41

*Konkol v. Diebold, Inc.*,
   590 F.3d 390 (6th Cir. 2009) ..........................................................37, 48

*Ley v. Visteon Corp.*,
   543 F.3d 801 (6th Cir. 2008) ...............................................................34, 37

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .....................................................................66

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ................................................................. 39-40

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010)............................................................................. *passim*

*Meyer v. JinkoSolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014).......................................................... 27, 32-33

*In re Miller Energy Resources Sec. Litig.*,
   No. 3:11-cv-386-TAV-CCS, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) ..........................68

*Miller v. Donnini*,
   No. 14-12337-NMG, 2015 WL 1431103 (D. Mass. Feb. 12, 2015) ...............................60, 68

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
   929 F. Supp. 2d 740 (M.D. Tenn. 2013)................................................. 37-38, 42

*In re Nature's Sunshine Prods. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah 2007)...............................................................30, 34

*Nolfi v. Ohio Ky. Oil Corp.*,
   675 F.3d 538 (6th Cir. 2012) ...................................................................55

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys.*,
   877 F. 3d 687 (6th Cir. 2017) ..........................................................65, 68, 69

*In re Ocwen Fin. Corp. Sec. Litig.*,
   No. 14-81057-CIV-WPD, 2017 WL 3701253 (S.D. Fla. June 13, 2017) ...........................27

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   830 F.3d 376 (6th Cir. 2016) ...........................................................65, 69

*In re Omnicare, Inc. Sec. Litig.*,
   No. 11-cv-173-DLB-CJS, 2013 WL 1248243 (E.D. Ky. Mar. 27, 2013) ...........................48

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ..........................................................23, 33

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015).............................................. 29-30, 32, 34

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) .......................................................37, 41-42, 51-52

*In re Proquest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007)............................................................38

*Rahman v. Kid Brands, Inc.*,
    No. 11-1624 (JLL), 2012 WL 762311 (D.N.J. Mar. 8, 2012) .................................40

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) .........................................................................43

*Ricker v. Zoo Entm't, Inc.*,
    534 F. App'x 495 (6th Cir. 2013) ...................................................................47

*Roaring Fork Capital SBIC, L.P. v. ATC Healthcare, Inc.*,
    No. 10-cv-00338, 2011 WL 1258504 (D. Colo. Mar. 29, 2011)............................60

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................................28-29

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009)...............................................................30

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)...............................................................30

*Smith v. Robbins & Myers, Inc.*,
    969 F. Supp. 2d 850 (S.D. Ohio 2013) .............................................................71

*Sun v. Han*,
    No. 15-803 (JLL), 2015 WL 9304542 (D.N.J. Dec. 21, 2015)...............................63

*In re Suprema Specialties, Inc. Sec. Litig*,
    438 F.3d 256 (3d Cir. 2006)..........................................................................38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................................... *passim*

*In re Telxon Corp. Sec. Litig.*,
    133 F. Supp. 2d 1010 (N.D. Ohio 2000).............................................................42

*In re The Goodyear Tire & Rubber Co. Sec. Litig.*,
    436 F. Supp. 2d 873 (N.D. Ohio 2006)...............................................................37

*United States v. Lindo*,
    18 F.3d 353 (6th Cir. 1994) ...........................................................................51

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ............................................................ 49-50

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009) ............................................................30, 32

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) .........................................................................49

*Willis v. Big Lots*,
    No. 12-cv-604, 2016 WL 8199124 (S.D. Ohio Jan. 21, 2016)..............................45

**Statutes**

15 U.S.C. § 78dd-1 ...........................................................................................29

15 U.S.C. § 78m(b)(2) .......................................................................................29

15 U.S.C. § 78u-4(b)(1)(B)................................................................................23

15 U.S.C. § 78z ...........................................................................................48-49

28 U.S.C. § 1658...............................................................................................52

**Other Authorities**

Procedures Relating to the Commencement of Enforcement Proceedings and
    Termination of Staff Investigations, Exchange Act Release No. 9796
    (Sept. 27, 1972)............................................................................................49

Defendants' Memorandum in Opposition to Lead Plaintiff's Motion to Alter or
    Amend, *In re Gen. Cable Corp. Sec. Litig.*, No. 2:14-cv-22, 2015 WL
    3937017 (E.D. Ky. Mar. 17, 2015)...................................................................59

Lead Plaintiff William Edward Long, as Trustee of the UA 09-21-2001 William Edward Long & Bonnie Diane Long Living Trust ("Plaintiff") respectfully submits this memorandum of law in opposition to the motions to dismiss and accompanying memoranda of law filed by Defendant General Cable Corp. ("GC Mem.") (ECF No. 75), Defendant Gregory B. Kenny ("K. Mem.") (ECF No. 76), and Defendant Brian J. Robinson ("R. Mem.") (ECF No. 77), (collectively, "Defendants").[1]

## I.      PRELIMINARY STATEMENT

This securities fraud class action arises out of false and misleading statements General Cable ("GC" or the "Company"), its former CEO, Gregory B. Kenny ("Kenny") and former CFO, Brian J. Robinson ("Robinson") made to investors regarding: (i) GC's purported implementation of policies and procedures designed to ensure compliance with the Foreign Corrupt Practices Act of 1977 ("FCPA"); (ii) the effectiveness of  its internal controls over financial reporting; and (iii) its failure to disclose the known risks posed by GC's dependence on widespread corruption to facilitate its overseas operations. Defendants' false and misleading statements and omissions of material fact were repeated in more than fifteen annual and quarterly reports filed with the SEC during the Class Period, and signed by or on behalf of Defendants.

Unbeknownst to investors, GC was engaged in a decade-long bribery scheme involving its operations in at least six different countries on two continents, resulting in tens of millions of dollars in illicit profits. The Company's knowing and willful criminal conduct is extensively documented in GC's non-prosecution agreement ("NPA") with the DOJ, executed on December

---

[1]    Unless otherwise noted herein:  (i) capitalized terms and abbreviations shall have the meanings ascribed to them in the Consolidated Class Action Complaint for Violation of Federal Securities Laws ("Complaint") (ECF No. 69); (ii) references to "¶ __" are to paragraphs in the Complaint; (iii) references to "Rule" are to the Federal Rules of Civil Procedure; (iv) all internal citations and quotation marks are omitted; and (v) all emphasis is added.

22, 2016, as well as in findings made by the SEC in a related Cease-and-Desist Order ("CDO") issued on December 29, 2016. In connection with the NPA and CDO, GC was forced to pay over *$75 million* in criminal fines and disgorgement of profits to resolve the DOJ's and SEC's investigations of the Company's FCPA violations. ¶¶24, 79. In addition, GC was required to undertake extensive remedial measures and to establish an effective FCPA compliance program— the very program that Defendants misrepresented was in place throughout the Class Period.

Together, the Company's admissions in the NPA and the findings in the CDO establish that at the time Defendants assured investors that they had "implemented policies and procedures designed to ensure compliance" with the FCPA, and that GC had internal controls in place to safeguard, *inter alia,* that its books and records were accurate, the Company "***knowingly and willfully*** failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents" and "***knowingly and willfully failed to address these known weaknesses which allowed the conduct to continue***."

Additionally, contrary to Defendants' public statements regarding the effectiveness of GC's internal controls over financial reporting, the SEC found that GC violated the FCPA by failing to maintain accurate books and records as GC's bribery payments were recorded as "legitimate business expenses," "when knowing or believing they were in fact used as bribes or improper payments to foreign government officials." GC also admitted, and the SEC found, that the Company "had deficient internal accounting controls" with respect to its oversight and due diligence of third parties it used to conduct business overseas.

As further revealed in the NPA and CDO, Defendants also misled investors by failing to disclose the known risk posed by GC's widespread reliance on corruption to obtain and retain

business. Contrary to GC's repeated representation that it disclosed all of the known risks to the Company's overseas operations, by no later than December 2011, it knew that Company officials were making "corrupt payments to foreign officials in order to obtain and retain business." GC also admitted in the NPA that its senior management "closed their eyes to" the illegal activity. When the bribery ceased, GC had to shutter a material portion of its overseas business.

In the wake of GC's settlements with the DOJ and SEC, Plaintiff launched an investigation into Defendants' fraud. During the course of this investigation, Plaintiff interviewed twelve former GC employees, who uniformly attested to the Company's near total lack of any FCPA compliance policies, procedures, or controls during the Class Period. Furthermore, the CWs include two individuals, CW 1, the former Vice President of Internal Audit, and CW 2, a Manager in Internal Audit responsible for conducting onsite audits at GC's foreign subsidiaries, who provided detailed accounts demonstrating that Defendants knew or recklessly disregarded that the Company's FCPA compliance program was virtually nonexistent and that Defendants ignored red flags that GC had failed to prevent or detect FCPA violations.

Unable to seriously contend with the Complaint's particularized allegations, Defendants make several unavailing arguments. *First,* Defendants rely heavily on a premature and factually-intensive affirmative defense that Plaintiff's claims are time-barred. This argument is contrary to the Supreme Court's decision in *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 651 (2010), which held that a plaintiff cannot discover his Section 10(b) claim until he has enough factual allegations to sufficiently plead all elements of his claim, including scienter. Defendants have failed to demonstrate that the scienter facts upon which Plaintiff relies to plead a strong inference of scienter were discoverable prior to January 5, 2015—two years prior to the date of the initial complaint in

this Action. In fact, virtually all of these facts were not publicly known or could not have been discovered prior to issuance of the NPA and CDO in December 2016. *See infra* at § IV.B.2.a.

*Second*, with respect to the element of falsity, Defendants seek dismissal of a case different than the one actually pled by Plaintiff. For example, Defendants contend that Plaintiff's claim involving GC's FCPA compliance program is that it was not "effective," not that it failed to exist. However, Plaintiff clearly alleges that GC's repeated assurances that it "implemented policies and procedures designed to ensure compliance with [the FCPA]" were materially false and misleading because Defendants had implemented virtually no FCPA-specific policies and procedures, and any such policies and procedures that existed were patently not designed to ensure FCPA compliance. Likewise, Defendants contend that GC had no obligation to include the risk posed by its FCPA violations among the stated risks to GC's overseas business because the statement "does not purport to list all possible risks of doing business in those [foreign] countries." But that is exactly what the statement purports to include as the reported "risk factors" were meant to advise investors of "all of the known material risks and uncertainties that we know to exist." Defendants' additional falsity arguments fail for the reasons set forth herein. *See infra* at § IV.A.4.

*Third,* with respect to scienter, GC studiously ignores the unequivocal inference of culpability that arises from of its NPA ***admissions*** regarding its knowledge of the lack of policies, procedures, and controls to ensure FCPA compliance and millions of dollars of corrupt payments, arguing that its stock buy-back alone somehow raises a more compelling non-culpable inference. It does not. Additionally, Kenny and Robinson (the "Individual Defendants") each seek to distance themselves from GC's admissions, erroneously contending, among other things, that the DOJ and the SEC decision not to prosecute them for FCPA violations somehow precludes a finding of scienter for their Exchange Act violations. Plaintiff's affirmative allegations, however, confirm

that the Kenny and Robinson knew about or recklessly disregarded the FCPA compliance risks, including that bribes had been paid in at least one country, but chose to do nothing. This "head-in-the-sand" approach led Defendants to repeatedly reassure investors that GC had implemented policies and procedures to ensure FCPA compliance without a reasonable basis to do so. As such, Defendants' arguments do not raise any plausible non-culpable inferences, let alone inferences that are more compelling than the fraud alleged in the Complaint based in large part on CG's admissions. *See infra* at § IV.B.5.

*Finally*, Defendants seek dismissal of loss causation allegations concerning one of three corrective events alleged in the Complaint. As explained herein, Defendants' arguments run afoul of Sixth Circuit case law and must be rejected. *See infra* at § IV.D.

For all of these reasons and those set forth below, Defendants' motions to dismiss should be denied.

## II.   STATEMENT OF FACTS

### A.   General Cable's Global Expansion

GC is one of the world's leading manufacturers of cable and wire for commercial and industrial uses. ¶¶30, 55. During the Class Period, GC's operations were divided into three geographic divisions: (i) North America; (ii) Europe and Mediterranean ("E&M"), which included the Company's operations in Angola and Egypt; and (iii) Rest of World ("ROW"), which included the Company's operations in Asia. ¶56.

Prior to and during the Class Period, GC vastly expanded the scope of its overseas operations, including in developing markets in Africa and the Asian-Pacific region. ¶¶2, 57-59. Included among the Company's acquisitions was Phelps Dodge International Corp. ("PDIC"), which operated factories and distribution centers in Latin America, Asia and Africa and sold cable and wire in Bangladesh, Indonesia, and Thailand, in addition to GC Egypt, and GC China. *Id.* GC

operated in these developing markets via a network of direct and indirect subsidiaries, whose financial statements were all consolidated with GC's. ¶¶34-38.

GC's overseas operations were critical to the Company as they accounted for nearly two-thirds of its annual revenues. ¶¶60, 266-67. By October 2014, GC's Asia Pacific and Africa operations, in particular, accounted for approximately $1 billion, or 16%, of the Company's total sales. *Id.* GC's rapid expansion into developing markets, including in several countries with high levels of public sector corruption, brought with it increased exposure to foreign bribery and corruption and risks related to compliance with the FCPA. ¶¶62, 68-70.

## B.     The FCPA and the Components of an Effective FCPA Compliance Program

As a U.S. company, GC, its domestic and foreign subsidiaries, and all of its officers, directors, employees, and agents, are subject to the FCPA. ¶¶4, 63. The FCPA (i) prohibits the payment of bribes by U.S. companies operating abroad, including the payment of money or anything of value to foreign officials in order to obtain or retain business, or gain any other advantage, ¶¶64-65; and (ii) requires that such companies maintain accurate books and records and sufficient internal controls to prevent the payment of bribes in violation of the FCPA. ¶¶66-67. Failure to comply with any FCPA provisions can lead to the disgorgement of profits tied to the violations, civil and criminal fines, and material operational impacts, including the inability to maintain operations in counties where violations occurred. ¶68.

Compliance with the FCPA is jointly regulated by the DOJ and SEC. ¶64. The *FCPA Resource Guide* sets forth the agencies' guidelines for enforcement and their expectations for minimum internal controls and compliance programs for U.S. companies operating abroad. ¶¶71-74. According to the *FCPA Resource Guide*, an effective FCPA compliance program should include ***at least*** the following: (i) policies and procedures to address FCPA compliance; (ii) well-designed and effective internal controls to prevent FCPA violations; (iii) high-level commitment

from senior executives to FCPA compliance and enforcement; (iv) sufficient compliance resources with proper oversight and independence from business operations; (v) training and guidance for employees concerning the FCPA and enforcement of an FCPA compliance program; (vi) initial and ongoing periodic assessments of FCPA risk; (vii) ongoing monitoring, testing, and auditing of effectiveness of compliance program; and (viii) due diligence concerning FCPA compliance issues, especially of third parties and merger/acquisition candidates. ¶75; *see* ¶¶83, 101, 112, 117.

The *FCPA Resource Guide* emphasizes that an effective corporate compliance program must be tailored to "the operational realities and risks attendant to the company's business" including, among other things, "the degree to which it has operations in countries with a high risk of corruption" and "the extent of its government interaction." ¶74.

### C. Defendants Misrepresent that They had Taken Steps to Mitigate FCPA Risk and that Their Internal Controls Were Effective

Given the importance of both its expanding overseas operations and its adherence to the requirements of the FCPA, Defendants repeatedly reassured investors during the Class Period that GC (i) had "implemented policies and procedures designed to ensure compliance with [the FCPA]," and (ii) implemented effective internal controls over financial reporting, which necessarily included compliance with the books and records and internal controls provisions of the FCPA. ¶¶76, 176, 178, 182-84, 194-95, 202, 211, 213-14.

The undisclosed reality as discussed herein, however, was materially different.

- GC had virtually no, let alone an effective, program in place to ensure that GC was complying with the FCPA. ¶¶77-78; *see generally* ¶¶80-120.

- Without such a program, Defendants were not able to design or implement effective FCPA-specific policies, procedures, or internal controls to prevent FCPA violations. *Id.*.

- As a direct consequence of GC's lack of a compliance program and Defendants' failure to design and implement an effective system of internal controls, GC engaged in widespread FCPA violations, including paying millions of dollars in undisclosed bribes to secure business overseas. ¶¶121-145.

Furthermore, while Defendants purportedly cautioned investors of "the economic, political and other risks of maintaining facilities and selling products in foreign countries," including, Angola and Thailand, ¶¶177-78, 193, 203, 212, they omitted any discussion of the risks posed by GC's reliance on corruption in order to facilitate its operations in these developing markets, rendering those statements materially misleading. ¶¶121-45, 186, 197, 207.

