# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF KENTUCKY

## NORTHERN DIVISION AT COVINGTON

**CIVIL ACTION NO. 2:17-cv-25 (WOB-CJS)**

SATISH DOSHI                                                                             PLAINTIFF

VS.                                    <u>MEMORANDUM OPINION AND ORDER</u>

GENERAL CABLE CORPORATION, ET AL.,                              DEFENDANTS

In the present matter, Plaintiff, acting on behalf of a putative class of individuals or entities who purchased or otherwise acquired General Cable's common stock during the Class Period, alleges that Defendant General Cable, Defendant Gregory B. Kenny, and Defendant Brian J. Robinson violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10-b5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiff also alleges that Defendants Kenny and Robinson violated § 20(a) of the Exchange Act. The defendants filed respective motions to dismiss all claims brought against them. (Docs. 75, 76, 77).

Having previously heard oral argument and taken this matter under submission, the Court now issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

1. **General Cable**

General Cable ("GC") is a wire and cable manufacturer based primarily in Highland Heights, Kentucky. The individual defendants—Gregory Kenny and Brian Robinson—served as GC's Chief Executive Officer and Chief Financial Officer, respectively, during the Class Period. (Doc. 69 ¶¶ 31-32). In addition to its North American endeavors, GC has extensive international operations and it derives a

large percentage of its revenues from these overseas divisions. (*Id.* ¶ 60). The relevant foreign subsidiaries were in Portugal, Angola, Thailand, China, and Egypt. (*Id.* ¶¶ 34-38).

In the early 2010s, GC began to realize that, through certain foreign entities, GC committed several violations of the Foreign Corrupt Practices Act ("FCPA"). In December of 2012, certain GC executives—which purportedly included Defendant Robinson—received an Internal Audit report that identified excessive payments to a particular agent in Angola. (*Id.* ¶¶ 148, 154). The report also recommended that GC establish a global policy for using agents and sales representatives, but GC failed to take any subsequent action on this matter until the fall of 2013 when it conducted an onsite review. (*Id.* ¶ 157). After this onsite review, GC reported its findings to the SEC and DOJ in January of 2014. (*Id.* ¶ 163). This prompted investigations by both departments that culminated in settlements between GC and the DOJ and SEC, respectively, in December of 2016. (*Id.* ¶¶ 170, 173). These settlements revealed the extensive nature of the FCPA-related issues, and GC admitted to knowing that certain subsidiaries had been acting in violation of the FCPA since 2011. (*Id.* ¶ 146).

### 2. General Cable's Statements During the Class Period

#### a. General Cable's regular SEC filings.

The Class Period for this action runs from February 23, 2012, to February 10, 2016. (*Id.* at 1). In compliance with SEC regulations, GC filed regular reports throughout the class period, which were signed by Kenny and Robinson. (*Id.* ¶¶ 175, 178, 192, 194, 202, 204, 211). In these filings, GC routinely informed investors of risks that were associated with its overall business. For example, in its 2011 Form 10-K—filed on the starting date of the Class Period—GC included a section appropriately titled "Risk Factors" in which it stated that it is "subject to a number of risk factors listed below[] which could have a material adverse affect on [its] financial condition."[1] (Doc. 75-16 at 3). GC identified the listed risk factors as "all of the known material risks and uncertainties that they know to exist" but cautioned that additional, unknown risks may also impair its business. (*Id.*).

---

[1] The Court may review the full text of these documents since they are referenced and quoted in the Amended Complaint. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 468-69 (6th Cir. 2014).

One of the risk factors was that certain foreign and U.S. laws applied to their international operations, including the FCPA. GC stated that "[a]lthough we have implemented policies and procedures designed to ensure compliance with these laws, there can be no assurance that our employees, contractors and agents will not take actions in violation of our policies, particularly as we expand our operations through organic growth and acquisitions." (*Id.* at 13). This statement was repeated in every Form 10-K and Form 10-K/A that was filed during the Class Period, and was also incorporated by reference in every Form 10-Q and Form 10-Q/A during this time. (Doc. 69 ¶ 76). GC had regularly repeated this statement in its Forms 10-K since at least December of 2007 (*Id.* ¶ 176).

GC also explained specifically that it is subject to risks that come with doing extensive international business. This included conducting operations in countries that are at "higher risk of being targets of economic and political destabilization, international conflicts, restrictive actions by foreign governments, nationalizations or expropriations, changes in regulatory requirements, **the difficulty of effectively managing diverse global operations**, terrorist activities, adverse foreign tax laws and the threat posed by potential pandemics in countries that do not have the resources necessary to deal with such outbreaks." (*Id.* ¶ 177) (emphasis in original). These risks, per GC, are particularly heightened in certain countries, including Angola, Thailand, and India. (*Id.*). These statements were repeated in the same SEC filings as the statement regarding GC's FCPA program. (*See id.* ¶¶ 178, 193-94, 203-04, 212-13).

GC also included a certification on its 2011 Form 10-K that related to the effectiveness of its internal controls over financial reporting. GC claimed the management had evaluated the effectiveness of the internal control over financial reporting and "concluded that internal control over financial reporting was effective as of December 31, 2011." (*Id.* ¶ 179). This was included in the 2012 Form 10-Qs for the first and second quarters. (*Id.* ¶ 180). Lastly, there were additional certifications which were required under Section 302 of the Sarbanes Oxley Act of 2002 that related to defendants Kenny and Robinson as CEO and

CFO, respectively. These certifications made extensive assurances as to the disclosure controls and reliability of financial reporting.[2] (*Id.* ¶ 183).

Through publication, republications, and incorporations by reference, these statements—with one exception—were repeated by GC throughout the Class Period. The exception is GC's statement that management had evaluated the effectiveness of the internal control over financial reporting and found it effective; it was issued on February 23, 2012, and repeated only on March 30, 2012, and June 29, 2012. (*Id.* ¶¶ 179-80).

### b. GC's disclosures of the FCPA violations.

In August of 2014, GC disclosed publicly that it had alerted the DOJ and SEC to the potential FCPA violation in Angola. (*Id.* ¶ 164). GC followed up in September in a separate disclosure and also revealed that it was reviewing certain payments in its Thailand and India operations for possible FCPA "implications." (*Id.* ¶ 165). In order to address flaws that it had discovered in its FCPA program, GC stated that it was implementing screening processes for international sales agents. (*Id.* ¶ 224). Following the September disclosure, GC's stock prices fell more than 10%. (*Id.* ¶ 19).

In October, GC announced that it was divesting its Asia Pacific and African operations. (Doc. 69 ¶ 20). According to a conference call conducted the following day, GC made this decision in order to better focus on its core operations in other parts of the world. (*Id.* ¶ 167). In this same call, Robinson updated the callers on the SEC and DOJ investigations by stating that GC had undergone extensive reviews and was making improvements to strengthen their FCPA compliance program. (Doc. 75-10). GC's stock fell 6% the following day. (Doc. 69 ¶ 232).

GC's final relevant disclosure was issued on February 10, 2016. There, GC announced that the FCPA investigation was substantially completed and it updated the amount of profits that would likely be

---

[2] These were filed in GC's 2011 10-K, first two quarterly reports for 2012 ("1Q 2012 and 2Q 2012 Forms 10-Q"), 2011 10-K/A, 2012 Form 10-K, 3Q 2012 Form 10-Q, 1Q Form 2013 10-Q, 2nd 2011 Form 10-K/A, 2012 Form 10-K/A, forms 10-Q/A for 1Q-3Q 2012, 1Q 2013 Form 10-Q/A, 2Q-3Q 2013 Form 10-Q, 2013 Form 10-K and 1Q 2014 10-Q. (*Id.* ¶¶ 181, 184, 195, 204, 214).

disgorged as an outcome of this investigation. (*Id.* ¶ 169). However, it also revealed that there were other suspicious transactions with FCPA implications that may require an additional profit disgorgement of, potentially, $33 million. (*Id.* ¶ 169). Following this final disclosure, GC's stock fell 31.61% on February 11, 2016. (*Id.* ¶ 238).