The risks associated with GC's lack of FCPA compliance program and the resulting FCPA violations began to materialize over a series of corrective disclosures on September 22, 2014, October 29-30, 2014, and February 10-11, 2016. ¶¶19-20, 22, 165-69, 221-39. Specifically, these disclosures partially revealed the effects from the lack of effective policies and internal controls and the Company's FCPA violations, which caused GC's stock price to decline and damaged investors. ¶¶221-39.

On September 22, 2014, GC filed a Form 8-K wherein the Company revealed that it was investigating certain payments to Angolan entities, and that it also was reviewing payments in Thailand and India for FCPA "implications." ¶¶165, 223. With respect to the Angolan payments, GC stated that they were made by "certain employees in our Portugal and Angola subsidiaries" at "various times" from 2002 to 2013. *Id*. Additionally, the Company announced it was implementing a screening process for foreign agents used in GC's overseas operations. ¶224. On this news, GC's stock price declined over 10.8% on heavy trading volume. ¶225. However, given Defendants' characterization of the nature and extent of the potential FCPA violations and the fact that Defendants told investors that the Company had self-reported these issues to the SEC and DOJ, investors remained unaware of the massive scope of (i) GC's FCPA-related risks, including, *inter*

8

*alia*, the amount of profits tied to corrupt payments in no less than six countries; and (ii) Defendants' securities fraud, including their knowing omission of material information from their prior statements. ¶226.

Then, on October 29, 2014, one of the risks associated with Defendants' fraud—that GC's overseas operations would be materially and adversely affected if it could no longer rely on making corrupt payments to facilitate those operations—materialized. Specifically, GC issued a press release announcing that it would exit its operations in Asia Pacific and Africa. ¶¶167, 227. The Company claimed that its planned divestiture was purportedly "to simplify [GC's] global portfolio and reduce operational complexity by focusing on core strategic operations in North America, Latin America and Europe." *Id.* During a conference call the following day, Defendant Robinson provided an update on the investigation announced on September 22, 2014, stating that GC was providing FCPA compliance training to all of its employees and hiring a Chief Compliance Officer. ¶229. GC's stock price declined an additional 6%. ¶232.

Once again, investors remained unaware of the true scope of (i) GC's FCPA-related risks, including, *inter alia*, the amount of profits tied to corrupt payments in no less than six countries; and (ii) Defendants' securities fraud, including their knowing omission of material information from their prior statements. ¶233. For example, investors remained unaware of the amount of profits GC generated through corrupt payments—more than $50 million—or that GC relied on bribes to generate profits in Bangladesh, Indonesia, Egypt, and China. ¶¶137-144 (detailing corrupt payments as revealed in the December 2016 DOJ/SEC settlements).

Finally, on February 10-11, 2016, Defendants disclosed for the first time the amount of GC's profits derived from transactions raising FCPA concerns likely to be disgorged. ¶¶169, 234-36. Specifically, Defendants revealed after the market closed on February 10, 2016 that GC had

increased its estimate of the profits the Company would likely have to disgorge under the FCPA to $61 million. ¶¶234-36. In total, this amount was ***more than double*** the amount previously disclosed. *Id.* In response to the news, GC's stock price declined an additional 31.61%, on heavy trading volume. ¶238.

While the magnitude of Defendants' fraud was revealed on February 10, 2016, affecting the Company's stock price, the substantive details of it were not revealed until the DOJ issued its December 22, 2016 NPA, the SEC issued its December 29, 2016 CDO, and Lead Plaintiff secured information from CWs 1 through 12 following its appointment by the Court in 2017.

### D.   The NPA and CDO Reveal Previously Undisclosed Facts About GC's Lack of a Compliance Program and Resulting FCPA Violations

On December 22, 2016, GC entered into the NPA, pursuant to which the Company admitted that its Class Period statements concerning FCPA policies, procedures and controls were false, and "agree[d] and stipulate[d]" to facts detailing its FCPA violations. ¶¶40, 170; *see also* ¶¶12-13, 77, 84-85, 121-43, 146-47, 157-58, 243-53, 272-74. On December 29, 2016, the SEC issued the CDO, which contained extensive, previously undisclosed findings of fact, demonstrating that GC did not have an effective FCPA compliance program during the Class Period, and that it repeatedly violated the FCPA by paying millions in bribes to secure overseas business. ¶¶42, 173; *see* also ¶¶10, 12, 86, 88, 110, 121-45, 157-58, 160-64, 248, 254, 256-57.

As detailed in the NPA and the CDO, GC's lack of a compliance program and internal controls, coupled with the Company's payment of bribes, led to the payment of over $75 million in criminal fines and disgorged profits. ¶24; ¶¶170-73. The NPA and the CDO also required GC to establish an effective FCPA compliance program, including, *inter alia,* "adopt[ing] new or [] modify[ing] existing internal controls, compliance codes, policies, and procedures in order to ensure that it maintains:  (a) a system of internal accounting controls designed to ensure that [GC]

makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anticorruption compliance program that includes policies and procedures designed to detect and deter violations of the FCPA and other applicable anticorruption laws." ¶¶171-73. In so doing, the NPA and the CDO required GC to adopt and/or modify the very policies, procedures, and controls that Defendants misrepresented were in place during the relevant portions of the Class Period.

The Company's admissions in the NPA and the SEC's findings in the CDO, detailed below, show that GC's FCPA compliance program was virtually nonexistent at all relevant times during the Class Period and led to violations of the FCPA in at least six countries.

### 1.     GC's Admissions Regarding Its Deficient FCPA Compliance Program and Internal Controls

The Company admitted in the NPA that during the Class Period it (i) "knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to prevent corruption or otherwise illegal payments by its agents"; (ii) "had deficient internal accounting controls that did not require and/or ensure, among other things (a) due diligence for the retention of third party agents and distributors, (b) proof that services had been rendered by third parties before payment could be made to them, and (c) oversight of the payment process to ensure that payments were made pursuant to contractual terms or that payments were reasonable and legitimate"; and (iii) "knowingly and willfully fail[ed] to address these known weaknesses which allowed the conduct to continue." ¶¶40, 77, 85, 122, 187, 249.

The SEC likewise found that GC violated the Exchange Act by, among other things, (i) "corruptly paying or offering to pay bribes or give other things of value to employees or officials of [state owned entities or] SOEs"; (ii) failing to maintain accurate books and records as these bribes were recorded as "legitimate business expenses" by GC's subsidiaries, "when knowing or believing they were in fact used as bribes or improper payments to foreign government officials,

or otherwise lacked reasonably detailed documentation to accurately and fairly reflect the payments on the subsidiaries' books and records," and were then "included in [GC]'s books and records and consolidated financial statements"; and (iii) failing to maintain an adequate system of internal controls designed to prevent or detect the corruption, because employees of the Company's subsidiaries "were not adequately trained on anticorruption risks, did not require third-parties on [SOE] sales to comply with the FCPA, and did not perform any anticorruption due diligence on third parties." ¶¶42, 86, 110, 188, 248, 254. The SEC expressly found that GC "did not provide adequate guidance or training on policies and procedures to ensure compliance with the FCPA" and that as a result, GC "employees were not aware that the FCPA, as a U.S. law, applied to their operations." ¶110; *see* ¶188(d)-(e).

The NPA and CDO also revealed—for the first time—the details of GC's bribery scheme in Angola, Thailand, Bangladesh, Indonesia, China, and Egypt. *See* ¶¶123-45.

### 2.     GC's Admitted Failure to Prevent or Detect Widespread Corruption Within Its Overseas Operations

**Angola.** GC conducted an audit of its Angolan subsidiary Condel in the third quarter of 2012. The audit consisted of a "Balance Sheet Review," including a sample of Condel transactions, and an assessment of its internal controls. ¶154. The audit uncovered a number of FCPA red flags, including Condel's exclusive use of a third-party sales agent who was being paid suspiciously high commissions that far exceeded the amounts required under the contract. ¶¶155, 157. These audit findings were circulated among GC's Finance, Accounting, and Legal departments, and were ultimately presented to GC's senior management, including Robinson, in the form of a December 2012 audit report. ¶¶156-57.

The SEC found that despite being notified of red flags suggesting that GC's relationship with the Angolan sales agent likely violated the FCPA, Defendants failed to immediately

investigate these payments or implement any additional internal accounting controls. ¶158. From December 2012 to August 2013, GC continued to make commission payments to the agent of over $1.5 million in violation of the FCPA. *Id.* Only in August 2013 did GC conduct an onsite review of Condel to follow up on the December 2012 report. ¶160. The review revealed additional red flags about Condel's relationship with the sales agent, including that Condel's Country Manager, who managed the relationship with the Agent, directed payments to the agent's personal bank account, and the agent did not provide proof of services performed. *Id.* Like the December 2012 audit report, a memorandum detailing the red flags was sent directly to a GC executive officer. *Id.* Nevertheless, on September 5, 2013, GC paid the agent additional commissions, knowing that at least part of the payments would be passed on to Angolan government officials. ¶158.

In October 2013, GC's executive management instructed Condel management to cease payment of past due commissions to the agent pending further investigation and not to make any additional payments without authorization. ¶161. However, to avoid the loss of approximately $10 million in sales to Angolan SOEs and approximately $5 million in termination costs, GC's executive management allowed Condel to continue to work with the agent on a case-by-case basis for new business with the SOEs. ¶162. As a result, GC approved sales contracts with the Angolan SOEs that called for excessive commissions to be paid to the agent in late November 2013. *Id.* Furthermore, in December 2013, one year after Robinson learned that the Company's relationship with the agent likely violated the FCPA, GC approved the payment of past due commissions totaling $342,613 to the agent. *Id.*

GC admitted in the NPA that it paid bribes to employees of three SOEs to obtain and retain business in Angola between 2003 and 2013. ¶124. Specifically, GC paid bribes directly to employees of the Angolan SOEs between 2003 and 2009. ¶127. Beginning in or around May 2009,

13

to conceal the payments to the Angolan officials, GC began making payments through the use of a third-party sales agent, who according to the NPA was used "as an intermediary to funnel corrupt payments to Angolan officials." ¶128. GC has admitted that it paid $8.7 million to the sales agent with knowledge that the agent would, and did, pass a portion of the payments to officials at the SOEs. ¶¶126, 128. In all, GC made 38 illegal payments to at least five employees of Angolan SOEs, and three payments to the sales agent. ¶127. According to one GC subsidiary employee, "[e]veryone knew" that the Company was paying bribes to the Angolan SOEs. ¶125. GC's awareness also was evidenced by falsely recording the bribes as payments for third-party consulting services and offsets against sales. ¶124.

**Thailand**. From January 2008 through January 2013, GC's subsidiary, PDTL, paid more than $5.4 million in improper payments to a Thai Company, resulting in profits of $13 million. ¶130. Specifically, between January 2008 to December 2011, in connection with at least 26 sales contracts between PDTL and Thai SOEs, PDTL paid $3.9 million in "success fees" to the Thai Company that were improperly booked as prepaid commissions or discounts. ¶131. From 2012 to 2013, acting through PDTL, the Company provided more than $1.5 million in illicit "rebates" to a distributor with the understanding that the distributor would use the money, in part, for corrupt purposes in association with PDTL's sales to Thai SOEs. ¶¶130, 132. A GC senior executive learned of the illegal payments in 2011 and recognized that the payments were being used for corrupt purposes, yet GC did nothing to stop the payments. ¶¶133-36, 146-147. GC management admitted in the NPA that they "came to the understanding that money being paid to the distributor was being used for illegal purposes, and closed their eyes to it being used for bribery." ¶136.

**Bangladesh.** Between 2010 and 2014, GC paid bribes to obtain business in Bangladesh through PDTL. ¶137. As with the Company's other bribery schemes, details of GC's illicit

14

payments were known within GC. For example, in a June 2012 e-mail to senior PDTL executives, a sales agent explicitly requested a commission of 10% to be "shared by decision makers [at the SOE and] concerned higher ups" in the Bangladeshi government. ¶¶137-39. Furthermore, GC admitted that it "was aware of red flags in connection with these payments and ultimately became aware of, or at the very least were willfully blind to, certain of the corrupt payments." ¶137.

**Indonesia.** Between 2010 and 2014, acting through PDTL, GC paid bribes in Indonesia, including $2 million to two freight forwarders with the understanding that they would use the money for corrupt purposes. ¶140. Consistent with its corrupt practices elsewhere, GC employees communicated about the illicit activity in Indonesia within GC. ¶141 (citing a March 2010 email describing the services of a principal of the two freight forwarders in Indonesia and the corrupt payments made by an agent to employees of Indonesian SOEs). Despite this awareness, it was not until February 2014 that GC terminated the PDTL manager involved in the illicit payments. *Id.*

**China.** Between December 2012 and 2015, acting through its subsidiary GC China, GC made corrupt payments to secure business on 19 projects in China, including $500,000 to China-based agents and distributors, typically in the form of rebates, special discounts, and technical service fees. ¶142. GC employees internally communicated about the scheme via e-mail, among other means of communication. *See, e.g.*, ¶143 (citing an August 2013 email in which a GC China representative stated that "a few key players at [the SOE customer] are our internal contacts and charge a certain amount of fees. If we are looking to have long term cooperation with them, charges for this is rather inevitable."). GC has admitted that it "knew that the third-party agents and distributors would use the money, in part, for corrupt purposes." *Id.*

**Egypt.** From September 2010 to May 2015, acting through its subsidiary, GC Egypt, GC gave or offered to give more than $80,000 in improper payments, including cash, gifts, or tips to

employees of Egyptian SOEs. ¶145. Some of these payments were improperly recorded as "consultant fees" for SOEs to add GC Egypt to an approved supplier list. *Id.*

### E.     Lead Plaintiff's Investigation Reveals GC's Virtually Non-Existent FCPA Compliance Program and Deficient Internal Controls

After being appointed on November 7, 2017, Plaintiff launched an investigation that involved, *inter alia*, a review of the DOJ and SEC settlements and interviews of former employees who worked for the Company during the Class Period. Complaint at 1-2. The accounts of the former employees (CWs 1-12) expand upon and add to the weight of GC's admissions in the NPA and the SEC's findings in the CDO. Specifically, they further establish that GC did not have in place even the basic elements of an effective FCPA compliance program during the Class Period, let alone sufficient internal controls or "policies and procedures designed to ensure compliance" with the FCPA, as Defendants repeatedly claimed. *See* ¶¶80-120.

The CWs provide firsthand accounts confirming, as reflected in the NPA, that the Company "knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents," and the SEC's finding that GC "did not provide adequate guidance or training on policies and procedures to ensure compliance with the FCPA." *See* ¶¶43-54, 87-88, 92-98, 102-09, 115, 118-120, 148-57, 166, 256, 259-62, 265, 269-70, 276-79.

Had GC actually possessed the policies and procedures it publicly touted, the CWs were the very people who would have been responsible for implementing and overseeing them. Indeed, the CWs include individuals from GC's Internal Audit and Compliance departments and related operational roles that enable them to confirm that GC lacked meaningful FCPA policies and procedures during the Class Period. *See* ¶¶43-53.

16

1.    **GC Lacked a High-Level Commitment from Senior Executives to FCPA Compliance and Enforcement of Its Compliance Program**

According to the *FCPA Resource Guide*, "compliance with the FCPA . . . must start at the top" of the company and when evaluating a company's "tone-at-the-top," the DOJ and SEC look for "the commitment of corporate leaders to a 'culture of compliance.'" ¶91. Plaintiff's investigation revealed that GC's senior leadership, including Defendants Kenny and Robinson, disregarded the Company's actual and potential non-compliance with the FCPA and the risk that non-compliance posed to its business. ¶¶92, 94. CW 1, who was hired in 2012 to fix the Company's "broken" Internal Audit department, explained that the attitude among senior management at the Company was that since there had been no FCPA violation uncovered to date, the Company must be compliant with the FCPA. ¶¶93-94, 96. CW 1 referred to Defendants' attitude as a "head in the sand" approach to FCPA compliance that was inconsistent with the level of exposure GC faced given the scope of its international operations, a fact that CW 1 explained to Robinson. ¶94.

Upon taking on the lead internal audit role, it was immediately apparent to CW 1 that the Company lacked an effective FCPA compliance program. ¶¶93, 277. When CW 1 raised the need for additional resources and a formalized FCPA compliance program with Robinson, Robinson was not receptive. ¶¶95-96. CW 1 also described efforts led by GC's Assistant General Counsel, Diana Toman ("Toman") to raise awareness about FCPA compliance. ¶¶97-98. Robinson was likewise nonresponsive. *Id.* Robinson's disregard of these requests for additional resources signaled the lack of a "commitment of corporate leaders to a 'culture of compliance'" in contravention of the *FCPA Resource Guide*. ¶96.