### c. GC enters into settlements with the DOJ and SEC.

Despite GC's disclosures to investors regarding FCPA-related issues, the extent of the FCPA violations was not fully revealed until it entered into separate settlements with the DOJ and the SEC. On December 22, 2016, GC entered into a Non-Prosecution Agreement ("NPA") with the DOJ in which it admitted that it committed several FCPA violations from 2003 through 2015. (*Id.* ¶ 39). GC also entered into a Cease-and-Desist Order ("CDO") with the SEC, which detailed the same FCPA violations. (*Id.* ¶ 42). Most relevant here are certain admissions that GC made regarding its FCPA compliance program in these documents, specifically the NPA. (*See, e.g.*, *id.* ¶¶ 40, 77, 84-85, 122).

The NPA states that:

> GC, acting through certain executives and employees . . . knew that certain of its foreign subsidiaries used certain third-party agents and distributors to make corrupt payments to foreign officials in order to obtain and retain business in certain countries. Nonetheless, GC knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents.[3]

(Doc. 75-12 at A-2—A-3).

The NPA also reveals that a certain high-level executive became aware of potential FCPA violations in Thailand in 2011, and "General Cable took no further action and did not take any steps to implement adequate internal accounting controls." (*Id.* at A-6 - A-7). The NPA acknowledges that GC has enhanced its program and "engaged in extensive remedial measures" to prevent this sort of activity from happening again. (*Id.* at 2). GC also agreed to "adopt new or [] modify existing internal controls, compliance codes, policies, and procedures" to maintain an effective system. (*Id.* at B-1).

---

[3] The Court can consider the full text of the NPA and CDO in this motion because it can consider the "full text of the SEC filings, prospectus, analysts' reports and *statements 'integral to the complaint,'* even if not attached, without converting the motion into one for summary judgment." *Bovee v. Coopers & Lycbrand C.P.A*, 272 F.3d 356, 360-61 (6th Cir. 2001) (emphasis added).

The CDO is similar. The SEC found that GC had a Code of Ethics that prohibited these sorts of payments and explicitly stated that the FCPA applied to GC and its employees. (Doc. 75-13 at 3). It also found that this same code required all transactions to comply with "federal securities laws that required GCC to maintain books, records, and accounts that accurately and fairly reflect transactions, and a system of internal accounting controls designed to provide reasonable assurances that GCC's financial statements will be accurate and complete." (*Id.*).

Despite this, the SEC found that GC failed to adequately train its employees in order to ensure compliance with the FCPA. (*Id.*). This resulted in a highly ineffective program: many of GC's foreign subsidiaries had no internal accounting controls through which they could safely work with third-party entities and some employees were generally unaware that the FCPA even applied to their operations. (*Id.* at 3-4). It also details specifically how the FCPA compliance program failed in Angola where there were no additional internal accounting controls implemented until months after the initial red flags were raised. (*Id.* at 4-5). Similarly, the SEC acknowledges that GC has extensively improved its system.

### d. Confidential Witness Accounts of the State of GC's Compliance Program.

Plaintiff dedicates a substantial amount of his Amended Complaint to several accounts from confidential witnesses ("CWs") who were employed at GC during the Class Period or in the years immediately preceding the Class Period. (Doc. 69 ¶¶ 43-54). The most prominent confidential witnesses are CW 1 and CW 2. CW 1 was hired in 2012 to be Vice President of Internal Audit at GC and was in that position during the Class Period. (*Id.* 43, 93). CW 1 reported, at least partially, to Robinson. (*Id.* ¶ 43). CW 1 was hired in the third quarter of 2012 supposedly in order to fix GC's "broken" Internal Audit department. (*Id.* ¶ 93, 96). CW 2 was a manager in Internal Audit during the Class Period, and reported directly to the Vice President of Internal Audit—who would seemingly be CW 1. (*Id.* ¶ 44). Many other CWs were auditors for GC, with only some working as auditors during the Class Period. (*Id.* ¶¶ 45-48). According to these CWs, GC had extraordinarily inefficient policies and procedures for ensuring compliance with the FCPA. CW 1 explained that GC did not provide adequate FCPA-specific training and resources to its Internal Audit department. (*Id.* ¶¶ 104-05). GC also failed to conduct formalized global risk assessments,

which help companies design and implement systems meant to address specific identified risks. (*Id.* ¶¶ 113, 115). Per multiple CWs—including CW 2—GC did not test its compliance with the FCPA, either, which would have helped it discover weaknesses and violations. (*Id.* ¶¶ 116, 118).

As part of CW 2's responsibilities, CW 2 conducted onsite visits at foreign subsidiaries. (*Id.* ¶ 44). CW 2 recounted incidents from these foreign subsidiaries that should have alerted GC to potential FCPA-compliance issues. CW 2 stated that many of GC's ROW subsidiaries were "difficult to work with and very defensive" when they had to work with Internal Audit. (*Id.* ¶ 149). CW 2 discovered an internal memorandum in the ROW division that stated that "auditors were 'not your friends' and 'only give the auditors what they ask for.'" (*Id.* ¶ 151). At some undisclosed time, CW 2 also found an email that also seemed to contain a plot from a South African operation to conceal the true reason that an Internal Control accountant was in South Africa. (*Id.* ¶ 152). CW 2 brought this to Robinson's attention but said that, while Robinson told CW 2 to "calm down" and that he would get to the bottom of it, CW 2 never heard from Robinson about the incident again. (*Id.*).

CW 1 also alleged that Robinson was regularly informed of supposed inefficiencies and needs for improvement. (*Id.* ¶ 93). Allegedly, CW 1 informed Robinson of many concerns regarding GC's "deficient FCPA compliance program" but Robinson was "nonrespons[ive]" to these concerns. (*Id.* at ¶ 95). While CW 1 offers no specific allegations as to Kenny's knowledge, CW 1 believed that "Kenny simply relied on Robinson when it came to issues such as compliance." (*Id.* at ¶ 96). The CWs overall create a picture that GC's management was largely unreceptive to efforts to improve its compliance program. (*Id.* ¶¶ 94-97). The reason for this, according to CW 1, seemed to be that "since there had been no FCPA violation uncovered to date, the Company's FCPA compliance must be sufficient. (*Id.* ¶ 94). CW 1 alleged that this "head in the sand" mentality was inconsistent with the level of exposure GC faced through its international operations. (*Id.* ¶ 94). As the NPA and CDO revealed, the program had many deficiencies that allowed multiple violations to occur.

**3. Procedural History**

An original complaint against GC, Kenny, and Robinson for alleged violations of federal securities laws was filed in January of 2017 in the Southern District of New York. (Doc. 1). Pursuant to 28 U.S.C. § 1404(a), the parties agreed to transfer venue to the Eastern District of Kentucky. (Doc. 9). Once a lead plaintiff was appointed by this Court, (Doc. 56), Lead Plaintiff then filed an Amended Complaint in January of 2018. (Doc. 69). Defendants thereafter filed respective motions to dismiss all claims brought against them. (Docs. 75, 76, 77). Defendants each attack the merits of Plaintiff's claims, and GC also asks that this matter be dismissed for being untimely.

*Analysis*

**1. Plaintiff's claim is not barred by the statute of limitations since the facts, specifically facts relating to scienter, were not discoverable before 2016.**

Defendant GC[4] argues that Plaintiff's claims are untimely since the factual allegations regarding the ineffective system and the apparent risks were all available to Plaintiff by the end of 2014, including facts related to Defendants' scienter. (Doc. 75 at 19-21). However, GC fails to recognize the extent to which Plaintiff relies on the factual findings revealed in the NPA and CDO—specifically for support in his allegations regarding scienter.

Section 10(b) claims have two-year statutes of limitations. 28 U.S.C. § 1658(b)(1). The period does not begin to run until the "plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation.'" *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010) (alteration in original). The starting point is thus not when the plaintiff would have begun investigating but when they would have actually discovered the facts. *Id*. Scienter is one of the facts constituting a 10(b) violation— hence plaintiffs need to be able to discover facts supporting their scienter claim. *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 547 (6th Cir. 2012). "Storm warnings" that indicate something is wrong in the company's representations are not enough. *See id.* A fact is "discovered" once a reasonably diligent plaintiff would

---

[4] Defendants Kenny and Robinson join Defendant GC's Motion to Dismiss in its entirety. (Doc. 77 at 1 n.1; Doc. 76 at 1).

have enough information to adequately plead the facts in a complaint. *Akbar v. Bangash*, No. 15-cv-12688, 2017 WL 4334912, at *4 (E.D. Mich. July 11, 2017) (*citing City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).