2.    **GC Failed to Devote Sufficient Oversight and Resources to FCPA Compliance**

As explained in the *FCPA Resource Guide*, the DOJ and SEC look to whether "the company [has] devoted adequate staffing and resources to the compliance program given the size,

17

structure, and risk profile of the business," and "[a]s a company's risk for FCPA violations increases" so does the need for increased "compliance procedures, including due diligence and periodic internal audits." ¶101. Lead Plaintiff's investigation revealed that despite the Company's explosive overseas growth, which included acquiring at least three subsidiaries that did business in countries with significant levels of FCPA risk between 2010 and 2012, GC made no effort to adopt an FCPA compliance program commensurate with its level of risk.

For instance, as explained by CW 6, until 2015, GC did not have anyone at the Company who was specifically responsible for FCPA compliance. ¶107. When CW 1 assumed responsibility over GC's Internal Audit department, the department consisted of just four auditors based in Kentucky and one auditor based in Europe – *for a company with 14,000 employees and $3.6 billion in sales in overseas markets*. ¶102. CW 5 confirmed that operations in GC subsidiaries with high-FCPA risk were not reviewed by Internal Audit with any regularity. ¶107. Indeed, no one from the Internal Audit department even visited, let alone audited the Company's operations in Angola, China, Thailand, or India during CW 5's tenure at GC. *Id.*

To make matters worse, none of the auditors working for GC possessed the expertise necessary to conduct a formal FCPA audit, in part, because the Company did not provide any specific FCPA audit training. ¶104 (CWs 1, 2, 3, 4, 5, 11, and 12 all confirmed that GC did not provide Internal Audit employees with any specific FCPA training). Indeed, virtually all of the CWs with responsibilities related to GC's international operations reported that there was very little, if any, training specifically concerning the FCPA. *See* ¶109 (citing accounts from CWs 5, 8, 9, and 10). The Company likewise lacked an FCPA testing protocol. ¶105. Even if properly trained, CW 1 recalled that the audit staff would have been unable to conduct any meaningful FCPA testing given the "woefully inadequate" level of staffing and resources in Internal Audit overall. *Id.* The

CW accounts, *see* ¶¶99-110, confirm the SEC's findings that GC "did not provide adequate . . . training on policies and procedures to ensure compliance with the FCPA" and that employees of GC's "subsidiaries were not adequately trained on anticorruption risks."  ¶110.

### 3. GC Did Not Conduct Assessments of FCPA Risk or Any Ongoing Monitoring, Testing, or Auditing of Its FCPA Compliance

The *FCPA Resource Guide* next provides that the "[a]ssessment of risk is fundamental to developing a strong [FCPA] compliance program." ¶112. However, GC did not even **initiate** a process for conducting a formal assessment of the FCPA risk posed by its international operations until 2015 at the earliest. ¶115. In fact, CWs 1, 3, 4, 5, and 6 independently confirmed that GC had not conducted an assessment of the sufficiency of its FCPA compliance program during their time with the Company. ¶¶93, 115.

Likewise, GC was required to "review and test its controls," ¶117, yet CW 1 explained that the Company did not audit the countries with the highest FCPA risk, such as Angola, Thailand, or China, on a regular basis. ¶120. Moreover, GC did not test the Company's compliance with the FCPA at any level. ¶118 (CWs 2, 3, 4, 5, and 11 all confirming that neither GC's Internal Audit nor Compliance departments specifically tested the Company's FCPA compliance).

### 4. GC Failed to Conduct any FCPA Due Diligence of Third Parties

The *FCPA Resource Guide* cautions that due diligence of payments to third party distributors and agents is critical to ensuring FCPA compliance, as third parties often serve as conduits for corruption. ¶87. CW 1 stated, however, that GC failed to conduct any due diligence of third parties and agents it hired, and did not maintain any centralized database or repository of information on its various agents and third parties. ¶119.

CW1's recollection is consistent with the Company's admission in the NPA that it "knowingly and willfully failed to implement and maintain an adequate system of internal

accounting controls designed to detect and prevent corruption or otherwise illegal payments to agents." ¶¶40, 77, 85, 122, 249, 251. Specifically, the Company conceded that it "had deficient internal accounting controls" including controls "that did not require and/or ensure" at least the following: "(a) due diligence for the retention of third party agents and distributors;" "(b) proof that services had been rendered by third parties before payment could be made to them;" and "(c) oversight of the payment process to ensure that payments were made pursuant to contractual terms or that payments were reasonable and legitimate." ¶¶40, 85, 250.

The CW statements also confirm the SEC's findings that GC did not "require third-parties" with whom GC contracted to facilitate sales to SOEs "to comply with the FCPA" and did not "perform any anticorruption due diligence on third parties." *Compare* ¶¶42, 86, 188, 254, *with* ¶87 (according to CW 1 and 2, GC lacked any due diligence policies or procedure regarding the Company's use of third parties and agents); (CW 4 confirmed that in conducting audits of foreign subsidiaries, CW 4 was not required to review any payments made to third party distributors, sales representatives, or agents). ¶119.

### F.   Lead Plaintiff's Investigation Revealed Defendants' Knowledge of and/or Reckless Disregard for Their Misstatements

As detailed *infra* at § IV.B, the NPA, CDO and Lead Plaintiff's investigation uncovered extensive evidence that the Individual Defendants knew of or at least recklessly disregarded GC's (1) virtually nonexistent FCPA compliance program, (2) deficient internal controls over FCPA compliance, and (3) widespread FCPA non-compliance. For example, the Company's admissions in the December 22, 2016 NPA establish that the Company knew that its foreign subsidiaries were actively violating the FCPA as early as 2011. ¶146. Specifically, GC has admitted that by December 2011, the Company "knew that certain of [the Company's] foreign subsidiaries used certain third-party agents and distributors to make corrupt payments to foreign officials in order to

obtain and retain business."  ¶¶122, 146, 243, 272. GC also admitted in the NPA that even after it "came to the understanding" that bribes were being paid by its subsidiaries, the Company's senior management "**closed their eyes to**" the illegal activity. ¶¶136, 243.

The Company likewise admitted that despite the known corrupt payments in violation of the FCPA, GC "**knowingly and willfully** failed to implement adequate internal accounting controls over payments to third parties despite knowing that third parties were making illegal payments." ¶¶40, 77, 85, 122, 251. Additionally, the Company admitted that GC "**knowingly and willfully** failed to address these known weaknesses [in the Company's internal accounting controls], in relevant part, to allow the conduct to continue." *Id.* GC also admitted that with respect to its corrupt payments in Bangladesh and Indonesia, it "was **aware of red flags** in connection with these payments and ultimately **became aware of, or at the very least were willfully blind to**, certain of the corrupt payments." ¶¶137, 141.

The Company's admissions of knowledge and recklessness are confirmed by the statements obtained from CWs 1 through 12. For example, CW 2 recounted how GC's executive management, including Robinson, received—but took no action in response to—an Internal Audit report prior to the third quarter of 2012, which recommended that management "create, implement and enhance," FCPA policies and procedures. ¶¶148, 259. CW 2 detailed additional red flags that put Defendants on notice of the Company's deficient internal controls among GC's foreign subsidiaries. For example, CW 2 described a memo circulating in the ROW division authored by a ROW Compliance Manager that explained how to subvert the Company's internal audit functions. ¶¶151, 260. CW 2 also recounted specific instances in which the Company's overseas employees sought to conceal information from CW 2 during the course of CW 2's audit work—a fact that was communicated directly to Robinson. *Id.*

21

Similarly, CW 1 communicated to Robinson CW 1's concerns that GC lacked FCPA-specific compliance policies, testing, or training, and never conducted an assessment of the sufficiency of its FCPA compliance program. ¶¶93, 269. Significantly, CW 1 specifically explained to Robinson why the Company's failure to devote sufficient resources to its FCPA compliance was inconsistent with GC's FCPA exposure, but Robinson failed to respond. ¶94. Despite these communications, however, Robinson was not responsive as there was no "appetite" among the Company's senior-most management to devote additional resources to FCPA compliance. ¶97.

CW 1 further revealed that, based on CW 1's participation in disclosure review meetings, Defendants' representations regarding GC's FCPA compliance program and internal controls over financial reporting had no factual basis. ¶¶270, 278. CW 1 explained that during meetings in which the Company's public statements regarding, *inter alia*, (i) its purported implementation of policies and procedures designed to ensure compliance with the FCPA; (ii) the effectiveness of GC's internal controls over financial reporting; and (iii) the accuracy and completeness of its risk disclosures concerning its overseas operations, Defendants did not engage in any meaningful discussion concerning these representations and whether the Company had a basis to make them. *Id.* CW 1 explained that the fact the representation had been included in prior year's filings served as the basis for which Defendants included it in the current year's filings. *Id.* CW 1 concluded that the FCPA violations that GC failed to prevent were facilitated and perpetuated by the continuous, "not at risk" mentality fostered and maintained by upper management, including Kenny and Robinson, who rejected attempts to enhance the Company's FCPA compliance program. ¶269.

## III.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must simply allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint alleging securities fraud must also satisfy Rule 9(b) and the PSLRA. Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake," whereas the PSLRA requires a plaintiff to "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B).

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 467 (6th Cir. 2011). In addition, "courts must consider the complaint in its entirety" in assessing the sufficiency of its allegations. *Tellabs*, 551 U.S. at 322. Further, courts should not resolve factual disputes or weigh evidence on a motion to dismiss. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558 (6th Cir. 2001). The question is "not whether [Plaintiff] will ultimately prevail, but whether" Plaintiff "is entitled to offer evidence to support its claim." *In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 711 (S.D. Ohio 2006).

## IV.    ARGUMENT

### A.    The Complaint Pleads Actionable Misrepresentations

In order to establish falsity, the complaint need only "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) ("*Dana I*"). "A misrepresentation is an affirmative statement that is misleading or false." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014). Once a

defendant chooses to speak, the defendant "assume[s] a duty to speak fully and truthfully on those

subjects." *Helwig,* 251 F.3d at 561 ("a company may choose silence or speech . . . but it may not

choose half-truths"). A statement is misleading whenever it is made "without some qualification

or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way."

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672-673 (6th Cir. 2005) ("once

[the defendant] elected to make statements . . . it was required to qualify that representation with

known information undermining (or seemingly undermining) the claim").

As alleged in the Complaint, Defendants repeatedly misrepresented (i) that GC had adopted

measures to ensure compliance with the FCPA; (ii) that the Company had effective internal

controls over financial reporting; and (iii) the risks the Company's undisclosed FCPA violations

posed to its international operations. ¶174; *see* ¶¶175-215. Each set of statements was untrue or

rendered materially misleading by virtue of Defendants' failure to disclose the Company's (i) lack

of a requisite FCPA compliance program, including policies, procedures, and controls designed

and implemented to ensure FCPA compliance; and (ii) corrupt bribery scheme ultimately admitted

to by the Company in connection with its settlements with the DOJ and SEC.

### 1.   Defendants Misrepresented the *Existence* of the Company's Purported FCPA Compliance Program

In every annual filing during the Class Period, GC represented that the Company had

"implemented policies and procedures designed to ensure compliance with [the FCPA]."  ¶¶176,

193, 203, 212. This statement has two components: (i) that the Company actually implemented

FCPA-specific policies and procedures; and (ii) that such policies and procedures were designed

to ensure compliance with the FCPA.

As detailed above, GC's admissions in the NPA, the findings of the SEC, and the accounts

of the CWs all confirm that the Company failed to implement even the minimum requirements of

an effective FCPA compliance program. ¶¶80-120. For example, the Company made no effort to adopt an FCPA compliance program commensurate with its level of risk, as it failed to:

- conduct an initial risk assessment to identify and categorize the compliance risks that needed to be guarded against through the implementation of policies and procedures, ¶¶112-15;

- design and implement FCPA-specific policies and procedures based on the results of the initial risk assessment, *id.*;

- conduct adequate training on the application of the FCPA to GC's overseas operations, as well as the failure to train any employees, including internal auditors, with respect to policies and procedures to ensure compliance with the FCPA. ¶¶99-110;

- conduct periodic follow-on risk assessments or testing to determine whether GC had, in fact, implemented policies and procedures to ensure FCPA compliance.  ¶¶116-20.

*See also* ¶¶91-96 (describing GC's lack of high-level commitment to, and enforcement of, FCPA compliance), ¶¶224, 229 (detailing the fact that remedial measures were only adopted once FCPA violations were discovered). These glaring deficiencies, led to the SEC's finding that GC "did not provide adequate guidance or training on policies and procedures to ensure compliance with the FCPA" and that as a result, GC "employees were not aware that the FCPA, as a U.S. law, applied to their operations." ¶¶110188(d)-(e).

These allegations are more than sufficient at the pleading stage to allege falsity as Defendants had no basis to make any representation as to the existence or effectiveness of the Company's FCPA compliance program. *Gov't of Guam Ret. Fund v. Invacare Corp.*, No. 1:13CV1165, 2014 WL 4064256, at *3 (N.D. Ohio Aug. 18, 2014) (citing *Bridgestone*, 399 F.3d at 674) ("[I]n this Circuit . . . when a statement or comment of regulatory compliance is subject to objective verification, it may be actionable."); *see also In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-cv-02324-GPC-KSC, 2016 WL 5390533, at *5, 11 (S.D. Cal. Sept. 27, 2016) (bank's positive

representations regarding internal control and audit measures held actionable where the bank's internal controls were alleged to be "nonexistent," and its audit programs were understaffed).

In *Invacare*, the defendant medical product company represented that it had "established numerous policies and procedures that the company believes are sufficient to ensure that the company will operate in substantial compliance" with applicable laws and FDA regulations, and that it "continues to strengthen its programs to better ensure compliance with applicable regulations." 2014 WL 4064256, at *3-4 (emphasis omitted). The court found these statements actionable in light of the complaint's allegations "describ[ing] numerous, pervasive and repeated violations of FDA and FDCA regulations." *Id.* at *5.

Similarly, in *BofI*, the defendants touted the defendant bank's regulatory compliance programs, stating that it had "made significant investments in our overall compliance infrastructure over the past several quarters," and that it had "spent a significant amount of money on [regulatory] compliance upgrades." 2016 WL 5390533, at *5. The complaint "set[] forth detailed allegations concerning [d]efendants' inadequate internal procedures and audit programs," including that "BofI's observed practices fell short" of "guidance issued by the Office of the Comptroller of Currency (OCC)," and that confidential witnesses described the internal audit department as "understaffed" and BofI's internal controls as "nonexistent." *Id.* at *10. The court held that "these allegations demonstrate" that "[d]efendants' statements were misleading or false at the time they were made." *Id.* at *11.

Under *Invacare* and *BofI*, even if the court holds that GC had a policy, which it did not, the statements were materially misleading because they were not designed or implemented to ensure compliance. Indeed, to the extent GC implemented any FCPA-specific measures they were so inadequate so as to be "virtually nonexistent," ¶269, and thus not "designed to ensure compliance,"

as Defendants claimed. ¶¶176, 193, 203, 212. *See Invacare*, 2014 WL 4064256, at \*5; *BofI*, 2016 WL 5390533, at \*11; *see also Meyer v. JinkoSolar Holdings Co., Ltd.,* 761 F.3d 245, 251 (2d Cir. 2014) (defendants' "comforting statements . . . about compliance measures" given undisclosed reality of noncompliance were actionably misleading).

In response, Defendants incorrectly contend that GC's repeated representations that it "implemented policies and procedures designed to ensure compliance with [the FCPA]," are not actionable because "the facts pled in the Complaint at most allege that GC's anti-corruption policies and internal controls were not sufficient to prevent the FCPA violations that occurred – not that they did not exist or were not designed to ensure compliance." GC Mem. at 26. *First*, as discussed above, Plaintiff does allege that GC's FCPA compliance program was so deficient as to be virtually nonexistent, rendering GC's representations materially misleading. *See* ¶¶80-120, 269; *Invacare*, 2014 WL 4064256, at \*5. *Second*, Plaintiff also demonstrates that whatever scintilla of a policy GC claims to have had certainly was not designed to ensure compliance with the FCPA as it did not meet the minimum standards of the *FCPA Resource Guide*. ¶80; *BofI*, 2016 WL 5390533, at \*11. Defendants offer no response to these allegations.