Even if GC were correct in claiming that Plaintiff could have discovered the truth regarding the deficiencies in GC's program in 2014, it is hard to see how Plaintiff had sufficient facts to plead scienter at that time. Throughout this entire Class Period, GC repeatedly offered assurances that it had a system in place and effective internal controls over its reporting. There is nothing in these disclosures to reveal that GC was not as surprised as anyone else to learn of the flaws that lead to these violations.

It was not until December of 2016 that Plaintiff could plead with any particularity that GC was aware of issues related to its program. In the NPA specifically, GC admitted that it knew it had an ineffective and inadequate FCPA compliance program. As stated in the NPA, GC knew that it had employees making illegal payments and it "knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents." (Doc. 75-12 at A-3). Further, it "knowingly and willfully failed to address these known weaknesses." (*Id.*). While Plaintiff also relies on an assortment of confidential witnesses, the NPA specifically provides insight into GC's state of mind and this information was wholly unavailable to Plaintiff prior to December 2016.

While GC maintains that information regarding scienter was available to Plaintiff in 2014,[5] this argument is undercut by Plaintiff's reliance on the admissions found in the NPA. (Doc. 69 ¶ 187, 246, 249-52). Prior to this settlement, Plaintiff had little to no evidence to support any scienter allegation. Thus,

---

[5] Doc. 75 at 20. GC incorrectly relies on this Court's conclusion that this information was "available" in 2014. This statement lacks context. In an earlier suit involving these same defendants, the  plaintiff moved to file  a Proposed Complaint involving similar claims regarding the FCPA compliance program. *Doshi v. Gen. Cable Corp.*, No. 2:14-cv-22, 2015 WL 2229233, at *3 (E.D.Ky. May 12, 2015). Plaintiff in that case asked the Court to reopen the case and amend the complaint to incorporate newly discovered evidence regarding the insufficient internal controls. This Court found that the evidence had been available to the plaintiff prior to the Court's entry of judgment and, consequently, could not be newly discovered evidence. *Id.*

Plaintiff was largely unable to plead his claim with any particularity prior to 2016 and GC's argument that this claim is barred by the statute of limitations therefore fails.

**2. Plaintiff failed to sufficiently state a valid claim under § 10(b) for any of the challenged statements.**

### a. The applicable standards for § 10(b) and Rule 10-b5 claims.

At the motion to dismiss stage, the Court must "accept plaintiff's allegations as true and construe the complaint in its favor." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014). There are six elements for a § 10(b)[6] claim: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)).

Securities fraud claims not only require plaintiffs to satisfy this litany of elements, but they also implicate two additional frameworks that further complicate matters. Because § 10(b) claims involve fraud, Rule 9(b) of the Federal Rules of Civil Procedure applies and requires the complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018).

The most significant pleading challenge, however, comes from the Private Securities Litigation Reform Act ("PSLRA"). Pursuant to the PSLRA, a plaintiff must "specify each statement alleged to have been misleading" as well as the "reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). While Rule 9(b) would allow a plaintiff to plead the state of mind generally, the PSLRA demands more: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with *particularity* facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphases added).

---

[6] "The United States Supreme Court has recognized that the scope of Rule 10b-5 is coextensive with the coverage of § 10(b). As a result, like the Supreme Court we will use § 10(b) to refer to both the statutory provision and the Rule." *Omnicare*, 769 F.3d at 469 n.1 (internal quotations omitted).

The Supreme Court issued guidance as to how courts must analyze motions to dismiss § 10(b) claims:

> *First*, . . . courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true . . . *Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard . . . *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphases in original).

When deciding if a complaint pleads facts giving rise to a strong inference of scienter, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. A complaint must plead facts that create an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

### b. Plaintiff's challenged statements from GC's SEC filings.

In his Amended Complaint, Plaintiff identifies three categories of allegedly false and misleading statements:

> *First*, Defendants falsely assured investors that General Cable had implemented policies and procedures designed to ensure compliance with the FCPA. *Second*, Defendants misleadingly discussed the risks posed to the Company's operations in overseas markets where, unbeknownst to investors, widespread FCPA violations were occurring. *Third*, Defendants falsely represented that the Company's internal controls over financial reporting were effective.

(Doc. 69 ¶ 174) (emphases in original).

Defendants attack each statement and argue that these statements are not materially false and misleading. They further allege that Plaintiff failed to adequately plead scienter as to any defendant. Plaintiff's claims for each statement fail for varying reasons, so each statement is addressed in turn.

### c. GC's statement regarding its compliance program is not actionable since it made no assurances that the system was effective and merely stated that it had a program, which is not false or misleading.

As explained above, GC included a "Risk Factors" section in its SEC filings throughout the Class Period. In this section, GC explained that there are various laws and regulations associated with its overseas

operations, which included the FCPA. (Doc. 75-16 at 13). In the Amended Complaint, Plaintiff focuses on a particular part of GC's statement immediately following its statement that certain laws, like the FCPA, apply to its international entities: "we have implemented policies and procedures designed to ensure compliance with [the FCPA]." (Doc. 69 ¶ 176) (alteration in original). Pursuant to the PSLRA, Plaintiff explains that this was false or misleading because Defendants "knew or were severely reckless in not knowing that: (i) General Cable lacked the components of an effective corporate compliance program . . . ." (*Id.* ¶ 185).

The parties disagree as to what specifically Plaintiff alleges in the Amended Complaint that explains why this statement was false. Defendants argue that Plaintiff is claiming GC misleadingly stated its program was effective when it actually made no assurances regarding the efficacy of any program—it merely stated that it had a program. (Doc. 75 at 26). Plaintiff argues that this statement was false because GC "failed to implement even the minimum requirements of an effective FCPA compliance program" to the extent that there essentially was not a program in place. (Doc. 101 at 24-25). Plaintiff clarifies that, because the program was allegedly extremely deficient, "even if the court holds that GC had a policy, *which it did not*, the statements were materially misleading because they were not designed or implemented to ensure compliance." (*Id.* at 26) (emphasis added).

While Defendants are closer to the truth regarding Plaintiff's allegations, there is some grey area as to whether Plaintiff challenges the existence or the efficacy of the program. Many of Plaintiff's allegations clearly center around the alleged inefficiency of GC's program: GC did not have "even the basic elements of a *suitable* FCPA compliance program;" GC did not have a "*meaningful* or *effective* program" to ensure compliance; former employees confirmed that GC lacked "the components of an *effective* FCPA compliance program;" and GC "knew or [was] severely reckless in not knowing that . . . General Cable lacked the components of an *effective* corporate compliance program . . . ." (Doc. 69 ¶¶ 8, 77, 78, 185) (emphases added).

Similarly, many of the confidential witness accounts center around the deficiencies that made GC's program ineffective: it did not provide sufficient staffing and resources to ensure compliance; the auditors

in Internal Audit were not specifically trained for the FCPA; and GC had "woefully inadequate" staffing and resources for Internal Audit.[7] (*Id.* ¶ 102, 104, 105). Plaintiff also boldly asserts that GC "did not implement *any* FCPA-specific policies, procedures, or internal controls to prevent FCPA violations" and had "wholesale disregard" for its FCPA responsibilities. (*Id.* ¶ 6) (emphasis added). However, as Plaintiff points out, he also claimed that the deficiencies rendered GC's compliance program "virtually non-existent . . . ." (*Id.* ¶ 269).

To the extent that Plaintiff alleges GC did not have any program, Plaintiff is incorrect. The SEC found that GC had a Code of Ethics that specifically stated that the FCPA applied to GC employees and that they were prohibited from giving consideration to public officials, unless authorized by law, and it prohibited excessive payments to third parties. (Doc. 75-13 at 3). It also required all "transactions to be executed only with management authority, general or specific, in compliance with federal securities laws that required GCC to maintain accurate books, records, and accounts that accurately and fairly reflect transactions, and a system of internal accounting controls designed to provide reasonable assurances that GCC's financial statements will be accurate and complete." (*Id.*). Thus, Plaintiff cannot plausibly claim that GC failed to have *any* FCPA-compliance program.