Defendants also erroneously contend that GC's warning that "there can be no assurance that our employees, contractors and agents will not take actions in violation of our policies" insulates them from any liability for their misstatements. GC Mem. at 27. Indeed, "[o]nce a company assures investors that a policy or practice exists, attempts to point out risks or explain that the policy or practice may be ineffective do not negate the fact that the assurance was made." *In re Ocwen Fin. Corp. Sec. Litig.*, No. 14-81057-CIV-WPD, 2017 WL 3701253, at \*4 (S.D. Fla. June 13, 2017) (granting plaintiffs' motion for summary judgment on falsity where purported policy did not exist).

27

Furthermore, GC has admitted that it was in fact violating the FCPA when it issued the alleged misstatements. Specifically, GC has admitted that by December 2011, GC "knew that certain of [the Company's] foreign subsidiaries used certain third-party agents and distributors to make corrupt payments to foreign officials in order to obtain and retain business." ¶¶146, 187, 243, 272. GC also admitted that, it "was aware of red flags in connection with these payments and ultimately became aware of, or at the very least were willfully blind to, certain of the corrupt payments." ¶¶137, 141. Accordingly, Defendants' warnings to investors regarding the risks of noncompliance, when such risks had already materialized, were themselves materially false and misleading and offer no protection. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 108 (D.C. Cir. 2015) ("To conclude . . . that even where a risk has materialized a company need only warn that it is a 'risk,' would render misleading cautionary language sufficient, a result neither the statutory text, nor legislative history, nor precedent supports."); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (finding warning concerning regulatory risk actionable, because "the inference is available at this stage in the proceedings that it could also be reasonably read as assuring the investor that no such threat existed at that precise moment").

### 2. Defendants Misrepresented that GC's Internal Controls over Financial Reporting and Disclosure Controls Were Effective

In GC's FY 2011 Form 10-K and 1Q and 2Q 2012 10-Qs, Defendants certified that GC "conducted an evaluation of the effectiveness of internal control over financial reporting" and "concluded that internal control over financial reporting was effective." ¶179. Likewise, in each Form 10-K, Form 10-K/A, Form 10-Q, and Form 10-Q/A filed during the Class Period, Defendants Kenny and Robinson certified that GC had "designed" sufficient internal controls over financial

reporting and disclosure "to ensure" the disclosure of material information and to "provide reasonable assurance regarding the reliability of [its] financial reporting," ¶¶182, 184, 195, 204, 214. These statements were materially false and misleading because GC did not have sufficient internal controls in place to ensure that (i) it disclosed all material information concerning its lack of an FCPA compliance program and resulting FCPA violations; or (ii) that its books and records accurately reported GC's tens of millions in illegal bribes and resulting profits. *See* ¶¶185, 187-91, 196, 198-201, 205, 207-10, 215.

In addition to proscribing actual bribes, *see* ¶¶64-65, 15 U.S.C. § 78dd-1, the FCPA requires companies to (i) make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflect an issuer's transactions and dispositions of an issuer's assets; and (ii) devise and maintain a system of internal accounting controls, ¶66, *see* 15 U.S.C. § 78m(b)(2)(A) & (B). Here, GC admitted that it "knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents." ¶¶40, 77, 85, 122, 249, 251. Additionally, the SEC found that GC "violated Section 13(b)(2)(A) [of the Exchange Act]" because the corrupt payments "were recorded as legitimate business expenses … [and] were included in [GC]'s books and records and consolidated financial statements." ¶¶42, 88, 248.

GC's admissions and the SEC's findings demonstrate that Defendants' internal control statements were materially misleading at the time they were made. *See, e.g.*, *In re Immucor, Inc., Sec. Litig.*, No. 1:05-cv-2276-WSD, 2006 WL 3000133, at *12 (N.D. Ga. Oct. 4, 2006) (finding representations regarding company's disclosure controls and internal controls over financial reporting materially false and misleading based on undisclosed bribery scheme and other internal control deficiencies); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015)

29

(finding management's representations that the company's internal controls were effective despite failure to disclose "extensive corruption in the Company's procurement activities" was sufficient to plead falsity); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (holding that plaintiffs plausibly alleged that defendant's "internal control problems were much more serious than the picture conveyed by its filings and press releases"); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) ("plaintiffs' factual allegations, accepted as true, suggest that the Company recklessly or intentionally misled investors as to the state of its internal controls"). As the court in *Immucor* stated, because the company's undisclosed internal control deficiencies "could have lead (and [p]laintiffs allege did in fact lead) to liability under the FCPA and impacted the value of Immucor's stock," the company's "misstatement of those weaknesses" rendered their affirmative statements regarding the effectiveness of the company's internal controls materially misleading. 2006 WL 3000133, at *12. The same holds true for Defendants representations regarding the sufficiency and effectiveness of GC's internal controls.

Additionally, the undisclosed internal control deficiencies alleged in the Complaint, *see* ¶¶185, 187-91, 196, 198-201, 205, 207-10, 215, render Defendants' certifications pursuant to Section 302 of the Sarbanes Oxley Act ("SOX"), ¶¶181-84, 195, 204, materially misleading. *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1307 (D. Utah 2007) (finding SOX certifications false and misleading where they represented that defendant was unaware of any fraud involving management with responsibility over financial reporting despite undisclosed FCPA violations involving CEO); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 533 (S.D.N.Y. 2009) (SOX certification was false because defendant violated internal hedging policy, which was an instance of fraud required to be disclosed to the company's auditor).

Defendants contend that their Class Period "statements referring to internal control over financial reporting and disclosure controls and procedures" were not rendered materially misleading because their FCPA violations and lack of internal controls (including specifically accounting controls) purportedly "have nothing to do with FCPA compliance policies and procedures." GC Mem. at 31 (citing *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 868-69 (S.D. Tex. 2016) and *In re Invision Techs., Inc. Sec. Litig.*, No. C04-03181 MJJ, 2006 WL 538752, at *6 (N.D. Cal. Jan. 24, 2006)). They are wrong.

As an initial matter, the case upon which Defendants rely are readily distinguishable because, unlike the instant case, they involved complaints which failed to allege with particularity that any FCPA violations had actually occurred, let alone admissions that the company violated the FCPA's accounting controls provisions (as opposed to provisions governing corrupt payments) by failing to maintain accurate books and records by, among other things, improperly recording bribes as legitimate business expenses. *Compare Key Energy*, 166 F. Supp. 3d at 863 (finding that the complaint failed to state a claim "because [p]laintiffs failed to allege particularized facts showing that FCPA violations actually occurred") *and Invision Techs.*, 2006 WL 538752, at *1 (describing alleged undisclosed FCPA violation as "payments to foreign officials in violation of the FCPA") *with* ¶¶40, 42, 77, 85, 122, 187-88, 249.[2] Defendants also fail to cite any facts, let alone allegations in the Complaint, which demonstrate conclusively at the pleading stage that the "accounting controls" governing the accuracy of GC's books and records (the original source of all financial reporting) mandated by the FCPA are not controls over financial reporting referenced

---

[2] Defendants misleadingly cite a portion of the *Key Energy* opinion summarizing the defendants' arguments in support of their motion to dismiss. *See* 166 F. Supp. 3d at 860-871. In ruling on these arguments, the court merely found that the complaint in that case failed to plead sufficient facts to show that any statement in the SOX certification was knowingly false, in part because of the plaintiff's failure to plead facts showing that internal control deficiencies actually existed. *Id.* at 872. Indeed, the complaint in *Key Energy* specifically alleged that the company "had policies, procedures, and training . . . to address FCPA issues," *id.* at 862, rendering that case factually inapposite.

in these statements. Therefore, the Complaint's allegations that Defendants' internal control representations included the FCPA accounting controls are sufficiently particularized at this stage of the litigation. *Cardinal Health,* 426 F. Supp. 2d at 711 (court should not resolve factual disputes on a motion to dismiss).

Furthermore, regardless of whether Defendants' representations about the Company's internal controls over financial reporting and SOX certifications specifically encompassed compliance with the internal controls provisions of the FCPA (they did), the Company's admitted, undisclosed internal controls deficiencies alleged in the Complaint are sufficient to independently render these statements materially false and misleading, as the above-cited cases demonstrate. ¶¶205, 207-10, 215. *Immucor*, 2006 WL 3000133, at *12; *Petrobras*, 116 F. Supp. 3d at 380-81; *Varghese*, 672 F. Supp. 2d at 607.

### 3. Defendants Failed to Disclose the Risks Posed by the Company's Reliance on Corruption to Facilitate Its Overseas Operations

In multiple SEC filings throughout the Class Period, Defendants claimed to identify all of the "economic, political and other risks of maintaining facilities and selling products in foreign countries," ¶¶177-78, 186, 193-94, 203-04, 212-13, yet omitted to disclose the risk posed by GC's rampant FCPA violations. That omission rendered these affirmative statements materially misleading because one of the primary risks facing GC was that it was dependent upon corruption in order to facilitate its overseas operations, and that an inability to sustain these practices would have a material adverse impact on the Company's continued operations in those countries. ¶¶186, 197, 206. In fact, the Company's undisclosed FCPA violations was the key "risk[] of maintaining facilities and selling products in foreign countries" because when it stopped, GC was forced to divest its overseas operations. ¶¶177, 197, 206, 227. *See Meyer*, 761 F.3d at 251-52 (failure to

disclose risk from regulatory noncompliance was actionable omission as "substantial non-compliance would constitute a substantial threat to earnings, if not to the entire venture.").

Defendants contend that the misstatement is not actionable because it "does not purport to list all possible risks of doing business in those [foreign] countries," GC Mem. at 28-29. But that is patently false, as the risk disclosures purported to advise investors of "all of the known material risks and uncertainties that we know to exist," associated with, among other things, "maintaining facilities and selling products in foreign countries." ECF No. 75-16 (2011 10-K) at 10-11; *see also* ¶178. As GC has admitted, it knew as of the dates it issued these disclosures that the Company was engaged in corruption to facilitate its overseas operations. ¶¶146, 187, 243 (admitting that by December 2011 GV "knew that certain of [its] foreign subsidiaries used certain third-party agents and distributors to make corrupt payments to foreign officials in order to obtain and retain business.").

Defendants similarly contend that GC had no duty to disclose the risk of "corruption" because the risks that were disclosed were uncontrollable risks, whereas risk from corruption was controllable. GC Mem. at 29. *First*, Defendants' representation to investors that the risk disclosures included "all of the known material risks and uncertainties that we know to exist" did not distinguish between controllable and non-controllable risks. ECF No. 75-16 (2011 10-K) at 10. *Second*, because Defendants chose to disclose some of the material risks to running its overseas business, it was required to disclose all of them. *Helwig*, 251 F.3d at 560 (when a defendant chooses to speak, the defendant "assume[s] a duty to speak fully and truthfully on those subjects"); *Omnicare Sec. Litig.*, 769 F.3d at 470 (same). *Third*, Defendants' contention is unsupported by the very language of the misstatement as it cites the "difficulty of effectively managing diverse global operations," which is a risk within Defendants' control. ¶177.

Finally, Defendants argue that the information allegedly omitted from these disclosures was "widely known," citing the Complaint's allegations that GC operated in developing countries known to have a high incidence of public corruption. GC Mem. at 30 (citing ¶70). Defendants misread Plaintiff's allegations. Plaintiff's asserted basis for falsity is not that GC failed to disclose the ***possible*** risk of corruption facing ***all*** companies operating in these countries, but that it failed to disclose the ***actual*** risk attending GC's active participation in the public corruption in these countries. ¶¶186, 197, 206. Accordingly, Defendants' assertion of what amounts to a "truth-on-the-market" affirmative defense fails. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (9th Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."); *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008) ("[W]e reserve for another day the issue of whether [the truth-on-the-market defense] may be applied at the motion to dismiss stage of the pleadings.").

### 4.    Defendants' Remaining Falsity Challenges Fail

Defendants weakly contend that Plaintiff is impermissibly attempting to "transform GC's admitted FCPA violations into securities fraud claims." *See* GC Mem. at 25. Plaintiff, however, is not asserting a cause of action for GC's admitted violation of the FCPA. Rather, he is asserting a cause of action based on how those admitted and pervasive violations rendered GC's public statements materially false or misleading. *See infra*. Notably, Defendants recognize that Section 10(b) cases based on lies and omissions involving FCPA violations are "routinely" filed—and upheld—throughout the country. *See* GC Mem. at 23 n.20.[3]

---

[3] Indeed, many of the cases cited by Defendants held that the plaintiffs had adequately alleged the falsity of statements similar to those alleged in the Complaint. *See, e.g., Petrobras*, 116 F. Supp. 3d at 380-81 (finding that undisclosed bribery scheme rendered false and misleading statements regarding the effectiveness of company's financial controls); *Nature's Sunshine Prods.*, 486 F. Supp. 2d at 1307 (findings SOX certifications false and misleading based on undisclosed FCPA violations); *In re FARO Techs., Inc. Sec. Litig.*, 534 F. Supp. 2d 1248, 1261-63 (M.D. Fla. 2007) (finding undisclosed FCPA violations rendered reported sales figures materially misleading); *Immucor,* 2006 WL 3000133, at *12-16 (finding statements and omissions that understated the seriousness of corruption problems in

Defendants also erroneously contend that their (i) repeated misrepresentations that the Company had "implemented policies and procedures designed to ensure compliance with [the FCPA]" (*see* ¶¶76, 176, 193, 203, 212); and (ii) failure to disclose that rampant ongoing FCPA violations constituted a material "risk of maintaining facilities and selling products in foreign countries" (*see* ¶¶177-78) are *per se* inactionable because they constitute disclosures that "are inherently prospective in nature." GC Mem. at 25-26 (quoting *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015). GC's claim that it "implemented" policies and procedures to ensure FCPA compliance was a representation of then existing fact; not a cautionary statement. Additionally, while GC's representations concerning implementing FCPA policies and procedures was followed by a cautionary statement that "there can be no assurance" that the FCPA may not be violated by "employees, contractors and agents," (GC Mem. at 37), Plaintiff does not contend that this portion of the statement is misleading. *Dana I*, 547 F.3d at 570 (a plaintiff must "specify the statements that the plaintiff contends were fraudulent").

Likewise, GC's ongoing FCPA violations was an ***existing risk*** to GC's overseas business the omission of which rendered GC's stated list of known potential risks materially misleading. Such an omission is not "inherently prospective" as Defendants contend. GC Mem. at 26. Defendants' reliance on the Sixth Circuit's unreported decision in *Yum! Brands* actually supports Plaintiff's position on this issue. *First*, the Sixth Circuit in *Yum! Brands* recognized that a risk disclosure can support a claim for securities fraud. 620 F. App'x at 491 ("there may be circumstances under which a risk disclosure might support Section 10(b) liability"). *Second*, the Sixth Circuit recognized that risk disclosures are actionable where, as here, the risk had already

---

company's subsidiary "misled potential investors into an overly optimistic assessment of the scope of [the company's] corrupt foreign business practices and of the strength of [the company's] internal control mechanisms," *id.* at *1).

materialized. *See id.* (*citing Rombach*, 355 F.3d at 173). Moreover, GC concedes that the omitted risks had materialized as of the date of Defendants' misrepresentations. *See* GC Mem. at 9-11; ¶¶123-145 (detailing FCPA violations occurring between 2003 and 2015); ¶¶40, 77, 84, 85, 122, 135, 147 (detailing Company's admissions).

### B.     The Complaint Alleges a Strong Inference of Scienter

Scienter is established where a defendant possessed actual knowledge or was at least reckless in issuing misrepresentations. *Bridgestone,* 399 F.3d at 683. "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable [person] would have known it." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) ("*Dana II*").

While an inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," it "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. "Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Dana I*, 547 F.3d at 571.

*Tellabs* also requires Courts to holistically review a complaint's scienter allegations. *Tellabs,* 551 U.S. at 326. Whereas courts within the Sixth Circuit previously analyzed scienter "by sorting through each allegation individually," the Sixth Circuit has since held that "the only appropriate approach following *Tellabs's* mandate [is] to review scienter pleadings based on the collective view of the facts, not the facts individually." *Dana II*, 646 F.3d at 961. According to the Sixth Circuit, the "former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees." *Id. Accord Cardinal Health,* 426 F. Supp. 2d at

741 ("Though one or two brush strokes may be more powerful up close, to fully appreciate the painting, the viewer must step back to take in the 'big picture.'").[4]

Inferences can be drawn from a variety of factual allegations. *Dana II*, 646 F.3d at 961-962. These facts can include, but are not limited to, the nine non-exhaustive factors the Sixth Circuit identified in its pre-*Tellabs* decision in *Helwig*, 251 F.3d at 552.[5] While the existence of any of these facts may be helpful in conducting the requisite holistic analysis, *see infra* at § IV.B.4, they are not a substitute for the approach required by *Tellabs*.