As for the statement in general, in order to be actionable, the statement must be false or misleading and it must concern a material fact. *Omnicare*, 769 F.3d at 470. While neither party addresses this issue, the Court is hesitant to find that this statement is material. "[W]e have said before that 'misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available.'" *Id.* at 472 (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997)). "Context matters when determining materiality." *Forman v. Meridian Bioscience, Inc.*, No. 1:17-CV-774, 2019 WL 590358, at *10 (S.D. Ohio Feb. 13, 2019) (citing *Omnicare*, 769 F.3d at 478).

---

[7] By incorporating the confidential witness accounts here, the Court is not attributing full weight to them or otherwise including them in its analysis as to whether GC issued false or misleading statements. *See Higginbotham v. Baxter Intern'l Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007). At this point, the Court is merely including them in an attempt to properly characterize Plaintiff's claims regarding GC's statements.

While Plaintiff has complied with the PSLRA by identifying a particular phrase he claims is misleading and false, it is important to remember what GC actually said in its disclosures rather than what it is alleged to have said. In these filings, GC said "[a]lthough *we have implemented polices and procedures designed to ensure compliance with these laws*, there can be no assurance that our employees, contractors and agents will not take actions in violation of our policies, particularly as we expand our operations through organic growth and acquisitions." (Doc. 75-16 at 13) (emphasis added). This statement vaguely references GC's commitment to abiding with applicable laws and regulations. As the Sixth Circuit said about similarly vague statements regarding legal compliance, it provides GC with "a great amount of wiggle room." *Omnicare*, 769 F.3d at 478. GC is not saying that it *is* complying with laws—rather, it only said that it has designed programs to foster compliance and compliance still may not always occur.

Further undercutting materiality is the fact that, as Plaintiff alleged, this statement had regularly appeared in each Form 10-K GC filed since its Form 10-K for the fiscal year ending in 2007. (Doc. 69 ¶ 176). The vague nature of this sentence and its borderline boilerplate quality cut against its materiality. *See Omnicare*, 769 F.3d at 478. In *Omnicare*, the Sixth Circuit seriously questioned whether defendant's statement that it "believe[d] that we are in compliance in all material respects with federal, state and local laws" was material because it also was regularly repeated in filings and similarly vague. *Id.*

The *Omnicare* court found that it was material, however, because of context: there had been issues with legal problems regarding non-compliance in the company's recent past, which meant an investor may put more weight on statements of compliance. *Id.* Here, there is no similar context until at least 2014 when GC began revealing to investors that it had disclosed potential FCPA issues to the DOJ and SEC. No investor had any special reason to place weight on GC's statements regarding legal compliance until it had notice of compliance-related issues. The importance of these statements would have grown as time went on and more issues arose, but it is hard to see how there is any context to earlier statements that would render this statement material in the same way as the *Omnicare* statement.

Moreover, GC's statement provides for even more latitude than the statement in *Omnicare*. The defendant in *Omnicare* said that it believed it was in compliance with relevant laws. *Id.* GC made no similar

statement regarding the state of its compliance—it simply said that it had implemented policies to ensure compliance while also fully acknowledging that compliance may not always happen. Further, it seems doubtful that a reasonable investor's opinion on whether to invest is dependent upon a vague statement that the company tries to comply with the law. Surely reasonable investors strive to invest in companies they believe comply with the laws without the company having to explicitly say it tries to operate lawfully. That is, it is hard to see how a reasonable investor would find this statement material.

However, while the Court has serious doubts regarding the materiality of this statement, it will heed the Sixth Circuit's warning that courts "must tread lightly at the motion-to-dismiss stage" for materiality because they do not have a full understanding of investor behavior and economic consequences. *Id.* at 472. The Court also notes that, as alluded to above, statements regarding compliance may have gained materiality as the FCPA-issues emerged. Thus, the Court assumes without deciding that this statement is material.

The statement must still be objectively false or misleading, though. As explained above, Plaintiff alleged that this statement was false because Defendants knew, or were reckless in not knowing, that it "lacked the components of an effective corporate compliance program . . . ." (Doc. 69 ¶ 185). The problem is that GC never said it had an effective compliance program. It made no guarantees for its compliance program. Rather, it said that there are "[v]arious laws and regulations associated with our current international operations" and "[t]hese laws and regulations include import and export requirements, U.S. laws *such as the FCPA*, and local laws prohibiting payments to governmental officials and other corrupt practices." (Doc. 75-16 at 13) (emphasis added). Immediately thereafter, it said that "we have implemented policies and procedures designed to ensure compliance with *these laws*," which includes the FCPA. (*Id.*) (emphasis added).

Thus, not only does Plaintiff miss the mark by inferring any sort of assurance as to the program's efficacy, he also incorrectly implies that GC said anything specific about the FCPA. GC acknowledged that its overseas operations were subject to several laws and regulations—including the FCPA—but it then only made a vague statement that it had policies and procedures designed to ensure compliance with all

applicable laws. This is the extent of what GC chose to say in these disclosures: laws apply, and it has implemented policies and procedures to ensure compliance with those laws.

There is therefore a wide discrepancy between what GC actually said and what Plaintiff argues is misleading. The Sixth Circuit has said that disparity between generalities like this is relevant to "whether the misstatements were objectively false . . . ." *Omnicare*, 769 F.3d at 484. Plaintiff argues that "defendants had no basis to make any representation as to the existence or effectiveness of the Company's FCPA compliance program." (Doc. 101 at 25). As an initial matter, GC did not make any representation as to the effectiveness of its program—it merely said that it had programs designed to ensure compliance with laws. Further, GC did have a basis to make an assurance regarding the simple existence of its program since the SEC found that GC explicitly addressed the applicability of the FCPA and had procedures designed to prevent illegal payments. (Doc. 75-13 at 3).

Rather than support Plaintiff's argument, the cases he relies upon further reveal why it is inappropriate to find that this statement was false or misleading. In *Invacare*, the corporate defendant made assurances that it had addressed specific FDA observations and issued other statements regarding particular concerns brought by the FDA. *Gov't of Guam Ret. Fund v. Invacare Corp.*, No. 1:13CV1165, 2014 WL 4064256, at *4 (N.D. Ohio Aug. 16, 2014). It was these specific statements that created liability when the defendant tried to "downplay[] and mischaracterize[] them in disclosures to the investing public." *Id.* at *7. The same is true in *BofI*: there, the defendant made statements about maintaining certain standards and requiring particular criteria to be met, and the court found this was actionable because the plaintiff alleged that the defendant's "actual lending practices fell short of the standards BofI represented to investors." *In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-cv-02324-GPC-KSC, 2016 WL 5390533, at *8-*9 (S.D. Cal. Sept. 27, 2016); *see also Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (holding that a company's statements regarding specific compliance measures were misleading since the company knew those measures were failing to prevent regulatory violations). In these cases, the defendants were responding to specific issues or making precise statements that were later revealed to be false. Here, Plaintiff

alleges nothing more than a generalized assurance that GC has policies and procedures designed to ensure compliance with laws.

In its reply, GC relies on a case that is more directly on point. In *Menaldi*, the defendant made similarly general statements that it had "implemented a global compliance program to address the legal and regulatory requirements that apply to our company-wide operations" and it had "developed and implemented policies and procedures designed to ensure strict compliance by us and our personnel with the FCPA . . . ." *Menaldi v. Och-Ziff Capital Mgmt. Grp., LLC*, 277 F. Supp. 3d 500, 512 (S.D.N.Y. 2017). The court found that these statements were not false because the defendant *did* have a program in place and it made no statements regarding the program's efficacy—it simply stated that it existed. *Id.* Further likening this case to GC's, the *Menaldi* defendant had also committed several FCPA violations and had entered into agreements with the DOJ and SEC. *Id.* at 507-08. Thus, the system had similarly failed by allowing violations. However, the court still refused to find that these generic statements were false or misleading. *Id.* at 513.