Under any analysis, the Complaint's allegations, including GC's admissions, the findings of the SEC, and the CW accounts, raise a strong inference of Defendants' scienter.

### 1. The NPA Admissions and CDO Findings Establish a Strong Inference of Defendants' Scienter

The Complaint pleads sufficient facts to establish a strong inference that, at the time of its misstatements, the Company knew, but concealed from investors, that it had failed to implement policies, procedures, or controls to ensure FCPA compliance and, as a result, GC made numerous corrupt payments in violation of the FCPA. Indeed, the Company's admissions in the NPA establish its scienter with respect to each category of misstatement. *See, e.g., N. Port Firefighters'*

---

[4] In light of the Sixth Circuit's holding in *Dana II*, Defendants' reliance on cases where the courts found scienter lacking based on an individual assessment of each allegation of scienter before conducting a holistic analysis is misplaced. These cases include: *Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009); *Ley*, 543 F.3d at 801; *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 686 (6th Cir. 2004); *Beaver Cty. Ret. Bd. v. LCA-Vision Inc.*, No. 1:07-cv-750, 2009 WL 806714 (S.D. Ohio 2009); *In re American Service Group, Inc.*, No. 3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009); and *In re The Goodyear Tire & Rubber Co. Securities Litigation*, 436 F. Supp. 2d 873 (N.D. Ohio 2006).

[5] The so-called "*Helwig* factors" include: "(1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs." *Bridgestone*, 399 F.3d at 683-684 (citing *Helwig*, 251 F.3d at 552).

*Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 785-86 (M.D. Tenn. 2013) ("Defendants' later admissions about the clearly improper accounting treatment of [certain transactions] raises an inference of scienter about the [d]efendants' prior statements on these issues and [the company's] internal controls."); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 745 (E.D. Mich. 2007) (CFO's admission that "expected restatement is the result of intentional fraud . . . is more than enough to [establish] actual knowledge"); *Cardinal Health*, 426 F. Supp. 2d at 708-710 (finding scienter adequately alleged where the company admitted intentionally committing accounting fraud).

For instance, contrary to Defendants' representations that the Company had "implemented policies and procedures designed to ensure compliance with [the FCPA]" (¶¶76, 176, 193, 203, 212) and that its internal controls over financial reporting were effective (¶¶179, 182, 184, 195, 204, 214)), GC admitted that it "*knowingly and willfully* failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents," and "*knowingly and willfully* failed to address these known weaknesses . . . to allow the conduct to continue," ¶¶40, 77, 85, 122, 249, 251-52.

With respect to the Company's failure to disclose its on-going FCPA violations as one the known risks facing GC's overseas operations (¶¶177-78, 186, 193-94, 203-04, 212-13), the Company admitted that it "*knew* that certain of its foreign subsidiaries used certain third-party agents and distributors to make corrupt payments to foreign officials in order to obtain and retain business in certain countries." ¶243; *see, e.g., In re Suprema Specialties, Inc. Sec. Litig*, 438 F.3d 256, 278 (3d Cir. 2006) (scienter adequately pled where participants in the fraudulent behavior underlying the securities violations pled guilty). Additionally, GC admitted that it "was *aware of*

red flags in connection with [corrupt] payments" occurring at its subsidiaries and was "***aware of***, or at the very least were ***willfully blind*** to, certain of the corrupt payments." ¶¶137, 141.

Even after GC "came to the understanding" that bribes were being paid by its subsidiaries, the Company admitted that it "***closed [its] eyes to***" the illegal activity. *Id.*; *see also* ¶¶244-46 (detailing knowingly corrupt payments). For example, after successive audit reports identifying FCPA violations in Angola, the Complaint alleges that the Company continued to pay commissions to the corrupt sales agent until December 2013. ¶¶158, 160-62. Based in part on these admissions, the SEC found that GC violated the FCPA by both making corrupt payments and recording these payments as legitimate business expenses on GC's books and records payments "when ***knowing or believing*** they were in fact used as bribes." ¶248. Nothing more is needed to establish the Company's scienter at this stage of the litigation.

Defendants incorrectly contend that Plaintiff's scienter allegations "have no bearing on the state of mind of Defendants in relation to the alleged falsity of the challenged statements." GC Mem. at 32. As shown above, the subjects of GC's admissions, e.g., that GC "knowingly and willfully failed to implement" FCPA policies, procedures and controls and was aware of GC's FCPA violations, ¶¶40, 77, 85, 249-52, lines up perfectly with the subjects of Defendants' alleged omissions, i.e., GC had virtually no FCPA compliance program, deficient internal controls, and was engaged in rampant FCPA violations, which was a primary risk to its overseas business. ¶¶174, 185-90, 196-200, 205-08 (alleged bases for falsity).

The NPA admissions and CDO findings that establish a strong inference of GC's scienter also contribute to a finding that the Individual Defendants acted with scienter. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) (where corporate scienter was pled, CEO's scienter was likewise found because he was "at the top of the corporate pyramid," he

issued "[a]lmost all the false statements" and it was "exceedingly unlikely" that he "was unaware

of the problems of his company's two major products …"); *Rahman v. Kid Brands, Inc.*, No. 11-

1624 (JLL), 2012 WL 762311, at \*19 (D.N.J. Mar. 8, 2012) (recognizing that corporate scienter

may extend to a corporate officer where the corporate wrongdoing is sufficiently widespread)

(citing *Bridgestone*, 399 F.3d at 689-90).[6] Furthermore, the Sixth Circuit in *Bridgestone*

recognized that such corporate scienter can flow to a corporate officer where there is independent

evidence supporting his scienter. *Id.* at 690, n.34. As detailed in the following Section, Plaintiff

pleads additional, independent evidence supporting a strong inference of the Individual

Defendants' scienter.

### 2.     The Complaint Alleges Kenny's and Robinson's Scienter

As detailed below, the Complaint alleges that the Individual Defendants knew of or

recklessly disregarded that GC's policies, procedures, and controls to ensure FCPA compliance

were virtually nonexistent and that violation of the FCPA was a material risk to GC's overseas

operations that had already materialized.

*First*, the Complaint shows that the Individual Defendants were aware of facts

contradicting their public statements. *See, e.g.*, *Dana II*, 646 F.3d at 959-62 (scienter adequately

pled where the defendants "were the top two executives" who "made positive public statements,

---

[6] Defendants Kenny and Robinson mistakenly rely on *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 749 (9th Cir. 2008) in arguing that "there is nothing in either [DOJ or SEC] settlement agreement that would support the conclusion that [the individual defendant] had actual knowledge of the violations." *See* K. Mem. at 17, R. Mem. at 10. Indeed, the facts of *Glazer* are inapposite and underscore why the NPA admissions and CDO findings here are sufficient to show their scienter. In *Glazer*, the court noted the fact that the "settlement agreements were largely legal conclusions, rather than particularized facts giving rise to a strong inference of scienter." *Id.* at 749. *Compare id. with* ¶¶121-161 (setting forth facts derived from SEC and DOJ settlements). In particular, the *Glazer* court reasoned that "the surreptitious nature of the transactions creates an equally strong inference that the payments would have deliberately been kept secret—even within the company." *Id.* at 746-47. In contrast, the Complaint alleges with particularity how details of the corrupt payments were openly discussed within GC subsidiaries, ¶¶140, 142, 144, 246, and expressly communicated to high-level executives at GC, ¶¶134-35, 147-48, 246.

and asserted the veracity of their financials to government authorities" while simultaneously ignoring information undermining their positive statements); *Bridgestone*, 399 F.3d at 683 ("divergence between internal reports and external statements on the same subject" may establish scienter).

For example, shortly after taking over as VP of Internal Audit, CW 1 told Defendant Robinson that GC: (i) employed a "head in the sand" attitude towards FCPA compliance that was inconsistent with the high level of exposure the Company faced from its international operations; (ii) did not have a centralized system for tracking interactions between the Company's foreign operations and third party agents; (iii) did not conduct any due diligence related to the use of these third parties; and (iv) never assessed the sufficiency of its FCPA compliance program, including by conducting initial or periodic risk assessments, FCPA-specific audits, or testing. ¶¶92-97, 103, 120, 153, 261, 269, 277-78. CW 1 also stated the General Counsel Toman relayed similar concerns to Robinson that, like CW 1's warnings, went unheeded. ¶¶97-98. As the Court held in *Key Energy Services*, 166 F. Supp. 3d at 862, a case cited favorably by GC, *see* GC Mem. at 31, allegations from confidential witnesses "about the efficacy of [a] company's FCPA compliance program" may be sufficient to demonstrate scienter where the complaint alleges that such "concerns were raised or otherwise communicated, such that the individual defendants 'would have reason to know that the compliance programs in place were inadequate to detect FCPA violations.'"

*Second*, the Complaint alleges that the Individual Defendants disregarded "multiple, obvious red flags," concerning GC's virtually nonexistent FCPA compliance program, deficient internal controls, and widespread practice of making corrupt payments in its overseas operations. *See Helwig*, 251 F.3d at 552 ("disregard of the most current factual information before making statements" supports strong inference of scienter); *PR Diamonds*, 364 F.3d at 686 (holding that a

strong inference of scienter may be established though "specific factual allegations that a defendant ignored red flags"); *see, e.g., In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1031 (N.D. Ohio 2000) (finding scienter adequately pled where "defendants deliberately ignored numerous warning signs that should have alerted them to [the company's] misstatements").

For example, prior to December 2012, the prevailing attitude among GC's senior management was that the Company's FCPA compliance must be sufficient because FCPA violations had not been uncovered. ¶94. According to CW 1, this "not at risk" mentality led the Individual Defendants to reject attempts by GC employees to install and enhance an FCPA compliance program. ¶269; *see also* ¶¶92-98, 153, 261, 277-78. The Individual Defendants continued to do so even after receiving an Internal Audit report in late 2012 recommending that management "create, implement and enhance" its FCPA policies and procedures. ¶¶148, 259. In fact, after senior executives (including Robinson) received a copy of the December 2012 audit report identifying corrupt payments in Angola, nothing was done for nearly a year. ¶¶154-58, 160-63. During this time frame, not only did the Company continue to approve illicit payments, but Defendants repeated their misstatements. ¶159, 163. Additionally, CW 2 recalled discovering on two separate occasions specific memoranda advising ROW employees on how to subvert internal auditors in 2012, one of which was forwarded to Robinson. ¶260. Robinson told CW 2 to "calm down" and that he would get to the bottom of it, but Robinson never took any remedial action. *Id.*

*Third*, the Individual Defendants did not make "any effort to verify" their public statements, which supports a strong inference of scienter. *N. Port Firefighters*, 929 F. Supp. 2d at 785 (finding scienter where defendants did not make "any effort to verify" their public assurances regarding accounting controls). Here, Defendants had no basis on which to make representations regarding the existence of policies and procedures to ensure FCPA compliance. *See, e.g.*, ¶¶80,

90, 111. As confirmed by CW 1 (who participated in the disclosure review committee meetings), the alleged misstatements were included in the Company's SEC filings during the Class Period solely because they had appeared in the prior year's filings. ¶¶270, 278. These allegations contribute to a strong inference of the Individual Defendants' scienter. *Halford v. AtriCure, Inc.*, No. 1:08cv867, 2010 WL 8973625, at *16 (S.D. Ohio Mar. 29, 2010) (finding a strong inference of scienter where the complaint included "confidential witness statements [that] cite to specific instances where there were discussions regarding" the subject matter of the alleged misstatements).

*Fourth*, the Individual Defendants' public statements, which indicated their knowledge of the subject matter underlying the alleged misrepresentations, "bridge[s] the [scienter] gap." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (second alteration in original); *see Dana II*, 646 F.3d at 962 ("difficult to grasp the thought" that corporation's executives "really had no idea" about facts undermining their public statements given their operational knowledge of the company); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 WL 1335803, at *57 (M.D. Tenn. Mar. 31, 2011) (same). Here, Defendants' public statements regarding the Individual Defendants' close oversight and knowledge of the Company's internal controls contributes to a strong inference of scienter. For example, on a March 26, 2013 conference call, in which Kenny and Robinson participated, Robinson affirmatively represented that the Company's "management team," of which he and Kenny were members, "own[ed]" the issue of internal controls and, to that end, had "shrunk . . . the decision-making of the company and the flow of the information" to ensure that the management team was fully aware of what was going on in the Company's operations. ¶¶264-265; *see also In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (the fact that CEO was the "champion for BP's reform efforts weigh[s] strongly in favor of

the inference that [he] paid special attention to [those] efforts or, at the least, was reckless in not doing so while continuing to [speak] publicly").

The Individual Defendants' SOX certifications, in which they claimed to have "conducted an evaluation of the effectiveness of internal control over financial reporting," and "[e]valuated the effectiveness of [GC's] disclosure controls and procedures, ¶¶76, 181-84, 195, 204, 263, further support a strong inference of scienter. *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 712 n.6 (E.D. Mich. 2010) (inference of scienter based on SOX certifications appropriate where "the complaint asserts facts indicating that, at the time of certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their SOX certification erroneous").

*Fifth*, the sheer magnitude of the FCPA compliance issues facing the Company during the Individual Defendants' tenure strongly supports an inference of their knowledge and/or recklessness. *See, e.g., Cardinal Health*, 426 F. Supp. 2d at 719-20 (magnitude of violations supports an inference of scienter); *In re Am. Apparel S'holder Litig.*, No. 10-06352 MMM (JCGx), 2013 WL 174119, at *21 (C.D. Cal. Jan. 16, 2013) (sheer magnitude of American Apparel's compliance violations "indicate[d] that American Apparel's compliance problems and shoddy screening practices were endemic" such that it "strain[ed] credulity to infer that the company's management remained completely ignorant"). Under Kenny's and Robinson's watch, GC paid more than $13 million in bribes to obtain tens of millions of dollars in business in at least 6 countries from 2003-2015. ¶¶130, 244, 253, *see generally* ¶¶122-45. The sheer scope and magnitude of the fraud was further illustrated by GC's payment of over $75 million in criminal fines and disgorged profits. ¶¶24; 79, 170-73, 185, 196, 205. It "strains credulity" to infer that Kenny and Robinson were completely unaware of the Company's lack of an FCPA compliance

program or extensive FCPA violations, and the statements that were rendered materially misleading as a result. *Am. Apparel*, 2013 WL 174119, at *21.

*Finally,* when viewed holistically with other well-pled scienter allegations, the Complaint's allegations concerning Kenny's and Robinson's experience, position, and related responsibilities strongly infer scienter. *See, e.g., Am. Serv. Grp.,* 2009 WL 1348163, at *60 ("A company's chief executive officer who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise strong inference of scienter."); *Willis v. Big Lots*, No. 12-cv-604, 2016 WL 8199124, at *35 (S.D. Ohio Jan. 21, 2016) ("given [the CEO's] awareness of [the] company's operations" plaintiff sufficiently alleged CEO "knew he was lying when he made the statements"). Here, the Complaint alleges that Kenny had a heightened awareness of the problems of corruption in emerging economies due to his prior position with the U.S. Department of State, while Robinson had extensive exposure to the FCPA during his prior work as a Deloitte auditor. ¶¶31-32, 262. Kenny and Robinson signed all of the relevant Class Period SEC filings, participated in earnings calls, and were involved in the "decision-making of the company." ¶¶31-32, 262-65. Moreover, the *FCPA Resource Guide* mandated their commitment to FCPA compliance as the senior executives of the Company. ¶75. These allegations bolster the Complaint's already strong inference of the Individual Defendants' scienter.[7]

### 3. The Fact that the Corrupt Scheme Concerned the Company's Core Operations Supports a Strong Inference of Scienter

"[T]he more central a fact is to a company's core operations the more likely its executive acted with scienter." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008);

---

[7] As demonstrated above, Plaintiff does not rely primarily on Defendants' positions and titles to allege scienter, as Defendants contend. R. Mem. at 10; K. Mem. at 12.

*see also Psychiatric Sols.*, 2011 WL 1335803, at *57 (same). Prior to and during the Class Period, GC vastly expanded the scope of and reliance upon its overseas operations. ¶¶2, 57-61. Indeed, GC's overseas operations became so critical to the Company that they accounted for nearly two-thirds of its annual revenues. ¶60, 266-67. Accordingly, the inference that Defendants knew of or recklessly disregarded specific information concerning deficiencies in the Company's FCPA compliance program and internal controls, and GC's widespread violations of the FCPA is strengthened by the importance of GC's overseas operations to its overall business. *See Bridgestone*, 399 F.3d at 687 (that the Firestone subsidiary "was the primary engine fueling" Bridgestone's growth supported Bridgestone's scienter as to its misrepresentation of Firestone's impairment risk). Moreover, the core operations doctrine is particularly applicable here because GC's overseas business was dependent upon GC's FCPA violations, and ultimately was shuttered when GC's FCPA violations ceased. *See* ¶¶21, 197, 206, 267.