Plaintiff's claim is essentially that GC's very general statement regarding all applicable laws and regulations was rendered false and misleading because of a very specific problem related to the FCPA. While the effects of this problem created large issues for GC, that does not change the nature of what GC actually said. Further, "[u]nder plaintiff's theory of its case, any company that has a compliance program and discloses that program in even the most austere terms would be required, *ipso facto*, to disclose any possible deviation that came to its attention." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008). Because GC made no assurances beyond saying that it had programs designed to ensure compliance with laws, this statement is not objectively false or misleading and is not actionable under § 10(b).

### d. Because GC did not know that its overseas operations would fail if it could not rely on corrupt business practices, it did not have a duty to disclose this as a risk.

Plaintiff's second category of allegedly false and misleading statements is also related to GC's identified risks. Plaintiff argues that GC disclosed risks regarding "the economic, political and other risks of maintaining facilities and selling products in foreign countries," including "the difficulty of effectively

managing diverse global operations" in countries like Angola, Egypt, India, and Thailand. (Doc. 69 ¶ 177). According to Plaintiff, this was false and misleading because "(i) these disclosures omitted the fact that one of the primary risks facing the Company's operations in these countries as of the date of these statements was the fact that General Cable was dependent upon corruption in order to facilitate it[s] overseas operations, and (ii) an inability to sustain these practices, either due to political reform abroad or enforcement at home, would have a material adverse impact on the Company's continued operations in those countries." (*Id.* ¶ 186). That this was the primary risk facing GC's overseas operations is clear because when GC had to stop engaging in FCPA violations, it "was forced to divest its overseas operations." (Doc. 101 at 32). Plaintiff therefore connects GC's decision to exit its operations in its Asia Pacific and Africa operations in October of 2014 with its FCPA violations: GC was working with the DOJ and SEC at the time it closed these divisions and, presumably, was stopping its corrupt practices, which allegedly caused its business to fail in those countries.

Again, the statement must be actionable in order to satisfy the § 10(b) requirements, meaning it must be a statement or omission pertaining to a material fact. *Omnicare*, 769 F.3d at 470. Because Plaintiff is alleging an omission by stating that GC failed to disclose the "primary risk facing the Company's operations in these countries," a different analysis applies than if this were a misrepresentation. *Id.* at 470.

Further, the Sixth Circuit distinguishes between different kinds of information contained in misrepresentations or omissions. *Id.* "When an alleged misrepresentation concerns 'hard information'— 'typically historical information or other factual information that is objectively verifiable'—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading." *Id.* (quoting *Sofamor Danek*, 123 F.3d at 401). In contrast is soft information, "which includes predictions and matters of opinion." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008) (quoting *Sofamor Danek*, 123 F.3d at 401). For soft information, "a plaintiff must additionally plead facts showing that the statement was made with knowledge of its falsity." *Omnicare*, 769 F.3d at 470 (internal quotations omitted).

Because this is an omission, there must be a duty to disclose. "A duty to affirmatively disclose may arise when there is insider trading, a statute requiring disclosure, or, as relevant in this case, an inaccurate, incomplete, or misleading prior disclosure." *Id.* at 471 (internal quotations and alterations omitted). When a plaintiff alleges that a defendant failed to disclose soft information the plaintiff must sufficiently allege that the information was "virtually as certain as hard facts and contradicts the prior statement." *Id.* (internal quotations omitted). "Whether newly acquired soft information is sufficiently concrete to trigger a duty to disclose will undoubtedly depend upon the facts in a given case, and the nature of both the prior disclosure and the new information will determine whether new information makes a prior disclose false or misleading." *Id.*

While GC relies on the Sixth Circuit's unpublished decision in *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015), the Court finds that the decision in *Zaluski* is a better comparison. In *Zaluski*, the defendant allegedly failed to disclose that it had violated its contract with the State of Tennessee and that it was at risk of sanctions or termination of the contract. 527 F.3d at 574. This information constituted the "potential consequences" of the defendant's actions and was "soft information that did not give rise to a duty to disclose." *Id.* This was also true because the plaintiffs did not allege any facts that revealed the defendant knew any of these potential consequences would occur. *Id.* Therefore, there was no duty to disclose.

Similarly, any forced cessation of GC's operations in these countries was a potential consequence of its actions and it was not information that had to be disclosed until it was virtually certain to occur. Plaintiff has connected the dots and inferred that, because GC announced it was ending these operations after it had to stop making corrupt payments, it must have depended upon those corrupt payments in order to sustain those operations. However, when GC announced it was exiting these divisions, it said it was doing so in order to focus on "core strategic operations in North America, Latin America and Europe." (Doc. 69 ¶ 167). Plaintiff has offered only his own inference as to why that was not true—he has not alleged any facts that GC actually closed its operations because they were unsustainable without corruption.

More importantly, though, Plaintiff alleged no facts that GC knew that it would have to shut down these operations if it could not continue engaging in corrupt practices. Similar to *Zaluski*, Plaintiff has not alleged facts that reveal GC knew more than it said. Because this was soft information, Plaintiff has to meet the actual-knowledge standard and Plaintiff has altogether failed to do so. For this reason, GC did not have to disclose the alleged risk that was omitted.

> **e.  Plaintiff has sufficiently plead that GC's statements regarding its internal controls were false and misleading.**

Plaintiff's final challenged statement relates to GC's internal accounting controls. In its 2011 Form 10-K, 1Q 2012 Form 10-Q, and 2Q 2012 Form 10-Q, GC stated that its management had conducted an evaluation of its internal control's effectiveness, and "[a]s a result of this process, management concluded that internal control over financial reporting was effective as of December 31, 2011." (Doc. 69 ¶ 179). GC did not repeat this statement throughout the Class Period, though, and it was not re-issued after June 29, 2012—thus, it was not issued for the majority of the Class Period. Apparently due to this absence, Plaintiff also alleged that particular certifications are allegedly false because they too refer to internal controls. (*Id.* ¶ 183). Pursuant to Section 302 of the Sarbanes Oxley Act of 2002, Kenny and Robinson signed CEO and CFO 302 Certifications, respectively ("SOX certifications"). (*Id.* ¶ 181). These were regularly repeated throughout the Class Period, and made several general assurances regarding disclosure mechanisms and internal controls over financial reporting.

According to Plaintiff, these statements were false or misleading because the Defendants "knew or were severely reckless in not knowing that . . . General Cable lacked the components of an effective corporate compliance program for FCPA, including sufficient policies, procedures and *internal controls* designed to ensure compliance with the FCPA's anti-bribery and accounting provisions . . . ." (*Id.* ¶ 185) (emphasis added). This was false because, as the NPA revealed, GC knew that it had deficiencies in its internal controls and it "knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent corruption or otherwise illegal payments by its agents." (*Id.* ¶ 187). The CDO likewise found that "a number of [the Company's] foreign subsidiaries lacked

internal accounting controls for doing business with third-party entities on sales to government customers." (*Id.* ¶ 188) (alteration in original).

Defendants argue that this statement is not false or misleading because it does not relate to the FCPA. GC was making assurances as to its financial reporting, which, it argues, is unrelated to whether it had internal controls for FCPA violations. (Doc. 75 at 30). This is true for both GC's general statement regarding its internal controls and for the SOX certifications: neither has any connection to the FCPA. (*Id.* at 31).

The Court shares some of GC's concerns, particularly regarding the SOX Certifications. This is partially due to PSLRA requirements. As explained above, plaintiffs are required to "specify *each statement*" that it alleges is misleading. 15 U.S.C. § 78u-4(b)(1) (emphasis added). For the other challenged other statements, Plaintiff clearly satisfies this requirement: in each, Plaintiff highlights particular provisions that he alleges to be false so that it is abundantly certain as to what his claim is based upon. (Doc. 69 ¶¶ 176-77, 179). That same sort of clarity is missing from Plaintiff's allegations for the SOX certifications since Plaintiff, seemingly, includes the majority of the SOX certification without emphasizing any particular portion as being false or misleading. (*Id.* ¶ 183). This is especially problematic because, as another court has recognized, SOX certifications do not make any explicit reassurances regarding the FCPA. *In re InVision Tech., Inc. Sec. Litig.*, No. Co4-03181 MJJ, 2006 WL 538752, at *6 (N.D. Cal. Jan. 24, 2006). Thus, in the instance where clarity is most crucial, Plaintiff has seemingly failed to meet his burden.