### 4. The Complaint Raises a Strong Inference of Scienter under *Helwig*

As noted above, the Sixth Circuit has held that a holistic scienter analysis "is the only appropriate approach following *Tellabs's* mandate to review scienter pleadings based on the collective view of the facts, not the facts individually." *Dana II*, 646 F.3d at 961. An application of the *Helwig* factors, however, can help further support a showing of scienter. Here, *Helwig* factors two through six, *see* 251 F.3d at 552, help further illustrate a strong inference of Defendants' scienter:

- the divergence between Defendants' public statements and the truth as revealed through internal reports, which were either provided to or were accessible by Defendants. *See* ¶¶252, 256-57;

- the closeness in time between Defendants' misstatements and their later disclosure of inconsistent information. *See, e.g.*, ¶¶ 211-13 (false statements issued in March and May, 2014); ¶¶222-23 (September 22, 2014 partial corrective disclosure);

- the widespread bribery occurring, ¶¶123-145, which involved high-level executives both at the Company and its subsidiaries, *see* ¶272;

- the SEC and DOJ investigations and settlement of GC's misconduct, including its payment of $75 million in fines and disgorged profits, ¶¶170-73; and

- Defendants' disregard of the most current factual information, including the reports of likely FCPA violations in Angola between August 2012 and August 2013, ¶¶158, 160-62, before issuing their statements throughout 2013, ¶¶192, 194.

### 5. The Individual Defendants' Remaining Scienter Challenges Fail

In response to the well-pled allegations regarding their scienter, which are based on the Company's own admissions, the SEC's findings, and the corroborating statements of 12 witnesses, the Individual Defendants assert several unavailing arguments that Plaintiff addresses below.

As an initial matter, the Individual Defendants ask the Court to ignore the Complaint's extensive allegations documenting the firsthand experiences of the CWs,[8] contending that these allegations are "vague, conclusory, and represent expressions of the speaker's personal views and opinions." K. Mem. at 14; *see also* R. Mem. at 14-16. It is well-established that "plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Doshi v. Gen. Cable Corp.* ("*Doshi Appeal*"), 823 F.3d 1032, 1037 n.2 (6th Cir. 2016). The CW allegations clearly set forth the CWs basis for knowledge of GC's lack of FCPA compliance policies and procedures as they were members of the Company's Internal Audit and Compliance department. *See, e.g., Ricker v. Zoo Entm't, Inc.*, 534 F. App'x 495, 496 n.2 (6th Cir. 2013) (finding that confidential witness's "employment in Zoo's accounting department positioned her to learn of the facts now alleged").[9]

---

[8] *See* ¶¶43-54, 87-88, 92-98, 102-09, 115, 118-120, 148-57, 166, 256, 259-62, 265, 269-70, 276-79.

[9] Defendants cited authority is inapposite. For example, this Court discounted the CW allegations in *Doshi v. Gen. Cable Corp.* ("*Doshi Dist. Ct. I*"), 2:14-cv-00022 (WOB-CJS), 2015 WL 366644, at *10 (E.D. Ky. Jan. 27, 2015) because, unlike the CW allegations alleged in the Complaint, those allegations "lack[ed] context," the plaintiffs

For example, CW 1 was GC's Vice President of Internal Audit and responsible for creating and executing the Company's annual Audit Plan, ¶43, and CW 2 was a Manager in Internal Audit, responsible for conducting audits in Portugal and in Angola, ¶44. *See also* ¶45 (CW 3 was a Senior Auditor); ¶46 (CW 4 worked as an internal controls manager); ¶47 (CW 5 was a Senior Internal Auditor); ¶48 (CW 6 was an Audit and Compliance Manager). Defendants fail to articulate why any of these witnesses would not have the knowledge attributed to them. *See, e.g.*, *Halford*, 2010 WL 8973625, at *3, *7 (crediting allegations from six confidential witnesses where their job descriptions supported a finding that witnesses could have "gained first hand knowledge of the facts attributed to [them]"). Additionally, as detailed above, the content and specificity of the information provided by CW 1 and CW 2 further supports the reliability of the allegations, *see supra* at § IV.B.2, as does the fact that the allegations are consistent with and corroborate the Company's admissions in the NPA and the SEC's findings in the CDO. *See* ¶¶88, 110, 157, 189, 200, 208.

The Individual Defendants' contention that the non-culpable inferences they seek to draw from the Complaint's allegations are more plausible than those advanced by Plaintiff also fails. For instance, the Individual Defendants advance a non-culpable inference based on the fact that neither Kenny nor Robinson were named as parties in either the DOJ or SEC settlements. *See* K. Mem. at 5, n.4, 17; R. Mem. at 2, 9-10. However, it is black letter law that defendants cannot rely upon or otherwise invoke the DOJ's or the SEC's inaction as a defense to securities fraud. *See, e.g.,* 15 U.S.C. § 78z ("No action or failure to act" by the SEC "with regard to any statement or

provided "no facts" linking the allegations to Kenny and Robinson, and the allegations were "not linked to the specific problems that led to the restatements." *See also Konkol*, 590 F.3d at 397-99 (discounting allegations where "[T]he complaint does not provide any details about most of the Confidential Witnesses, such as dates of employment, job description, employment location or sector, or which [d]efendants interacted with them); *In re Omnicare, Inc. Sec. Litig.*, No. 11-cv-173-DLB-CJS, 2013 WL 1248243, at *9 (E.D. Ky. Mar. 27, 2013) (discounting CW allegations that failed to describe what specific "compliance related concerns" were brought to senior management, and whether they related to the subject of the alleged fraud).

report filed with or examined by [the SEC pursuant to the Exchange Act] or rules and regulations thereunder" shall be "deemed a finding by such authority that such statement or report is true and accurate on its face or that it is not false or misleading."). That is because a regulator's decision "to take no enforcement action is not a determination on the merits . . . in any sense." *In re Cirrus Logic, Inc.*, No. A-07-CA-212-SS, 2008 WL 4065925, at *5 (W.D. Tex. Aug. 28, 2008).[10] As a result, courts typically draw no inference from a regulator's decision not to charge a defendant. *See, e.g., In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707 n.5 (9th Cir. 2012); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 n.15 (N.D. Cal. 2009) ("Although the SEC ultimately decided not to prosecute Defendants for fraud, the Court finds that the SEC's discretionary determination with respect to prosecution is not determinative of whether Defendants, in fact, committed securities fraud.").

In a similar vein, the Individual Defendants suggest that GC's purported voluntary disclosure of certain FCPA violations in Angola to the DOJ and SEC in January 2014 rebuts any inference of their scienter. *See* K. Mem. 19-20; R. Mem. at 17-18. Notably, the Company does not seek such an inference, having admitted that it was aware of GC's FCPA violations, which occurred in six countries from 2003-2015. ¶¶146, 187, 243. As such, the most senior executives of the Company, Kenny and Robinson likewise are not entitled to a non-culpable inference. Additionally, the Complaint alleges that Defendants were alerted to possible Angolan FCPA violations one year before reporting the misconduct, ¶¶154-63, and two CWs alerted senior management to internal control deficiencies and the lack of an FCPA compliance program

---

[10] Indeed, the SEC itself has repeatedly invoked Exchange Act Release No. 9796, "Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations" (Sept. 27, 1972), in explaining to targets of SEC investigations the limits of any decisions the SEC makes with respect to whether to commence an enforcement action or terminate an investigation. Specifically, these actions "must in no way be construed as indicating that the party has been exonerated" and "[t]he attempted use of such a communication as a purported defense in any action that might subsequently be brought against the party, either civilly or criminally, ***would be clearly inappropriate and improper***." *Id.*

throughout the Class Period. *See* ¶¶92-98, 148-52, 200, 259-65, 269. These allegations also strongly militate against the Individual Defendants' suggested non-culpable inference.[11] The Company also received credit in the form of reductions in the fines and penalties imposed for its January 2014 disclosure, *see* R. Mem. at 17, and the disclosure likely was inevitable given the admittedly widespread nature of GC's corruption. Both of these facts also weigh against a non-culpable inference.

In his brief, Defendant Kenny contends that:

> a more plausible inference than the one Plaintiff suggests is that Mr. Kenny became aware of the FCPA violations to which GC admitted but held a good faith belief, ***based on representations from employees who reported to him***, that [GC] had policies and procedures designed to detect and prevent FCPA violations, the Company adequately disclosed its risks in its public filings, and the Company's internal controls over financial reporting were effective.

K. Mem. at 19. However, the only allegations regarding employees reporting to Kenny state that Kenny "simply relied on Robinson when it came to issues such as compliance." ¶96, and, as set forth above, the Complaint details Robinson's specific knowledge of the Company's deficient FCPA compliance program, severe red flags concerning the Company's deficient internal controls, and receipt of internal reports concerning ongoing FCPA violations. ¶¶80-120, 148, 152-59.[12]

---

[11] Robinson's reliance on *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665(PGG), 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014) is misplaced. In *Avon*, the court's finding that the company's self-disclosure of its FCPA violations weighed against scienter turned on the fact that the plaintiffs did "not plead facts sufficient to demonstrate that [the CEO] became aware of the alleged bribery scheme prior to" reporting it. *Id.* at 21. Here, the Complaint alleges that Robinson was alerted no later than 2012 to the Company's lack of an FCPA compliance program and probable violation of the FCPA, and yet GC did not disclose its misconduct until January 2014.

[12] Defendant Kenny cites the Sixth Circuit's holding in the *Doshi Appeal*, 823 F.3d at 1043 – i.e., the allegations lent "some support" to a finding that Defendants Kenny and Robinson acted with scienter, but the more plausible inference is that they acted negligently – with the hope that this Court reaches the same result here. However, *In re General Cable Corporation Securities Litigation*, (Master File No. 2:14-cv-00022-WOBCJS) ("*Doshi Restatement Securities Litigation*") involved accounting fraud committed by certain managers in GC's ROW operations, *Doshi Appeal*, 823 F.3d at 1036-37, whereas this case centers on GC's ***admitted*** failure to implement corporate-wide policies and procedures designed to ensure FCPA compliance, deficiencies in GC's corporate-level internal controls over financial reporting, and FCPA violations occurring in six countries, ¶174, that GC has admitted it was aware of by no later than December 2011, ¶¶146, 187, 243. If Kenny and Robinson were negligent in the *Doshi Restatement Securities Litigation*, they are at least reckless here.

Defendant Robinson posits two equally unavailing non-culpable inferences as to his knowledge of a 2012 internal audit report that he received and on which he was required to sign off that showed likely FCPA violations by GC's subsidiary in Angola. R. Mem. at 12; ¶¶154-159. *First*, he suggests that while he may have received the December 2012 audit report, there can be no inference that he "actually reviewed" and "understood its significance." *Id.* (emphasis in original). However, the far more plausible inference is that Robinson, as GC's CFO and an individual with international auditing and accounting experience, read and understood the document. ¶263; *see* ¶43 (CW 1's responsibilities included "updating the CFO on approximately a bi-weekly basis on the specific audits that were being conducted"); ¶156 (CW 2 stated that Robinson "was required to sign off on all audit reports"). Indeed, given his role at GC, had Robinson ignored the audit report, that would support a strong inference of recklessness.

*Second*, Robinson contends that because the audit report was distributed to GC's legal department, any actions he took following receipt would necessarily have been based on the advice of counsel. R. Mem. at 12-13. Robinson's speculation is inconsistent with the Complaint's allegations that he personally rejected efforts by the Company's legal department to improve the Company's FCPA compliance. *See* ¶97. Furthermore, the good faith reliance on counsel is an affirmative defense that requires proof that the defendant (1) fully disclosed all pertinent facts to counsel, and (2) actually relied in good faith on counsel's advice. *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994). Robinson cannot make such a showing at the pleading stage.

Finally, Defendants Kenny and Robinson both contend that the Complaint is deficient because it fails to allege a specific motive on their part to commit securities fraud, such as insider trading. K. Mem. at 19; R. Mem. at 17. However, the Sixth Circuit has "never held that the absence of insider trading defeats an inference of scienter." *PR Diamonds*, 364 F.3d at 691. Moreover, the

51

Supreme Court in *Tellabs* concluded that "[w]hile it is true that motive can be a relevant consideration . . . the absence of a motive allegation is not fatal." 551 U.S. at 325.[13]

### C.      Defendants' Statute of Limitations Affirmative Defense Fails

#### 1.      The Discovery Rule and Exchange Act Claims

"[T]he statute of limitations is an affirmative defense on which the defendant bears the burden of proof." *Haw. Ironworkers Annuity Tr. Fund v. Cole*, No. 3:10cv371, 2011 WL 1257756, at *14 (N.D. Ohio Mar. 31, 2011) (noting that the Supreme Court had placed the burden "squarely on the shoulders of the defendant," *id.* at *15). To succeed on this defense at the pleading stage, defendants must demonstrate that "the allegations in the complaint affirmatively show that the claim is time-barred." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). These inquiries are typically fact intensive and therefore "a motion under Rule 12(b)(6) . . . is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Id.*

Pursuant to 28 U.S.C. § 1658, Exchange Act claims must be brought within "two years after the discovery of the facts constituting the violation." *Invacare*, 2014 WL 4064256, at *9. In *Merck & Co., Inc. v. Reynolds*, the Supreme Court rejected the notion that the statute of limitations begins to run when a plaintiff is on "inquiry notice" of his claims. 559 U.S. 633, 651 (2010). "Discovery" of the claim is required and "discovery" means either actual discovery or the point at which "a reasonably diligent plaintiff would have discovered the facts constituting the violation." *Id.* at 637; *see also id.* at 648 (discovery "encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known"). Discovery does not

---

[13] GC likewise contends that its share repurchases "undermine" an inference of scienter. GC Mem. at 33. *First*, the purpose and effect of the repurchase program, which was not alleged in the Complaint, raises factual issues that cannot be resolved at the pleading stage. *See Helwig*, 251 F.3d at 558 (courts should not resolve factual disputes or weigh evidence on a motion to dismiss). *Second*, the Company's share repurchases do not rebut the otherwise strong inference of scienter raised by, *inter alia*, the Company's binding admissions of knowingly corrupt conduct belying its public statements. As such, any non-culpable inference that can be drawn from the Company's repurchases of shares does not equal or outweigh the strong inference generated by the Company's admissions.

mean the point at which a reasonably diligent plaintiff "would have *begun* investigating." *Id.* at 651 (emphasis in original).

Courts look at the "discovery" of a fact underlying an Exchange Act claim "in terms of what information and evidence a plaintiff would need to survive a motion to dismiss." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011) ("*MBIA*"). This makes sense. "Only after a plaintiff can adequately plead his claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run." *Id.* at 175; *see also Hull v. Global Dig. Sols., Inc.*, No. 16-5153 (FLW), 2017 WL 6493148, at *8 (D.N.J. Dec. 19, 2017) ("the 'discovery' rule ensures that the statute of limitations will only begin to run when a reasonably diligent plaintiff should have discovered facts permitting it to successfully plead a claim, including all elements, under section 10(b)"). As such, a plaintiff will not be deemed to have "'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *MBIA,* 637 F.3d at 175; *Akbar v. Bangash*, No. 15-cv-12688, 2017 WL 4334912, at *4 (E.D. Mich. July 11, 2017).

## 2.    Plaintiff's Exchange Act Claims Are Timely

"[T]he amount of particularity and detail a plaintiff must know before having 'discovered' the fact will depend on the nature of the fact." *MBIA*, 637 F.3d at 175. In fraud cases such as this one, a plaintiff must plead falsity and materiality with particularity, identifying each false statement and piece of omitted information, and why these were important to investors. *See supra* at § IV.A. To sufficiently plead scienter, a plaintiff must allege facts that strongly infer a defendant acted with the required state of mind. *See supra* at § IV.B.

Accordingly, "[u]ntil the plaintiff has uncovered—or a reasonably diligent plaintiff would have uncovered—enough information about" the material falsity of Defendants' statements and

their state of mind "to satisfy th[e] pleading standard, he has not 'discovered' the fact[s]" of falsity, materiality, or scienter "and the statute of limitations cannot begin to run." *MBIA*, 637 F.3d at 175; *see also Invacare*, 2014 WL 4064256, at *9 (denying motion to dismiss where defendants "have not shown that a reasonably diligent plaintiff would have discovered facts sufficient to plead the key element of scienter"); *Haw. Ironworkers,* 2011 WL 1257756, at *17 (same); *accord Merck*, 559 U.S. at 648-649.