Plaintiff does attempt to cast some light on the matter in a later paragraph by lumping various phrases from the SOX certifications—GC had "designed" internal controls "to ensure" disclosure of material information and "provide reasonable assurance regarding the reliability of its financial reporting"—in with the other challenged statements in a large paragraph that explains why *all* of these statements are false. (Doc. 69 ¶ 185). The Court assumes, then, that these are the statements Plaintiff believes to be misleading or false in the SOX certifications.

While the Court is aware that this barely passes PSLRA-muster and that other courts have declined to find these SOX certifications false based on FCPA-related reasons, the Court finds that Plaintiff has adequately plead the falsity of these statements. Plaintiff is largely able to do so because the NPA and CDO clearly reveal that, despite GC's assurances otherwise, it had deficient internal accounting controls and it incorrectly recorded various corrupt payments. (*Id.* ¶¶ 187-88). Because the problematic internal accounting controls identified in the NPA and CDO are technically part of GC's overall financial internal control system, the fact that GC had admitted deficiencies and that it failed to fix these issues renders its statements regarding the efficacy of these internal controls misleading in light of information now known. *Omnicare*, 769 F.3d at 478. Thus, this statement is actionable.

### f. However, Plaintiff has failed to adequately plead that GC acted with the requisite scienter in making this final category of statements.

Finally, Plaintiff must satisfy the PSLRA's strict scienter requirement by pleading "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court has defined scienter in the securities fraud context as the intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Sixth Circuit has identified various kinds of scienter requirements that are dependent upon the kind of statement that is being made. If a statement is present or historical fact, "the state of mind required is recklessness. Recklessness is defined as highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must be at least so obvious that any reasonable man would have known of it." *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) (internal quotations omitted). Because hard information is historical or other factual information, the mental state for allegedly false misrepresentations of hard information is therefore at least recklessness. *See id.*; *Omnicare*, 769 F.3d at 470. When a misrepresentation relates to soft information, though, the "Plaintiffs will need to allege particular facts demonstrating that defendants had actual knowledge that their statements concerning soft information were false or misleading at the time that they were made." *Omnicare*, 769 F.3d at 471.

GC's statements that it had determined "internal control over financial reporting was effective" is soft information since it is GC's perception of its internal controls. While Plaintiff's allegations regarding the SOX certifications lack clarity, it seems that the relied-upon provisions would also constitute soft information. (*See* Doc. ¶ 185) (alleging that GC falsely or misleadingly stated it "had 'designed' sufficient internal controls 'to ensure' the disclosure of material information and 'provide reasonable assurance regarding the reliability of [its] financial reporting . . . .'") (alteration in original). Thus, Plaintiff must allege sufficient facts to establish that GC actually knew the falsity of its statements when it issued them and that it acted to defraud the public. *See Omnicare*, 769 F.3d at 483-84 (imputing knowledge of a corporate officer but dismissing because there were insufficient facts to establish that the corporation acted to defraud the public).

As to whether GC knew what it was saying was false, the Court finds that it did not. As GC has repeatedly argued, it was making statements regarding its overall financial reporting system and the internal controls for its general financial status. Per the NPA, what GC actually knew to be deficient was a very specific problem: GC

> knowingly and willfully failed to implement and maintain an adequate system of internal accounting controls *designed to detect and prevent corruption or otherwise illegal payments by its agents.* In particular . . . General Cable had deficient internal accounting controls that did not require and/or ensure . . . (a) *due diligence for the retention of third-party agents and distributors*; (b) *proof that services had been rendered by third-parties before payment could be made to them*; (c) *oversight of the payment process to ensure that payments were made pursuant to contractual terms or that payments were reasonable and legitimate.*

(Doc. 75-12 at A-3) (emphases added).

Thus, what GC knew about its internal controls is at odds with the general assurance it made regarding internal controls for its overall financial status. The same is true for the SOX certifications: these, again, ensure nothing specific to the FCPA and are collective statements over its company-wide financial system. It is hard to say that, based on this very specific sort of deficiency, GC actually knew its broad, company-wide statements were false.[8]

---

[8] As mentioned above, the Sixth Circuit also allows recklessness to be an appropriate mental state for § 10(b) claims. Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care.

This disparity also weighs against finding that GC acted with the requisite intent to defraud the public. The Sixth Circuit often looks to a list of nine non-exhaustive factors that are relevant in determining if a defendant acted with scienter. These are commonly referred to as the *Helwig* factors and they are:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

What GC allegedly knew regarding its internal controls applies to the second and sixth factors. The Sixth Circuit has stated that the second factor—divergence between internal reports and external statements on the same subject—is often the "key factor" in finding the defendant acted with scienter. *Dougherty*, 905 F.3d at 981. By at least December of 2012, there was an actual report regarding FCPA-related deficiencies in GC's internal controls—the Internal Audit report from Angola. As the NPA stated, the Internal Audit revealed issues with GC's relationship with a third-party agent and "[t]hereafter, the Company failed to establish adequate internal accounting controls and General Cable Condel continued to make corrupt payments to the agent in excess of the contractually required amounts." (Doc. 75-12 at A-5). Thus, this constitutes an internal report that presented divergent information from GC's assurances that its "internal control over financial reporting was effective" and that it had "designed" appropriate internal controls to

---

Recklessness requires more than negligence and is akin to conscious disregard. Before drawing an inference of recklessness, courts typically require multiple, obvious red flags, demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (internal quotations omitted). While the Court finds this to be soft information requiring actual knowledge, Plaintiff would also fail under a recklessness standard. Being made aware of a very specific problem regarding the company's FCPA obligations, yet assuring investors as to financial controls overall, is not the "multiple red flags" that evidence a desire to avoid the obvious or investigate the doubtful.

"provide reasonable assurance regarding the reliability of its financial reporting." (Doc. 69 ¶¶ 179, 185) (alteration omitted). This also constitutes current information that was disregarded.

However, the disparity between what GC knew and what it said, again, cuts in GC's favor for not finding scienter. As the Sixth Circuit has found, disparities in generality matter for scienter as well as for finding a statement false or misleading. *See Omnicare*, 769 F.3d at 484; *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1042 (6th Cir. 2016). "Importantly, in cases where we have found scienter to be sufficiently pleaded, this disparity did not exist." *Omnicare*, 769 F.3d at 484. Hence, these factors do not weigh strongly in favor of scienter since the false statement does not align with the known information.

Plaintiff argues that the third, fourth, and fifth *Helwig* factors also weigh in favor of scienter. (Doc. 101 at 46-47). The third factor, closeness in time, is foreclosed by Sixth Circuit precedent. In the first *Doshi* decision, the panel rejected an 86-day gap between an allegedly fraudulent statement and later disclosure of inconsistent information. *Doshi*, 823 F.3d at 1042. Here, there is almost the exact same timeframe. GC allegedly issued a false statement in its May 6, 2014, disclosure since it contained the same SOX certifications. However, it revealed on August 1, 2014, that it had reported potential violations in Angola to the SEC and DOJ. (Doc. 69 ¶¶ 163-64, 213). This is an 87-day gap, which is one day longer than what the Sixth Circuit rejected in *Doshi*. For this reason, this does not weigh in favor of scienter.

The fourth factor—evidence of bribery by a top official—does not clearly weigh in favor of scienter, either. The widespread bribery in this instance constituted the actual FCPA violations. Plaintiff does not explain how this also weighs in favor of scienter in that GC was acting to defraud the public. The fifth factor, ancillary fraud lawsuits and the company's quick settlement, likewise does not weigh in favor of scienter. Plaintiff argues that this factor is satisfied through GC's settlements with the DOJ and the SEC. (Doc. 101 at 47). It is technically true that this factor considers settlements entered into by the defendant. However, to say that GC's settlement is like the settlements encompassed by this factor is an untenable proposition. GC self-reported results of its internal investigations to the SEC and DOJ, and received credit for fully cooperating with the three-year investigation that it brought upon itself through its self-reporting. (*See* Doc. 69 ¶¶ 170, 173; Doc. 75-12 at 1; Doc. 75-13 at 11). This *Helwig* factor refers to the traditional

lawsuit in which the opposing party initiates the investigation into the corporation's wrongdoing by filing a lawsuit, and the corporation acts quickly to sweep information under the rug before it is known to the public. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 685 (6th Cir. 2005) (describing how Firestone entered into settlements in which the parties agreed to conceal discovery, "damaging documents" were returned to Firestone, and the settlement agreements themselves were sealed). Consequently, this factor does not weigh in favor of scienter.