The facts upon which Plaintiff relies to allege falsity, materiality, and scienter with the requisite particularity could not have been discovered by a reasonably diligent plaintiff until after January 5, 2015. As a result, Plaintiff's claims were timely filed on January 5, 2017.

### a. Disclosures Prior to January 5, 2015 Did Not Reveal that Defendants Possessed the Intent to Deceive Investors

The seminal case addressing a statute of limitations defense at the pleading stage of a Section 10(b) matter, *Merck & Co. v. Reynolds*, turned on whether the plaintiffs "discovered" facts constituting a strong inference of the defendants' scienter. In *Merck*, the plaintiffs alleged that the drug maker concealed information concerning the cardiovascular risks associated with Vioxx. 559 U.S. at 637-38. The defendants identified numerous events, which they claimed caused the plaintiffs to discover facts constituting evidence of scienter more than two years prior to the commencement of the case on November 6, 2003: (i) the results of a March 2000 drug study called VIGOR, which showed that Vioxx users suffered materially more cardiovascular events than those taking a comparator drug; (ii) public debate about the VIGOR findings in February 2001 involving the FDA; (iii) the commencement of multiple products-liability actions starting in May 2001, alleging that Merck had "omitted, suppressed, or concealed material facts concerning the dangers and risks associated with Vioxx" and "*purposefully* downplayed and/or understated the serious nature of the risks associated with Vioxx" (emphasis in original); (iv) an August 2001 medical

journal article referring to the VIGOR results as a "cautionary flag"; and (v) a September 21, 2001 FDA warning letter stating that VIGOR showed "potentially serious cardiovascular findings" and Merck's attempt to minimize the results was "false, lacking in fair balance and otherwise misleading." *Id*. at 639-640, 653.

The Court concluded that because none of the earlier events would have sufficed to raise a strong inference of scienter, Merck had failed to show— as a matter of law— that a reasonably diligent plaintiff would have discovered "the facts constituting the violation" to trigger the statute of limitations. *Id*. at 653-54; *see also Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 547 (6th Cir. 2012) (holding that statute of limitations did not begin to run until the plaintiffs "learned the facts which made them aware of an ***intent to deceive*** and gave them grounds for a §10(b) claim.").

Defendants' statute of limitations arguments are far less compelling than those rejected by the Supreme Court in *Merck*. Unlike in *Merck*, where information in the public domain two years before the initial complaint was filed suggested that the company was issuing "false … or otherwise misleading" information and "purposefully" downplaying serious cardiovascular risk associated with Vioxx, *id.* at 640, 653, the public disclosures prior to January 5, 2015 here "did not, in any fashion, provide factual information" indicating "that defendants committed a fraud on [GC's] investors." *Haw. Ironworkers*, 2011 WL 1257756, at *17 (holding that plaintiffs could not have discovered scienter facts prior to the publication of an SEC complaint where earlier press releases describing restatement failed to implicate Defendants or include facts regarding Defendants' state of mind).[14]

---

[14] Indeed, it was not until additional information was revealed to Merck investors within two years of commencing suit, including ***company admissions*** that Vioxx caused cardiovascular problems and media reports of internal company communications revealing the company's ***knowledge of and attempts to conceal*** the risks associated with Vioxx, that plaintiffs were deemed to have sufficient facts to plead a Section 10(b) claim. *Id.* at 641-42.

55

For example, the August 1, September 22, and October 29-30, 2014 disclosures cited by Defendants, *see* GC Mem. 16-17, failed to meaningfully implicate Defendants in or expose their knowledge or reckless disregard of (i) the lack of a credible FCPA compliance program or internal controls at GC; or (ii) the millions in illegal payments that occurred as a result. Plaintiff was not aware of and could not have discovered the fact that GC had "knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption" or that GC's knowing and willful failure to address these "known weaknesses" allowed corrupt conduct to continue, leading to payment of more than $13 million in bribes to secure more than $50 million in profits for GC. ¶¶40, 77, 85, 122, 249, 251. Plaintiff likewise was not aware of and could not have discovered that GC "knew that certain of its foreign subsidiaries . . . ma[d]e corrupt payments . . . in order to obtain and retain business" in *six countries*. ¶¶122, 146, 187, 243, 272. That information was not publicly discoverable until the DOJ and SEC issued the NPA and CDO, respectively, in late December 2016. Notably, this matter was instituted within two weeks of those disclosures. ECF No. 1.

Furthermore, prior to January 5, 2015, Defendants remained silent regarding the deficiencies in GC's FCPA compliance program, publicly blamed the potential bribes that were disclosed on "employees" of select subsidiaries, and touted its self-disclosure of these payments to the DOJ and the SEC. ¶¶164-165, 168.[15] It was not until the DOJ and SEC disclosures in December 2016 that Plaintiff had sufficient facts to adequately allege scienter as to GC and was in a position to discover the facts necessary to tie Defendants Kenny and Robinson to both the deficient FPCA compliance program and the corrupt payments. *See, e.g., Invacare*, 2014 WL 4064256, at *9 (despite a December 2010 warning letter, "sufficient scienter facts were not

---

[15] Significantly, Kenny and Robinson both cite the Company's self-disclosure of its FCPA violations to the DOJ and SEC as evidence that purportedly *rebuts* an inference of scienter. *See* K. Mem. at 19-20; R. Mem. at 17-18.

discoverable until December 2012" when the FDA made public its "findings on Invacare's knowledge of problems and reluctance to correct them"); *Haw. Ironworkers*, 2011 WL 1257756, at *16-17 (despite press releases in 2005 announcing a restatement, plaintiffs could not have discovered facts sufficient to plead securities fraud until after SEC complaint was published four years later); *Hull*, 2017 WL 6493148, at *9 (denying motion to dismiss where, despite public disclosures regarding certain aspects of plaintiff's claims, investors did not "know the extent of [defendant's] conduct – not merely that [defendant] made certain false statements" until the SEC filed a complaint more than two years later).

### b. Defendants' Contentions that Scienter Facts Were Discoverable before January 5, 2015 Fail

Defendants contend that "[t]he facts available to" Plaintiff "by the end of 2014 include facts that he claims support scienter." GC Mem. at 19. *First*, the Complaint makes clear that the vast majority of facts upon which Plaintiff relies to allege a strong inference of scienter were not discoverable until after December 2016. *See* ¶¶242-54, 256-61, 269-270. GC and Robinson admit as much in their briefs: GC concedes that "the disclosure of the outcome of the government investigation (which are relied upon heavily in the Complaint) *facilitated Lead Plaintiff's ability to plead his claim*," GC Mem. at 2, while Robinson admits that "without government 'findings' to rely on," Plaintiff's scienter allegations would consist only of presumptions based on Defendant Robinson's title," which alone are inadequate. R. Mem. at 3.

*Second*, the handful of allegations to which Defendants cite allege only that Defendants Kenny and Robinson had "hands-on involvement" in GC's "core operations" and that Robinson made statements on March 26, 2013 touting his knowledge of and responsibility over the Company's overseas operations. GC Mem. at 20-21. While those allegations provide additional support for the strong inference of scienter generated by a holistic analysis of the Company's

admissions in the NPA, the SEC findings, and the result of Plaintiff's subsequent investigation, *see Tellabs*, 551 U.S. at 308, the specifics of what they knew— which were required to plead this fraud case—were concealed from the public until well after January 5, 2015, and in many cases until December 2016. Indeed, Defendants contend that these facts by themselves are insufficient to allege a strong inference of scienter. *Compare* K. Mem. at 12-14;  R. Mem. at 10-11 (arguing that allegations based on Kenny's and Robinson's position and access to information are insufficient to plead scienter) *and* R. Mem. at n.9 (arguing that Robinson's statements in March 2013 do "not indicate in any way that Robinson personally learned anything . . . that would have alerted him to corrupt payments") *with Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519, 2012 WL 1680097, at *8 (D.N.J. May 11, 2012) (rejecting statute of limitations defense where "[d]efendants themselves argue that the *Washington Post* article does not in any way show facts indicating [d]efendants' scienter").

Defendants next assert that because certain facts disclosed on August 1 and September 22, 2014, were alleged to support an inference of scienter in the *Doshi Restatement Securities Litigation*, *see Doshi Appeal*, 823 F.3d 1032 -- a different securities fraud matter tied to an unconnected accounting fraud involving an unrelated GC Brazilian subsidiary -- facts sufficient to plead scienter in this Action were "available" to Plaintiff "by the end of 2014." GC Mem. at 19-20. *First*, as noted above, the *Doshi Restatement Securities Litigation* involved allegedly false financial statements based on undisclosed accounting violations unrelated to the FCPA compliance misstatements alleged in this Action. *See* ECF No. 75-4 (proposed amended complaint) at ¶2. *Second*, both this Court and the Sixth Circuit found that these facts were ***insufficient*** to plead scienter under Section 10(b). *Doshi v. Gen. Cable Corp*. ("*Doshi Dist. Ct. II*"), No. 2:14-cv-22, (WOB-CJS), 2015 WL 2229233, at *3 (E.D. Ky. May 12, 2015) (denying leave to amend as futile);

*Doshi Appeal*, 823 F.3d at 1043-44 (holding that the facts disclosed on August 1 and September 22, 2014 "cannot give rise to a strong inference of scienter" because they did not in any way suggest that "Kenny, Robinson . . . or any other specific GC employee knew of the improper payments.").

In fact, Defendants themselves argued to this Court that the allegations in the *Doshi Restatement Securities Litigation* "lack[ed] any particularized facts showing that any violation of the FCPA occurred, what the alleged FCPA violations were, when they supposedly occurred and, most importantly, how or why the Defendants knew or should have known about them." *In re Gen. Cable Corp. Sec. Litig.*, No. 2:14-cv-22 (WOB-CJS), 2015 WL 3937017, at *14 (E.D. Ky. Mar. 17, 2015). These missing facts were unavailable to Plaintiff prior to January 5, 2015, or indeed before the December 2016 disclosures of the Company's admissions and the SEC's findings. Accordingly, *Merck* mandates rejection of Defendants' argument. 559 U.S. at 654.[16]

Finally, Defendants incorrectly assert that there is nothing alleged in the Complaint to suggest that a reasonably diligent plaintiff could not have obtained the CW statements by October 30, 2014 at the latest. GC Mem. at 21. Notwithstanding that it is Defendants' burden to prove that Plaintiff could have discovered facts constituting a strong inference of scienter, the two witnesses that provide allegations demonstrating Defendants' knowledge of both the deficient FCPA compliance program and resulting violations—CW 1, the former VP of Internal Audit, and CW 2, the Internal Audit manager that conducted the 2012 Angola audit—were both employed by GC "during the Class Period." ¶¶43-44. As such, Defendants have not established that Plaintiff could

---

[16] Because the facts were insufficient to plead a strong inference of scienter in the *Doshi Restatement Securities Litigation*, Defendants' reliance on this Court's finding that the facts were "available" by the end of 2014 is of no moment. GC Mem. at 19-20. In any event, Defendants misread the Court's order, which said nothing more than the information set forth in the August 1 and September 22, 2014 press releases were publicly "available" prior to the entry of judgment in that litigation.

have obtained the requisite information from them prior to January 5, 2015. *See, e.g., Invacare*, 2014 WL 4064256, at *9 (rejecting statute of limitations affirmative defense where "numerous Confidential Witnesses . . . were not accessible for Plaintiff's investigation until after" the relevant date). In any event, Defendants' arguments are misplaced, because as the Supreme Court has held, "absent any reason to think" an investor has been defrauded, there is no duty to conduct ***any*** investigation into potentially fraudulent activity. *Gabelli v. SEC*, 568 U.S. 442, 450-51 (2013) ("people "do not typically spend [their] days looking for evidence that [they] were . . . defrauded" and the law does not require them do so).[17]

### c. Disclosures Prior to January 5, 2015 Did Not Reveal Facts Sufficient to Plead Material Omissions with Particularity

To affirmatively prove that Plaintiff discovered or would have discovered the facts constituting a violation of Section 10(b), Defendants also must show that sufficient evidence of falsity was made public more than two years before this action was commenced. Their effort fails.

As an initial matter, because Defendants failed to prove that sufficient evidence of scienter existed two years before the institution of this case dooms their statute of limitations defense under *Merck*, the Court need not entertain further arguments on this issue. *See* 559 U.S. at 649. Indeed, a false or misleading statement "by itself, does not indicate whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error." *Id.* at 650; *see also Miller v. Donnini*, No. 14-12337-NMG, 2015 WL 1431103, at *11 (D. Mass. Feb. 12, 2015) ("discrepancies" in the information provided "do not establish that a fraud was committed"). Therefore, "[s]imply showing that a defendant has made a materially false statement is not alone

---

[17] *Roaring Fork Capital SBIC, L.P. v. ATC Healthcare, Inc.*, No. 10-cv-00338, 2011 WL 1258504 (D. Colo. Mar. 29, 2011), the only case cited by Defendants that dismissed a complaint on limitations grounds is at odds with *Gabelli* and *Merck* as it held that defendant's announcement that it "discovered certain items which may not have been properly recorded in prior financial statements," constituted a "storm warning" that triggered the limitations period. *Id.* at *9-10; *contra Gabelli*, 568 U.S. at 450; *Merck*, 559 U.S. at 651.

sufficient to start the running of the statute of limitations in every case." *Pharmacia*, 2012 WL 1680097, at *7. If it were, "[s]o long as a defendant concealed for two years that he made a misstatement with an intent to deceive, the limitations period would expire before the plaintiff had actually 'discover[]ed' the fraud." *Merck*, 559 U.S. at 649.

In any event, investors were not aware of the facts necessary to sufficiently allege with particularity the material information Defendants omitted from their Class Period statements by January 5, 2015. Indeed, the material omissions pled in the Complaint were identified as a result of GC's admissions in the NPA and the SEC's findings, both of which were first revealed in December 2016, *see* ¶¶121-162, and Plaintiff's subsequent investigation in 2017 and 2018, *see* ¶¶80-120.

As detailed above, Plaintiff pleads that (i) GC had virtually no policies, procedures, and controls designed and implemented to ensure FCPA compliance; and (ii) GC knew of, but concealed, tens of millions of dollars in corrupt payments in six countries and that those violations were a known risk to GC's overseas operations. *See supra* at § IV.A. With respect to GC's failure to implement an FCPA compliance program, the only public information available prior to January 5, 2015 indicated that the Company was implementing select FCPA compliance processes (i.e., a screening process for foreign sales agents, anti-corruption training for sales staff, and hiring a CCO). ¶¶168, 224, 229. It remained concealed until after December 22, 2016, when the NPA, the Cease-and-Desist Order and former GC employees all confirmed, that GC had virtually no FCPA compliance program and materially "deficient internal accounting controls" at all times prior to September 22, 2014. *See* ¶¶80-120. Defendants concealed that these new FCPA compliance processes were necessary to establish, as opposed to simply strengthen, components of GC's FCPA

61

compliance program, as Defendants claimed at the time. ¶¶168, 229 (Robinson stating on October 30, 2014 that GC was "tak[ing] steps to strengthen the [C]ompany's compliance program").[18]

For instance, while investors learned on September 22, 2014 that Defendants were planning to implement a "screening policy" for foreign agents, they remained unaware that GC historically had **no controls** to ensure that foreign agents, and any payments thereto, were vetted for compliance with the FCPA. *See* ¶40 (GC admission that it "did not require and/or ensure, among other things … due diligence for the retention of third party agents and distributors"); ¶42 (SEC finding that GC failed "to maintain an adequate system of internal controls" because, *inter alia*, it "did not perform any anticorruption due diligence on third parties"); ¶87 (CWs 1 and 2 describing the lack of any due diligence policies or procedures regarding the Company's use of third parties and agents prior to 2015). Similarly, while investors were made aware on October 30, 2014 that GC was planning to conduct anti-corruption training for its sales staff, ¶¶168, 229, they remained unaware that, in violation of the FCPA, Defendants had historically failed to provide **any** "training on policies and procedures to ensure FCPA compliance" to GC's employees. ¶¶109-110. Without the concealed information, Plaintiff was unaware of, let alone in a position to specifically plead, material omissions. *MBIA*, 637 F.3d at 175.

Furthermore, Defendants consistently reassured investors prior to September 22, 2014 that the Company had in place an FCPA compliance program, such that the September 22, 2014 announcement of additions to that purported program did not reveal its complete absence prior to that time. *See* ¶¶175-214; ¶176 (noting that every 10-K beginning with the fiscal year ending December 31, 2007 represented that GC maintained FCPA compliance policies and procedures).