Therefore, only two *Helwig* factors weigh in favor of scienter, and their strength is undercut by the wide gap that separates what GC knew and what it said. The Court also acknowledges that, while the *Helwig* factors have been used in post-*Tellabs* cases, the Court must heed *Tellabs* instruction "not to scrutinize each allegation in isolation but to assess all the allegations holistically." 551 U.S. at 326; *see also Dougherty*, 905 F.3d at 981 (determining which of the *Helwig* factors were satisfied). Thus, while these factors weigh against finding scienter, the Court will construe the complaint as a whole and consider these factors as part of its overall analysis.

Plaintiff also points to the NPA and CDO admissions as evidence of scienter. As explained above, these admissions establish that GC knew its internal controls were inadequate regarding third-party agents. (*See, e.g.*, Doc. 69 ¶ 246). These admissions further establish that GC knew it committed FCPA violations. (*See, e.g.*, *id.* at ¶ 243). But these admissions do not reveal that GC knew it was misleading the public when it made a statement regarding its entire financial reporting status and certain SOX certifications. The NPA and CDO reference internal accounting control deficiencies, but they, again, do not contain any admission covering GC's financial reporting and controls overall. Hence, what is revealed in the NPA and CDO is only a small part of the statement GC made to its investors.

Plaintiff also relies on confidential witnesses to establish that GC knew of "several incidents that raised 'red flags' regarding the lack of internal controls . . . at the Company's overseas subsidiaries." (Doc. 69 ¶ 260). But these alleged "red flags" are simply CW 2's accounts that certain foreign subsidiaries did not willingly cooperate with Internal Auditors. While the Defendants argue that the confidential witness accounts should be discounted for various reasons, the Court need not decide what weight to give this

account since it is altogether irrelevant regarding GC's statement for its overall financial internal control mechanisms. That particular foreign subsidiaries did not enjoy working with Internal Auditors, or even that they actively sought to conceal activities from them, does not make this statement fraudulent.

Plaintiff argues that, because GC's overseas operations were part of GC's core operations, it is reasonable to believe GC was aware of these issues when it made the above statements. (Doc. 101 at 45-46). Plaintiff is correct that courts have found statements regarding a company's core operations to be more indicative of scienter. *See In re Huffy Corp., Sec. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008). Assuming that GC derived the majority of its revenue from its overseas operations, *see* Doc. 69 ¶ 60, the Court is still unpersuaded that this means that GC acted to defraud when it made these statements. The inquiry is the same: whether GC had scienter when it made a generalized statement for its financial reporting overall while knowing a very specific issue related only to FCPA compliance. The fact that GC relied heavily upon its overseas operations still does not establish that, first, GC actually knew these statements were false because of an FCPA-related issue, and, secondly, that it was acting with scienter.

Because we must employ a holistic analysis, the Court also considers the fact that GC repurchased its own stock during the Class Period when the stock prices were allegedly inflated. (*See, e.g.*, Doc. 75-7 at 24). Other courts have found that this "undermines any inference of scienter." *I.B.E.W. v. Limited Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011); *see also Beaver Cty. Retirement Bd. v. LCA-Vision Inc.*, No. 1:07-CV-750, 2009 WL 806714, at *24 (S.D. Ohio Mar. 25, 2009) (finding that the Company's decision to repurchase its stock, when viewed in conjunction with other factors, weighed against scienter). The Court joins these other courts and finds that this weighs against scienter as to GC.

To summarize, GC knew that a very specific facet of its internal controls had failed and was inadequate. GC knew that it did not have controls that provided a sufficient framework for dealing with third-parties in the identified subsidiaries and GC knew that this allowed it to violate the FCPA in particular countries. But this does not mean that GC knew its overall internal controls over financial reporting were not effective, nor does it mean that GC knew its SOX certifications—which do not specifically relate to the FCPA—were false. Moreover, none of these facts alleged establish that GC acted with scienter when

27

issuing these statements, even when viewed collectively. The facts do not change the nature of what was said—that, generally, GC believed its financial controls were effective and designed to ensure material information was reported.

Further, as mandated by *Tellabs*, the Court must consider other plausible inferences. *Tellabs Inc.*, 551 U.S. at 314. The most plausible inference is a reiteration of the same principle echoed throughout this section: when GC made assurances regarding its financial reporting internal controls overall, it did not believe it was speaking falsely, nor was it acting to deceive the public. Further, while GC mentioned the FCPA in its "Risk Factors" section, these statements appeared in other sections of GC's SEC filings and Plaintiff has not alleged that these sections referenced the FCPA. Consequently, it is entirely plausible that, when GC made statements regarding its overall financial reporting system, it believed them to be sound despite a specific FCPA-related issue. For these reasons, Plaintiff fails to adequately plead scienter and his § 10(b) claim against GC fail.

### g. Plaintiff also fails to adequately plead that Robinson and Kenny acted with the requisite scienter.

Plaintiff's § 10(b) claim is also brought against the Individual Defendants, Robinson and Kenny. (Doc. 69 ¶ 300). Each has challenged this claim on similar bases as GC. The Court finds that Plaintiff failed to adequately allege that either Robinson and Kenny acted with scienter, and his claims against them likewise fail.

Plaintiff includes several allegations regarding Robinson and what he supposedly knew that contradicted GC's statements described above. The most damning piece of evidence against Robinson is his receipt of the 2012 Internal Audit report regarding the issues in Angola. Plaintiff alleges that Robinson received a copy of the official audit report that identified potentially illegal payments that were being made to an agent in Angola. (*Id.* ¶ 156). The SEC commented on potential aspects of this Internal Audit and noted that, thereafter, GC "failed to implement any additional internal accounting controls in response to the internal audit report until at least eight months after General Cable issued the audit report, in August 2013."

(*Id.* ¶ 158). It is reasonable to infer based on the SEC-provided information, then, that it related to internal control deficiencies.

While Robinson argues that his receipt of this Internal Audit does not actually mean he "reviewed the 2012 report, let alone that he would have understood it meant that bribery was taking place if he had read it," the Court accepts as true that Robinson was required to sign off on all audit reports and presume that Robinson read it prior to signing off on it. (*Compare* Doc. 77 at 11, *with* Doc. 69 ¶ 156). Thus, by December of 2012, Robinson was allegedly aware that there were issues with GC's internal controls in Angola that allowed these violations to occur. Plaintiff relies on several confidential witness accounts, as well, in establishing that Robinson was aware of issues. Many of these statements regard GC's FCPA-compliance program in general,[9] though, and are not related to issues regarding the internal controls.