---

[18] Notably, even Defendants concede that the September 22, 2014 disclosure discussed "how the Company was *enhancing its compliance procedures*," not that it was installing them for the first time as Plaintiff alleges. GC Mem. at 16.

*See, e.g., Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 402 n.16 (3d Cir. 2006) (holding that reassurances "can dissipate apparent storm warnings" when they are the type "an investor of ordinary intelligence would reasonably rely on"); *Sun v. Han*, No. 15-803 (JLL), 2015 WL 9304542, at *18 (D.N.J. Dec. 21, 2015) (rejecting contention that accounting fraud claims were time barred in light of auditor's "assurances that the [c]ompany's revenue recognition was in accordance with GAAP").

With respect to GC's failure to disclose material information concerning its FCPA violations, the only information available to investors as of January 5, 2015 suggested that GC was in the process of "reviewing" certain (i) payments in Angola that raised possible FCPA "concerns"; and (ii) payments in Thailand and India that raised FCPA "implications." ¶¶164-69. The public disclosures on August 1, September 22, and October 29-30, 2014 in no way revealed what GC subsequently admitted in December 2016—that GC knowingly paid millions of dollars in bribes in Angola, Thailand, Bangladesh, Indonesia, China and Egypt that violated the FCPA's bribery and internal control provisions and put GC's operations at risk. ¶¶29-42, 121-45. Indeed, the pre-January 5, 2015 disclosures said nothing about (i) the number or amount of the transactions at issue or the period during which the payments under review were made; (ii) the existence of corrupt payments in four additional countries—more than double the number of countries disclosed prior to January 5, 2015; and (iii) the tens of millions in profits generated from the Company's violations of the FCPA's bribery and accounting provisions. ¶¶121-45.[19] Without these facts, which were not disclosed until after January 5, 2015, Plaintiff would have been unable to allege with particularity

_____

[19] Far from "admit[ting] that [GC] disclosed" the omitted material information by January 5, 2015, GC Mem. 16, the Complaint alleges that investors were not aware of the magnitude and scale of GC's FCPA violations, or that payments under review for FCPA "implications," were in fact illegal until the Company disclosed on February 10, 2016 that it had more than doubled its reserve for the "likely" disgorgement of profits tied to these payments. ¶¶165, 169.

the material information Defendants failed to disclose to investors regarding GC's FCPA violations. *MBIA*, 637 F.3d at 175.

### d. Defendants' Arguments that the Alleged Material Omissions Were Discoverable before January 5, 2015 Fail

Defendants incorrectly contend that GC disclosed each of the omissions alleged in the Complaint in disclosures on August 1, 2014, September 22, 2014 and October 30, 2014. GC Mem. at 16-18.[20] Defendants' arguments all fail. *First*, as detailed above, the foregoing disclosures did not reveal sufficient information to allow Plaintiff to plead his case -- that information was not disclosed until after January 5, 2015. *See supra*. Defendants' arguments in that regard are far from compelling. For instance, Defendants redefined the scope of omitted information regarding the FCPA violations from "widespread and costly FCPA violations," GC Mem. at 15, to "widespread FCPA *issues likely* to be costly," GC Mem. at 17, in a fruitless attempt to make the omissions concerning admitted FCPA violations in six countries and $75 million in disgorged profits and fines fit the Company's disclosure of an ongoing review of FCPA "concerns" or "implications" in just three countries which may lead to unspecified costs.

*Second*, GC's contention is based on Plaintiff's *characterizations* of what the September 22, 2014 and October 29-30, 2014 disclosures revealed for loss causation purposes, not the actual disclosures themselves, as demonstrated by the fact that GC extensively quotes Plaintiff's allegations and not the disclosures themselves. *See, e.g.*, GC Mem. at 16 (stating that the September 22, 2014 8-K disclosed that GC was taking "the first in a series of remedial measures . . . to address the lack of an effective FCPA compliance program") (quoting ¶224)); *id.* at 16-17 (stating that the October 29-30, 2014 disclosure revealed that GC "had taken additional remedial

---

[20] As Defendants concede, on August 1, 2014 GC disclosed only that its review of "certain commission payments in Angola "may have implications" under the FCPA, and that this information had been reported to the SEC and DOJ. GC Mem. at 16; ¶¶18, 164.

measures to address its woefully deficient FCPA compliance" (quoting ¶20) and "revealed that the extent of Defendants' "corrupt scheme was exposed," which "forced [the Company] to divest much of its overseas operations") (quoting ¶21)); *see also id.* 16-18 (quoting ¶¶19, 21, 166, 191).

*Third*, the foregoing characterizations of what was omitted before and effectively revealed on September 22, 2014 and October 29-30, 2014, are rooted entirely in the facts that were discovered after December 22, 2016, the NPA, Cease-and-Desist Order and CW interviews. *See* ¶24 (alleging that "[w]hen the dust finally settled and after the harm was done to investors . . . [GC] was required to undertake extensive remedial measures and establish an effective FCPA compliance program – the very program that Defendants misrepresented was in place throughout the Class Period.); ¶89 (alleging that the NPA's remedial measures "confirms that GC did not have sufficient procedures or controls in place" during the Class Period).

*Fourth*, with respect to the September 22, 2014 and October 29-30, 2014 disclosures, Defendants arguments rest on a conflation between loss causation and discovery rule principles. Defendants contend that the Complaint's reliance on these disclosures to allege that the relevant truth regarding the omitted material information was partially revealed demonstrates that Plaintiff could have discovered facts sufficient to plead Exchange Act claims prior to January 5, 2015. However, loss causation is nothing more than "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016). "[T]he success of any loss causation argument" is not "contingent upon a defendant's acknowledgement that it misled investors." *Id.* at 385. Indeed, "defendants reveal[ing] their own fraud" is "an admission that can be hard to come by" and is not necessary to successfully plead that the truth was revealed. *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys.*, 877 F. 3d 687, 695 (6th Cir. 2017).

Here, revelations of "truth" alleged to show the causal link between the misrepresentations and the economic harm suffered by investors in no way reveals all aspects of Defendants' fraud, including both the falsity of Defendants' statements and their intent to defraud investors. Plaintiff's allegation that the September 22 and October 29-30, 2014 disclosures were corrective because they *partially* revealed Defendants' fraud is irrelevant to the discovery rule under *Merck*. *See* ¶226 (alleging that despite the disclosure of adverse news on September 22, 2014, "the market remained unaware of the extent to which [GC]'s grossly deficient FCPA policies, procedures, and controls had failed to identify known instances of corrupt payments in at least six countries over a twelve-year period"); ¶233 (same with respect to the October 29-30 disclosures).

Defendants raise two related arguments that similarly conflate the discovery rule as construed by *Merck* and the principles of proximate cause, as reflected by the fact that Defendants expressly rely on cases dealing with loss causation. *See* GC Mem. at 22-24. Defendants first ask the Court to speculate as to the causes of movements in the Company's stock price *ten months after the Class Period* on December 22 and 29, 2016, contending that the fact that Plaintiff did not plead these disclosures as corrective renders them immaterial and irrelevant to Plaintiff's discovery of his claims. GC Mem. at 22. However, Defendants ignore the relevant authority on this point. *See, e.g.*, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) ("Although [the company's] stock dropped over 20% the day after the announcement about the subpoena, the market reacted hardly at all to CVB's bombshell disclosure about its largest borrower, confirming that investors understood the SEC announcement as at least a partial disclosure of the inaccuracy of the previous . . . statements"); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006) ("[B]y the time that Bradley announced its restatement of earnings in April 2005, the market had already incorporated that the previously released financial statements could not be

relied upon.").[21] Defendants next contend that the February 10, 2016 partial corrective disclosure purportedly did not reveal any previously undisclosed information concerning Defendants' fraud, and that therefore it was not necessary for Plaintiff to discover his claim. GC Mem. at 23-24. *See* GC Mem. at 24. This argument is a mirror image of Defendants' loss causation argument, which is addressed in § IV.D, *infra*.[22]

*Finally*, Defendants contend that because Plaintiff "does not challenge as false" statements made on or after August 1, 2014, that serves as an "acknowledgement" that the omitted information rendering Defendants' previous misstatements materially misleading was fully revealed by August. GC Mem. at 18-19. Defendants misconstrue Plaintiff's decision not to allege the material falsity of Defendants' statements issued after May 6, 2014. Plaintiff did not allege false or misleading statements after this time because, as Plaintiff alleges, beginning on September 22, 2014 and continuing at least through February 10, 2016, "the relevant truth concealed and/or obscured by Defendants' misconduct was revealed to the market" through a series of partially corrective disclosures. ¶221. Furthermore, Plaintiff discovered during the course of its investigation following the December 2016 revelations in the NPA and the Cease-and-Desist Order that GC had begun implementing an FCPA compliance program by that time, rendering its statements following August 1, 2014 at the very least not materially misleading. *See* ECF No. 77-5 at 5 (NPA stating that GC "enhance[d] its compliance program and internal controls" and

---

[21] Defendants also overlook the fact that one of the disclosures identified by the Supreme Court in *Merck* as providing the plaintiffs with information necessary for them to discover the facts underlying their claims was not alleged to have an associated stock price reaction. *See Merck*, 559 U.S. at 641 (discussing October 2003 disclosure of Merck-funded study demonstrating a connection between Vioxx and increased risk of heart attack).

[22] Defendants' fallback policy argument, that "[a]ny other conclusion" but to grant Defendants' affirmative defense would lead to "absurd results" (GC Mem. at 23) is meritless and was ***rejected*** by the Supreme Court in *Merck* when it noted that the statute of repose, which cannot be tolled, eliminates any "fears that [the discovery rule] will give life to stale claims or subject defendants to liability for acts taken long ago." 559 U.S. at 649-50.

"engaged in extensive remedial measures"). That does not mean, however, that Plaintiff knew before January 5, 2015 that he and the Class had been defrauded.

### D.      The Complaint Sufficiently Alleges Loss Causation

Loss causation is nothing more than "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Fed. Home Loan Mortg. Corp.*, 830 F.3d at 384. To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "As pleading requirements go, this one is 'not meant to impose a great burden upon a plaintiff.'" *Norfolk Cty.*, 877 F.3d at 695 (quoting *Dura*, 544 U.S. at 347); *see also In re Miller Energy Res. Sec. Litig.*, No. 3:11-cv-386-TAV-CCS, 2014 WL 415730, at *21 (E.D. Tenn. Feb. 4, 2014) ("Loss causation is not subject to heightened pleadings standards.").

The Complaint alleges that Defendants' materially false and misleading statements and omissions caused GC's stock traded at artificially inflated prices during the Class Period, and that Plaintiff and the Class suffered significant declines in the value of their investments when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized. ¶¶220-21. Specifically, the Complaint alleges that this occurred on at least three dates: September 22, 2014, October 29, 2014, and February 10, 2016. ¶221. On each of these dates, GC disclosed new, previously concealed information concerning its FCPA compliance program and internal controls, and the risks posed to the Company's overseas operations by its FCPA non-compliance. ¶¶222-39. "Taken together, these disclosures—and the speed at which [GC's] share price fell after them—make it at least plausible that the disclosures had something to do with [Plaintiff's] losses." *Norfolk Cty.*, 877 F.3d at 696 (citing *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (a plaintiff need only show that a

misrepresentation was "a significant contributing cause" of his losses, i.e., that "the misrepresentation *touches upon* the reasons for the investment's decline in value.")).

As a testament to the sufficiency of the Complaint's loss causation allegations, Defendants challenge just one of Plaintiff's alleged corrective disclosures: February 10, 2016. GC Mem. at 35. On this date, GC announced that it had substantially completed its internal investigation related to improper payments by its employees in Angola, Thailand, India, China, and Egypt and, based on the findings of the investigation, had increased the Company's accrual for profits likely to be disgorged from these transactions to $28 million. ¶234. GC also disclosed that it had identified "certain other transactions that may raise concerns under the FCPA for which it is at least reasonably possible we may be required to disgorge estimated profits" of up to an additional $33 million. ¶¶235-36.

Defendants concede that there were at least three components of this disclosure that involved "new information that was revealed to the market": (i) GC's investigation "was substantially completed"; (ii) the Company was "increasing its disgorgement reserves" for previously identified FCPA violations by 16%; and (iii) the Company had identified "other FCPA violations that could require additional disgorgement up to $33 million." GC Mem. at 35. Defendants also concede that this news preceded a 31.6% decline in GC's stock price. *Id.* As Defendants acknowledge, the Company's disclosures on this date revealed new information that was directly related to the subject matter of the misstatements and omissions alleged in the Complaint and that these disclosures immediately preceded Plaintiff's losses. *Id.* Nothing more is required. *Fed. Home Loan Mortg. Corp.*, 830 F.3d at 384; *Dura*, 544 U.S. at 347; *Norfolk Cty.*, 877 F.3d at 696.[23]

---

[23] Defendants' cited authority is inapposite because in those cases the causal connection between the alleged misstatements and the disclosures was lacking, whereas in the instant case Defendants *concede* that the requisite

**E.      The Complaint Sufficiently Alleges that the Individual Defendants Were Controlling Persons under § 20(a)**

For the reasons set forth above, the Complaint states a claim for securities fraud against all Defendants. Furthermore, the Complaint alleges that the Individual Defendants had access to undisclosed adverse information about GC's operations, and participated in the drafting, preparation, and/or approval of the Company's public statements, and had the ability and opportunity to prevent their issuance or cause them to be corrected. ¶¶284-86. The Individual Defendants do not contest these allegations, which are sufficient to state a claim for control person liability. *Dana II*, 646 F.3d at 962. *See* K. Mem. at 21; R. Mem. at 19. Defendants nonetheless argue that Plaintiff has failed to allege that either Individual Defendant was a culpable participant in the underlying violation. As Defendants recognize, the Sixth Circuit does not require such a showing. K. Mem. at n.14; R. Mem. at n.14. Even if such a showing were required, the Complaint's scienter allegations against Defendants Kenny and Robinson (*see supra*) establishes their culpable participation in GC's fraud. *See, e.g.*, *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 875 (S.D. Ohio 2013) (finding defendants' involvement in transactions at issue and participation in issuance of statements constituted culpable participation).

---

relationship between their alleged misstatements and omissions and the February 10, 2016 disclosure has been established. *See Ind. State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945 (6th Cir. 2009) ("the complaint expressly attribute[d] the decline in share price to the confluence of governmental probes, *not* the news of Part D difficulties" and so "we cannot conclude that loss causation has been adequately pled with respect to the implementation of Part D."); *D.E.&J. Ltd. P'ship v. Conaway*, 133 F. Appx. 994, 1000 (6th Cir. 2005) (finding loss causation inadequately pled where the plaintiff "did not plead that the alleged fraud became known to the market on any particular day . . . and did not connect the alleged fraud with the ultimate disclosure and loss"); *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 317 (5th Cir. 2008) (finding loss causation inadequately pled where "*no new facts*" were alleged to have been revealed on the corrective disclosure dates concerning the defendants' alleged improper accounting for its stock-option grants, which was "the only claim-dismissal contested" on appeal, *id.* at 314).

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motion. If the Court grants any part of the Defendants' Motions, Plaintiff respectfully requests

leave to amend pursuant to Rule 15(a)(2).

Dated:  May 24, 2018                              Respectfully submitted,

                                                  **KESSLER TOPAZ MELTZER
                                                     & CHECK, LLP**

                                                  *s/  Andrew L. Zivitz*
                                                  ANDREW L. ZIVITZ (Admitted *Pro Hac Vice*)
                                                  NATHAN HASIUK (Admitted *Pro Hac Vice*)
                                                  280 King of Prussia Road
                                                  Radnor, PA 19087
                                                  Telephone: (610) 667-7706
                                                  Facsimile: (610) 667-7056

                                                  -and-

                                                  JENNIFER L. JOOST (Admitted *Pro Hac Vice*)
                                                  One Sansome St, Suite 1850
                                                  San Francisco, CA 94104
                                                  Telephone:  (415) 400-3000
                                                  Facsimile: (415) 400-3001

                                                  *Attorneys for Plaintiff and Lead Counsel for the
                                                  Putative Class*

                                                  **MEHR, FAIRBANKS & PETERSON
                                                     TRIAL LAWYERS, PLLC**

                                                  ERIK PETERSON (Bar No. 93003)
                                                  201 West Short Street, Suite 800
                                                  Lexington, KY 40507
                                                  Telephone:  (859) 225-3731
                                                  Facsimile:  (859) 225-3830

                                                  *Liaison Counsel for Plaintiff and for the Putative
                                                  Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 24, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.


<u>*s/ Andrew L. Zivitz*</u>
Andy L. Zivitz