Plaintiff does allege one specific confidential witness encounter that allegedly "raised 'red flags' regarding the sufficiency of General Cable's internal controls and compliance program" at GC's overseas subsidiaries. (Doc. 69 ¶ 149). CW 2 recounted that GC's ROW subsidiaries were difficult to work with and described internal documentation that revealed these subsidiaries did not want to cooperate with Internal Auditors. (*Id.* ¶¶ 149, 151-52). This account is problematic for two reasons. The first is that it is hard to see how this clearly should have informed Robinson that his statement regarding the internal controls for GC's

---

[9] While the Court holds that GC's statements regarding the FCPA program in general are not actionable, these confidential witness accounts would not create liability for Robinson anyway. "While courts often discount information provided by anonymous sources, plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Doshi*, 823 F.3d at 1037 n.2. Here, while Plaintiff introduces several confidential witnesses, the most relevant are CW 1 and CW 2 and they are described with particularity because their positions and responsibilities are sufficiently detailed to ensure that they possess the information they profess to have. *See id.* However, much of what these witnesses describe is largely unhelpful for Plaintiff at this stage for two reasons. The first is that the only actionable statement refers to GC's internal controls over financial reporting and these witness's account are largely related to other inefficiencies and flaws of the FCPA-compliance program in general, and do not reveal that Robinson knew about issues related to the internal controls specifically. Second, what these witnesses reveal regarding even the FCPA program in general is largely unhelpful since "[c]onfidential sources cannot be used to merely parrot conclusory allegations contained in the complaint, but [they] may assist securities fraud plaintiffs so long as they are not vague and conclusory." *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at * 5 (M.D. Tenn. April 19, 2018). Thus, CW 1's accounts that CW 1 "routinely communicated CW 1's concerns with respect to the Company's FCPA compliance to Robinson;" Robinson gave a "nonresponse" when CW 1 expressed concerns; and that Robinson was "not receptive" when CW 1 "raised the need for additional resources and a formalized FCPA compliance program" are largely unhelpful since they are conclusory and vague. (Doc. 69 ¶¶ 93, 95, 96).

overall financial reporting system was false or misleading. Second, while CW 2 allegedly told Robinson about these incidents, Plaintiff does not allege specifically *when* CW 2 spoke to Robinson about this. This is an important omission because it does not establish that, when Robinson spoke, he knew what he said was false or misleading. *See Omnicare*, 769 F.3d at 483.

Plaintiff also points to statements made by Robinson because these statements pertain to "[his] close oversight and knowledge of the Company's internal controls" and this contributes to a finding of scienter. (Doc. 101 at 43). Plaintiff includes Robinson's statements that the "management team," and Robinson specifically, owned the issue of internal controls and had "shrunk the decision-making of the company and the flow of information" to make sure that management was aware of what was happening in GC's operations. (*Id.*) (alterations omitted). None of this pleads with particularity what the "flow of information" revealed to Robinson, though, or what he actually knew. Similar statements have been rejected for failing to plead with particularity. *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (holding that an individual's boast that "there is nothing in this company that I don't know" was insufficient to support a strong inference of scienter); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006) (rejecting plaintiff's allegations that the individual defendant's statement that he was "knowledgeable" of the company and "responsible" for its financial statements as too broad and conclusory to establish scienter). Robinson's general statements are likewise insufficient to establish scienter. Thus, while there are specific allegations regarding Robinson in the Amended Complaint, they fail to establish Robinson knew what he certified was false.

While Plaintiff regularly alleges what GC and Robinson knew in the Amended Complaint, the same is not true as to Individual Defendant, Kenny. The most that Plaintiff alleges about Kenny is that CW 1 believed Kenny relied on Robinson for compliance issues and that Kenny and Robinson both had a "head in the sand" attitude. (Doc. 69 ¶¶ 92, 96). As explained above, the PSLRA imposes exacting pleading requirements on plaintiffs that require them to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). These two allegations wholly fail to meet that standard.

Despite Plaintiff's contentions, Kenny is named seemingly on the sole basis of his position. Plaintiff alleges that Kenny had access to material non-public information and he therefore knew that the company had omitted material information or that its representations were false. (Doc. 69 ¶ 33). But Sixth Circuit law is clear: "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information. Without more, Plaintiffs fail to meet the PSLRA requirement to state with particularity facts giving rise to a strong inference of scienter." *PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 432 (6th Cir. 2004). The most concrete allegation as to Robinson—the 2012 Internal Audit report—is not connected to Kenny in any way. Plaintiff offers no allegations that Kenny ever received the report, let alone read it and understood there were issues with the Angolan internal controls. Thus, even where Plaintiff's allegations are strongest, they are unconnected to Kenny.

Plaintiff attempts other routes to establish the scienter of both Individual Defendants, but they likewise fail. Plaintiff asserts that the SOX certifications are indicative of scienter, but this is a high bar for plaintiffs to clear. There must be facts that a defendant was severely reckless in signing the SOX certifications before this counts for scienter. *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011). Here, while Plaintiff relies upon the SOX certifications as being a false or misleading statement, he has not alleged facts that either defendant was severely reckless when they signed them.

Plaintiff also argues that the "sheer magnitude of the FCPA compliance issues facing the Company during the Individual Defendants' tenure strongly supports an inference" of scienter. (Doc. 101 at 44). When courts have reviewed whether a violation was substantial enough to indicate knowledge, they have consistently found that the violations must be so "great in magnitude[] that they should have been obvious to a defendant." *Cardinal Health*, 426 F. Supp. 2d at 719-20 (internal quotations omitted). For the years 2008 through 2012, GC's annual gross profit never fell below $500 million. (Doc. 75-7). Lead Plaintiff insists that $13 million—which was paid out over 12 years—was significant enough to a company of this size to inevitably be discovered. (Doc. 101 at 44).

Breaking down these payments reveals how nominal they are considering the amount of money consistently passing through GC: in Angola specifically, $450,000 was paid between 2003 and 2009, then $8.7 million between 2009 and 2013. (Doc. 75-12 at A-3 - A-4). Despite Plaintiff's assertion, it certainly does not "strain credulity" that the Individual Defendants' were unaware of these payments. The cases that Plaintiff relies upon further reveal how these FCPA issues failed to reach such a degree that Kenny and Robinson must have been aware of it. *Cardinal Health*, 426 F. Supp. 2d at 721 (the defendant manipulated an accounting rule for four years to create inflated Operating Revenues of approximately $26 billion); *In re Am. Apparel, Inc. Shareholder Litig.*, No. CV 10-06352 MMM (JCGx), 2013 WL 174119, at * 22 (C.D. Cal. Jan. 16, 2013) (finding that the magnitude of the violation supported scienter because the corporate defendant lost more than one third of its work force at its primary facility and more than 1,900 of its employees were using alien registration numbers that did not allow them to work in the U.S., among other issues). GC's violations are not of similar magnitude.

Further, while Plaintiff relies on Kenny's and Robinson's background as support for the contention that they should have been aware of corruption issues, this still fails to state with particularity actual facts that Kenny and Robinson acted with scienter. Perhaps Kenny and Robinson should have known about and been concerned with issues before they acted. But, as Plaintiff alleges, GC had been operating in highly corrupt countries for several years and it had not uncovered any FCPA violations prior to 2011. (Doc. 69 ¶¶ 35, 36, 94). Upon Robinson's receipt of the 2012 Internal Audit report, it was not fraudulent for him to continue believing that the internal controls overall were still effective. Even if CWs 1 and 2 regularly reported issues to him, these accounts do not establish with any certainty that Robinson did not believe what he certified to be true. The same is even more true of Kenny. Kenny cannot be held responsible for making false statements if there are no facts that reveal he knew, or even suspected, the situation was different than what he assured investors in these filings. No confidential witness recounted any conversations with Kenny, nor were these FCPA issues so pervasive, obvious, or extensive such that he must have known about them prior to his disclosures.

GC has admitted that it committed FCPA violations in several countries that allowed it to incur substantial profits. GC has also paid for those violations through disgorgements of millions in profits. While GC's disclosures regarding its FCPA violations hurt investors' share prices, that does not necessarily mean that GC acted to deceive its investors through statements it made. The reasons for that are explained at length above. For these reasons, Plaintiff's § 10(b) claim against all defendants is dismissed.

**3. Plaintiff's controlling persons claims against Kenny and Robinson are also dismissed.**

Plaintiff also brought a controlling persons claim under § 20(a) against both Kenny and Robinson. (Doc. 69 ¶ 311). A § 20(a) control persons claim is derivative of a plaintiff's § 10(b) claim. *Dougherty*, 905 F.3d at 984. "Because [Plaintiff's] complaint alleges no primary violation of the securities laws, its § 20(a) control-person claim[]" is dismissed as well. *Doshi*, 823 F.3d at 1045.

<em>Conclusion</em>

Therefore, having reviewed this matter, and the Court being otherwise advised, **IT IS ORDERED** that

(1) Defendants' Motions to Dismiss (Docs. 75, 76, 77) be, and are hereby, **granted** as to Plaintiff's § 10(b) claim.

(2) A separate judgment shall enter concurrently herewith.

This 30th day of April, 2019.



**Signed By:**

**William O. Bertelsman**

**United States District Judge**